IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FIDELITY AND DEPOSIT COMPANY OF MARYLAND, | : : : | No. 21-CV-3576 |
| Plaintiff, | : : : | |
| v. | : : | **JURY TRIAL DEMANDED** |
| MAIN STREET PHASE II, L.P.  and MAIN STREET PHASE III, L.P., | : : : | |
| Defendants. | : | |

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM TO PLAINTIFF'S COMPLAINT**

Defendants Main Street Phase II, L.P. and Main Street Phase III, L.P. ("Main Street"), by and through undersigned counsel, hereby answer Plaintiff's Complaint and assert affirmative defenses and a counterclaim thereto, as follows:

**THE PARTIES**

1.      Admitted in part; denied in part.  It is admitted that Fidelity and Deposit Company of Maryland ("F&D") is the Plaintiff in this action.  After reasonable investigation, Main Street is without sufficient information to admit or deny the truth or falsity of the remaining allegations contained in paragraph 1.

2.      Admitted.

3.      Denied.  Main Street Phase III, LP merged into Main Street Phase II, LP on or about December 20, 2019.

**JURISDICTION AND VENUE**

4.      Admitted.

5.      Admitted.

6.      Denied.

7.      Denied as a conclusion of law.

**BACKGROUND**

8.      Admitted in part; denied in part.  It is denied that the Ashbridge Apartments are located at the Main Street at Exton shopping center.  The remaining allegations are admitted.

9.      Admitted.

10.     Admitted in part; denied in part.  It is admitted that F&D issued Performance Bond No. 9281093 in the original penal sum amount of $31,860,715.00 and that the Performance Bond is attached as Exhibit A to the Complaint.  The penal sum of the Performance Bond subsequently increased to an amount in excess of $48,000,000 as a result of additive Change Orders issued by Owner increasing JMB's scope of work and increasing the Contract Sum.   The remaining allegations are denied.

11.     Denied.  The Performance Bond is a writing which speaks for itself.

12.     Denied.  The Performance Bond is a writing which speaks for itself.

13.     Denied.  The Performance Bond is a writing which speaks for itself.

14.     Admitted.

15.     Admitted.

16.     Admitted.

17.     Admitted in part; denied in part.  It is admitted that F&D began funding Jeffrey M. Brown Associates, LLC ("JMB") in or about July, 2020.  The remaining allegations are denied.

18.     Admitted in part; denied in part.  It is admitted that F&D sent a letter to Main Street dated August 18, 2020.  The remaining allegations are denied, inasmuch as the letter is a writing which speaks for itself.

19.     Admitted.

20.     Admitted in part; denied in part.  It is admitted only that Section II.9 of the Liquidated Damages Settlement Agreement and Dedication of Contract Balance ("Liquidated Damages Agreement") provides, in part, that F&D will advance funds to JMB to fulfill JMB's obligations to Main Street under the Base Work Contract, including all amendments, addenda and exhibits thereto.  The remaining allegations are denied.

21.     Denied.

22.     Admitted in part; denied in part.  It is admitted only that a small handful of residential units were available for lease in September, 2020.  However, even those few residential units available for lease contained defective and non-conforming work and incomplete punchlist items.  The remaining allegations are denied.

23.     Admitted.

24.     Admitted in part; denied in part.  It is admitted that  F&D and JMB agreed to pay Main Street $6 million for liquidated damages assessed through the date of the Liquidated Damages Agreement as follows: (a) Main Street would retain twenty-nine percent (29%) of each pending and future progress payment for a total of $3,596,754.00; and (b) F&D agreed to pay Main Street a lump sum payment of $2,403,246.00 when Final Completion is achieved.  The remaining allegations are denied.

25.     Denied.  Section II.5 of the Liquidated Damages Agreement states, in part, that the Unpaid Balance of Contract, including retainage, was $14,999,042 at the time that the Liquidated Damages Agreement was executed.  The remaining allegations are denied.

26.     Denied.  In Section II.5 of the Liquidated Damages Agreement states that the Unpaid Balance of Contract is calculated as follows:  $48,934,923 (Revised Contract Sum) minus

$34,223,701 (previous payments for payment applications 1 through 26) plus $287,820 (amount held by Main Street). The remaining allegations are denied.

27.     Admitted in part; denied in part. It is admitted only that the Liquidated Damages Agreement states that Main Street is entitled to withhold twenty-nine (29%) of each unpaid and future application for payment, for a total of $3,596,754, as partial payment to Main Street of the Settlement Amount. The remaining allegations are denied.

28.     Denied.

29.     Admitted in part; denied in part. It is admitted only that a portion of Section II.7 of the Liquidated Damages Agreement contains the language quoted in paragraph 29. The remaining allegations are denied.

30.     Admitted in part; denied in part. It is admitted only that the language quoted in paragraph 30 is contained in Section II.10 of the Liquidated Damages Agreement. The remaining allegations are denied.

31.     Admitted in part; denied in part. It is admitted only that the language quoted in paragraph 31 is contained in Section II.8 of the Liquidated Damages Agreement. The remaining allegations are denied.

32.     Denied.

33.     Admitted in part; denied in part. It is admitted that Section II.14 of the Liquidated Damages Agreement states that the parties will meet and confer within thirty (30) days after Final Completion. It is also admitted that the language quoted in paragraph 33 is contained in Section II.14 of the Liquidated Damages Agreement. The remaining allegations are denied.

34.     Admitted in part; denied in part.  It is admitted only that the language quoted in paragraph 34 is contained within Section II.15 of the Liquidated Damages Agreement.  The remaining allegations are denied.

35.     Denied.

36.     Denied.

37.     Denied.

38.     Denied.

39.     Admitted in part; denied in part.  It is admitted only that Main Street has assessed liquidated damages due to JMB's failure to achieve Substantial Completion of any of the Buildings at the Project in accordance with the Liquidated Damages Agreement and Contract Documents. The remaining allegations are denied.

40.     Denied.

41.     Denied.

42.     Denied.

43.     Denied.

44.     Denied.

45.     Denied.  It is denied that any amounts are due or owing to F&D or JMB.  To the contrary, Main Street has suffered significant damages in excess of $10 million as a direct and proximate result of F&D's and JMB's breach of the parties' contracts and breach of warranty.

46.     Admitted in part; denied in part.  It is admitted only that Main Street has not deposited the amount of $7,126,760.00 into an escrow account.  The remaining allegations are denied.

47.     Admitted in part; denied in part.  It is admitted only that Main Street has not deposited the amount of $7,126,760.00 into the Escrow Account.  It is denied that any amounts are due or owing to F&D or JMB.

48.     Denied.

49.     Denied.

50.     Denied.

51.     Denied.

52.     Denied.

53.     Denied.

54.     Denied.

55.     Denied.

**COUNT ONE**
**DECLARATORY JUDGMENT**

56.     Main Street hereby incorporates its answers to paragraphs 1 through 55 of the Complaint as though fully set forth herein at length.

57.     Denied as a conclusion of law.

58.     Denied.

59.     Admitted in part; denied in part.  It is admitted that Main Street, F&D and JMB are required to submit all disputes involving the Construction Contract, the Liquidated Damages Agreement and the Performance Bond to binding arbitration before the American Arbitration Association.  The remaining allegations are denied.

60.     Denied.

61.     Denied.

62.     Denied.

63.     Denied.

64.     Denied.

WHEREFORE, Defendants Main Street Phase II, L.P. and Main Street Phase III, L.P. demand judgment in their favor and against Plaintiff on Count One of the Complaint, together with an award of attorney's fees, costs and such other relief as the Court deems appropriate.

## COUNT TWO
## INJUNCTION

65.     Main Street hereby incorporates its answers to paragraphs 1 through 64 of the Complaint as though fully set forth herein at length.

66.     Admitted in part; denied in part.  It is admitted only that F&D seeks injunctive relief.  The remaining allegations are denied.

67.     Denied.

68.     Denied.

69.     Denied.

70.     Denied.

71.     Denied.

72.     Admitted in part; denied in part.  It is admitted only that Section III.7 of the Liquidated Damages Agreement includes, in part, the language quoted in paragraph 72.   The remaining allegations are denied.

73.     Denied.

74.     Admitted in part; denied in part.  It is admitted only that Section II.8 of the Liquidated Damages Agreement includes, in part, the language quoted in paragraph 74.  The remaining allegations are denied.

75.     Denied.

76.     Denied.

WHEREFORE, Defendants Main Street Phase II, L.P. and Main Street Phase III, L.P. demand judgment in their favor and against Plaintiff on Count Two of the Complaint, together with an award of attorney's fees, costs and such other relief as the Court deems appropriate.

## COUNT THREE
## SPECIFIC PERFORMANCE

77.     Main Street hereby incorporates its answers to paragraphs 1 through 76 of the Complaint as though fully set forth herein at length.

78.     Denied.

79.     Denied.

80.     Denied.

81.     Denied.

82.     Denied.

WHEREFORE, Defendants Main Street Phase II, L.P. and Main Street Phase III, L.P. demand judgment in their favor and against Plaintiff on Count Two of the Complaint, together with an award of attorney's fees, costs and such other relief as the Court deems appropriate.


## AFFIRMATIVE DEFENSES

By way of further and additional defense to Plaintiff's Complaint, Main Street asserts the following affirmative defenses:

1.     The Complaint fails to state a claim upon which relief can be granted.

2.     Plaintiff's claims are barred in whole or in part by the doctrine of unjust enrichment.

3.     Plaintiff's claims are barred in whole or in part by the doctrines of release, estoppel and waiver.

4.      To the extent Plaintiff suffered any of the alleged harm or damages, the existence of which is expressly denied, said harm/damages were caused solely by the acts and/or omissions of Plaintiff, JMB and/or Beacon Consulting.

5.      To the extent Plaintiff suffered any of the alleged harm or damages, the existence of which is expressly denied, said harm/damages were caused in whole or in part by individuals and/or entities over whom Main Street had no control, right of control or responsibility.

6.      Plaintiff's claims are barred and/or limited by Plaintiff's failure to mitigate its alleged harm and alleged damages.

7.      Plaintiff's claims are barred under the doctrine of unclean hands.

8.      Plaintiff's claims are barred under the doctrine of contributory negligence.

9.      Plaintiff's claims are barred under the doctrines of res judicata and collateral estoppel.

10.     Plaintiff's claims are barred by the failure to satisfy mandatory conditions precedent to Main Street's performance, including but not limited to, JMB's failure to achieve Substantial Completion and/or Final Completion of the Project.

11.     Plaintiff's claims are barred by Plaintiff's material breach of the Construction Contract, the Performance Bond and the Liquidated Damages Agreement and by Plaintiff's bad faith conduct in performing its obligations under the aforesaid agreements.

12.     Plaintiff's claims are barred by JMB's material breach of the Construction Contract and the Liquidated Damages Agreement, and by JMB's bad faith conduct in performing its obligations under the aforesaid agreements.

13.     Plaintiff's claims are barred and/or limited by the terms of the Liquidated Damages Agreement, the Performance Bond and/or the Construction Contract.

14.     Main Street performed each and every duty, if any, whether contractual or otherwise, owed to Plaintiff.

15.     The Court lacks subject matter jurisdiction over this dispute because JMB is a necessary and indispensable party, joinder of which would destroy diversity of citizenship.

16.     Defendants reserve the right to raise any and all affirmative defenses which may become apparent during the course of this action.

WHEREFORE, Defendants Main Street Phase II, L.P. and Main Street Phase III, L.P. demand judgment in their favor and against Plaintiff on all Counts of the Complaint, together with an award of attorney's fees, costs and such other relief as the Court deems appropriate.

## COUNTERCLAIM

Main Street hereby asserts the below Counterclaim against F&D pursuant to Fed.R.Civ.P. 13, and states as follows:

1.     Main Street hereby incorporates by reference the above paragraphs as though fully set forth herein at length.

2.     This Court has jurisdiction over Main Street's Counterclaim against F&D pursuant to 28 U.S.C. §1332 (a)(1), inasmuch as: (a) Main Street and F&D are citizens of different states; and (b) the matter in controversy in the Counterclaim exceeds the sum of $75,000.00, exclusive of interest and costs.

3.     Venue is proper in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1391(a)(1) and (c) because the events and/or omissions giving rise to Main Street's Counterclaim against F&D occurred in the Eastern District of Pennsylvania.

**The Construction Contract**

4.     Main Street is the owner of a mixed residential and commercial development in West Whiteland Township, Chester County, Pennsylvania.

5.     The residential portion,  known as Ashbridge, is a luxury residential community consisting of six three to four story apartment buildings with amenities such as a pool, fully equipped gym, dog park and historic mansion (the "**Project**").

6.     On or about September 17, 2018, Main Street and JMB entered into a Base Work Contract (the Base Work Contract, Addenda, Project Plans, Specification and Contract Documents are hereinafter referred to as the "**Construction Contract**").  A true and correct copy of the Construction Contract (without Exhibits, Project Plans, Specifications and other Contract Documents) is attached hereto, incorporated herein and marked as **Exhibit A**.

7.     Under the Construction Contract,  JMB agreed to perform certain Work for the construction of three luxury apartment buildings, Buildings A, B and C, as detailed in the Contract Documents, on the Project for the Original Contract Sum of $31,860,715.00.

8.     On or about April 30, 2019, Main Street and JMB agreed to add the construction of three additional residential buildings, Buildings D, E and F, to the scope of JMB's work under the Construction Contract for the additional sum of $13,245,246.00.  A true and correct copy of Change Order No. 002 (without exhibits) is attached hereto, incorporated herein and marked as **Exhibit B**.

9.     The Construction Contract and Change Order No. 002 contain dates for the completion of various Critical Path Items, including dates for the completion of each Building. Construction Contract, Addendum § 3.1 and Change Order No. 002, §3.1.

11

10.     JMB agreed that Buildings A, B and C would be one-hundred percent complete, with completed punch lists and certificates of occupancy by the following dates:  Building A–March 16, 2020; Building B – March 16, 2020; and Building C – April 1, 2020.   *See e.g.* Construction Contract, Addendum §3.1.

11.     JMB also agreed that Buildings D, E and F would be one-hundred percent complete, with completed punch lists and certificates of occupancy by the following dates:  Building D – March 25, 2020; Building E – April 20, 2020; and Building F – May 18, 2020.  *See e.g.* Change Order No. 002, §3.1.

12.     Main Street and JMB agreed that time was of the essence and that it would be difficult to ascertain and impractical to fix the actual damages suffered by Owner as a result of JMB's failure to timely complete the Work.  Construction Contract, Addendum §3.1.

13.     As a result, Main Street and JMB agreed that liquidated damages would be fair and reasonable compensation to Owner for JMB's default of the Critical Path deadlines.  Construction Contract §3.1.

14.     The Construction Contract requires JMB to perform the Work in accordance with the Contract Documents which include, but are not limited to, the Project Plans, Specifications, Project Manual and Submittals approved by the Project Architect ("**Contract Documents**"). *See e.g.* Construction Contract §3.2.3.

15.     The Construction Contract requires JMB to promptly correct Work which fails to conform to the requirements of the Contract Documents and to bear the cost to correct defective and non-conforming Work, including but not limited to, the cost of additional testing and inspections and compensation for the Architect's and other professionals' services and expenses made necessary thereby.  Construction Contract §12.2.1.

16.     The Construction Contract authorizes Main Street to withhold Contract funds to protect itself from loss due to, *inter alia*, JMB's defective work, JMB's failure to perform Work in accordance with the Contract Documents, JMB's failure to complete its Work by the Critical Path Deadlines, and for any claims which Owner may have against JMB under or in connection with the Contract.  Construction Contract, §§9.5.1 – 9.5.8, 9.6.1.

### F&D's Performance And Payment Bonds

17.     On or about October 1, 2018, JMB, as principal, and F&D, as surety, for a valuable consideration, executed and delivered to Main Street, as obligee, a performance bond with an original penal sum of $31,860,715.00 to guarantee the furnishing by JMB of all labor and materials required under the Construction Contract ("**Performance Bond**").   A true and correct copy of the Performance Bond is attached hereto, incorporated herein and marked as **Exhibit C**.

18.     F&D waived notice of any changes to the Construction Contract or to related subcontracts, purchase orders and other obligations.  Performance Bond, §10.

19.     F&D agreed that the penal sum of the Performance Bond shall be automatically increased in the amount of any additive Change Orders and Construction Change Directives. Performance Bond, §16.5.

20.     During the Project, the penal sum of the Performance Bond increased to an amount in excess of $48,000,000 as a result of additive Change Orders issued by Owner increasing JMB's scope of work and increasing the Contract Sum.

21.     The Performance Bond guarantees that: "[t]he Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the Performance of the Construction Contract, which is incorporated herein by reference".  Performance Bond, §1.

13

22.     F&D is obligated under the Performance Bond for:

      a.     the responsibilities of the Contractor for correction of defective/non-conforming work and completion of the Construction Contract;

      b.     additional legal, design professional, professional services and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety; and

      c.     liquidated damages due and owing to the Owner under the Construction Contract.

Performance Bond, §7.

23.     On October 1, 2018, F&D also issued Payment Bond No. 9281093 in the original amount of $31,860,715.00.   The Payment Bond states that F&D and JMB will be jointly and severally liable to Owner for labor, materials and equipment furnished in connection with JMB's performance of the Construction Contract.  Payment Bond, §1.

### JMB's Initial Default Of The Construction Contract

24.     Main Street issued a Notice to Proceed to JMB on September 28, 2018 to begin Work on the Project.

25.      Between September 2018 and early 2020 Main Street paid JMB in excess of $30 million for labor and materials supplied by JMB on the Project.

26.      However, in 2020, it became clear that JMB was in default of many provisions of the Construction Contract.

27.     JMB had not completed any of the six residential buildings by the Critical Path Deadlines contained in the Construction Contract or in Change Order No. 2.

28.      Significant portions of JMB's Work was defective/non-conforming and JMB was refusing to correct the defective/non-conforming Work despite notices from Main Street.

29.      JMB also failed to pay some of its subcontractors and suppliers, who were threatening to file mechanic's liens against the Project.

30.     As a result, on June 25, 2020, Main Street issued a Notice of Default to JMB ("**Notice of Default**").   A true and correct copy of the Notice of Default is attached hereto, incorporated herein and marked as **Exhibit D**.

31.     On the same date, Main Street provided Notice of Contractor Default to F&D and made a demand under the Performance Bond that F&D complete and correct JMB's Work in accordance with the Contract Documents.   A true and correct copy of the Notice of Contractor Default is attached hereto, incorporated herein and marked as **Exhibit E**.

## The Liquidated Damages Agreement

32.     From July, 2020 to November, 2020, Main Street, F&D and JMB  , through counsel, engaged in lengthy negotiations regarding the completion of JMB's Work on the Project, Main Street's liquidated damages, and F&D's obligations under the Performance Bond.

33.     On November 2, 2020, Main Street, F&D and JMB entered into a Liquidated Damages Settlement Agreement and Dedication of Contract Balance ("**Liquidated Damages Agreement**").   A true and correct copy of the Liquidated Damages Agreement (without exhibits) is attached hereto, incorporated herein and marked as **Exhibit F**.

34.     The Liquidated Damages Agreement provides, *inter alia*, that:

a.     JMB will complete the Project and perform all of its obligations under the Construction Contract in accordance with the Contract Documents, Liquidated Damages Agreement, p.1;

b.     F&D will advance funds and provide project management and other assistance to JMB to ensure that JMB timely and fully completes its obligations under the Contract, *id.*, §II.8;

c.     Main Street will receive $6 million in liquidated damages incurred through the date of the Liquidated Damages Agreement as a result of JMB's failure to complete the Project according to the original Critical Path Deadlines contained in the Construction Contract and Change Order No. 002 ("**Stipulated Past LDs**").   The parties agreed that payment of the Stipulated Past LDs would be made through a

pro-rata deduction from each of JMB's progress payments and through a payment from F&D in the amount of $2,403,246.00, *id*, §§II.6, II.7;

d.      JMB will achieve Substantial Completion of Buildings A, B and C by January 10, 2021, and Substantial Completion of the entire Project by April 10, 2021, *id.*, §II.11, §II.12;  and

e.      If JMB fails to achieve Substantial Completion as aforesaid, Main Street will receive additional liquidated damages in the amount of $5,000 per day if Buildings A, B or C are not Substantially Complete by January 10, 2021 and $25,000 per day if the entire Project is not Substantially Complete by April 10, 2021 ("**Additional LDs**"), *id.*, §II.11, §II.12.

35.      In order for JMB's Work to be deemed Substantially Complete, the Construction Contract requires that JMB's Work must be*, inter alia*, (a) completed in accordance with the Contract Documents, including Project plans and specifications; (b) in such a condition that the Project (or relevant phase) is capable of being occupied for its intended purposes without any further work necessary for completion of the same other than normal 'punch list' items which do not unreasonably interfere with use or occupancy; (c) all requirements for Substantial Completion are met; and (d) the remaining Work is minor in nature. Construction Contract, §§ 9.8.1, 9.8.1.1.

36.      Section 9.8.1 of the Construction Contract states:

**The Work will not be considered suitable for Substantial Completion review until all Project systems included in the Work** and which are required for the commencement of occupancy and business operation of tenants **are operational as designed and scheduled**, all designated or required governmental inspections and certifications which are required for the commencement of occupancy and intended use by tenants have been made and posted, designated instruction of Owner's personnel in the operation of system has been completed to the extent required for the commencement of occupancy and use of tenants. In general, **the only remaining Work shall be minor in nature**, so that the Owner or Owner's tenants or other intended occupants could occupy the building on that date and use all areas adjacent thereto, including, without limitation, parking areas, and all such are visually attractive and clean, the use by such tenants or other intended occupants will not be diminished because such Work has not been completed, and the completion of the Work by the Contractor would not interfere or hamper the Owner's or Owner's tenants' (or those claiming by, through or under Owner) intended use. As a further condition of Substantial Completion acceptance, the **Contractor shall certify that all remaining Work will be completed within**

**thirty (30) consecutive calendar days or as agreed upon following the Date of Substantial Completion**.

Construction Contract, § 9.8.1 (emphasis added).

37.    Section 9.8.1.1. of the Construction Contract states:

**The Project (and each phase thereof specified herein for completion as of a specific date) shall be deemed Substantially Completed for purposes of this Contract only when (i) the Architect shall have certified to the Owner and Lender in writing that the Project (or the relevant phase) has been substantially completed in accordance with the Plans and Specifications and other Contract Documents** (as they may have been amended and supplemented with the written approval of the Owner), the Lease Agreement (as defined in Section 14.12) and, as to the performance of the Work, in accordance with all applicable statutes, laws and ordinances, and with the rules, regulations and requirements of all regulatory authorities having jurisdiction, and in conformity with requirements of the applicable department of fire underwriters or comparable body having jurisdiction over the geographic area in which the Project site is situated, or any other body now or hereafter constituted exercising similar functions, that all buildings and improvements are wholly within the building restriction lines (however established), do not encroach upon or overhang any easements, rights-of-way or land of others, and which certificate shall indicate that all buildings and all on-site and off-site (if any) improvements included in the Work (or to the extent included in the relevant phase to be completed), including parking, is in such a condition that the Project (or relevant phase) is capable of being occupied for its intended purposes without any further work necessary for the completion of the same other than normal "punch list" items which do not unreasonably interfere with the usual and customary intended use and occupancy of the Project (or relevant phase); (ii) Contractor shall have performed all Work required under this Contract to permit issuance of certificates of occupancy and such other certificates, permits, approvals, documents, and writings by the authorized governmental departments or agencies, evidencing that the Work (or relevant phase) is in compliance with all applicable statutes, laws, ordinances, rules, regulations or requirements, and allowing occupancy and operation of the Project (or relevant phase) for its intended purposes, and any conditions contained in such certificates and constituting a part of the Work shall have been fulfilled to the extent included in the Work required under this Contract; (iii) Intentionally Omitted; (iv) Intentionally Omitted; (v) **Contractor shall have delivered to Owner all as-built drawings and  specifications, operating manuals, warranties and guarantees required of Contractor under the Contract Documents** (as to the relevant phase, if such determination is made as to a phase); as to any portion of the Work which is to be occupied or utilized primarily by any one tenant of the Project, such Work shall have been accepted by such tenant for fixturing; (vi) the Work shall have been approved by the inspector of each Lender and each Major Tenant, as herein defined.

Construction Contract, §9.8.1.1. (emphasis added).  *See also*, Construction Contract, §9.8.2.

38.     The date on which the last of all of the events set forth in Section 9.8 has occurred is the date of Substantial Completion.  Construction Contract, §8.1.3.

39.     Main Street, F&D and JMB agreed that **time is of the essence** with regard to all dates and time periods set forth in the Liquidated Damages Agreement.  Liquidated Damages Agreement, §III.6.

40.     Particularly important, the Liquidated Damages Agreement did not supplant the Construction Contract, Construction Documents the Performance Bond or the Payment Bond, which remained in full force and effect.

> **Agreements Remain in Effect**:  Other than as modified herein, the Contract, Performance Bond, and Payment Bond remain in full force and effect.  The Indemnity Agreement among Surety, JMB and its individual indemnitors remains in full force and effect.

Liquidated Damages Agreement, §II.18 (emphasis in original).

### JMB's Shoddy, Defective And Non-Conforming Work

41.     In or around July, 2020, F&D began financing JMB and took control over JMB's Work and all of JMB's financial and construction decisions on the Project, both directly and through its on-site representative Beacon Consulting.

42.     However, F&D's involvement did not eliminate Project delays or cause JMB to meet agreed-upon deadlines, nor did it correct JMB's shoddy, defective and non-conforming Work (as highlighted in detail below).

43.     To this day, JMB has failed to fully perform the Work under the Construction Contract, and significant portions of JMB's Work remain defective, non-conforming and in need of repair or replacement.

44.     In fact, new items of defective and non-conforming Work are discovered on an almost weekly basis, including the following.

**A.  The Storm Water System**

45.    The storm drainage system designed for each building consists of primary drains at the roof level and each solid surface balcony to internal conductors which then convey the storm water to an underground storm drainage main beneath the first floor slab.  Non-potable clear water waste from HVAC equipment and water heater drain pans is also discharged to the storm drainage system.

46.    JMB defectively constructed and improperly installed the storm drainage systems within each of the six (6) buildings.

47.    During rain events on August 19, 2021, September 1, 2021 and September 23, 2021, the storm drainage system failed, causing water to overflow into the first floor apartments and common areas in each of the six (6) buildings.

48.    Residents repeatedly complained to Main Street about the water damage to the Property and to their personal property and demanded compensation, relocation and termination of their leases.

49.    Main Street's initial investigation revealed that JMB failed to install trap guards in all floor drains and in funnel floor drains, although required by the Project plans and specifications. The lack of trap guards is believed to be one of the causes of the water overflow.

50.    JMB and F&D refused Main Street's demands to install the trap guards, despite F&D/JMB's contractual obligation to do so.  As a result, Main Street was forced to utilize its own resources to install trap guards in each floor drain to try to stop water from overflowing into the common spaces and apartments in each Building.

51.     In addition to conducting its own investigation, Main Street retained the Project engineer, Advanced Engineering Incorporated ("AEI"), to thoroughly test and investigate the storm water system installed by JMB.

52.     On November 16, 2021, AEI issued a Storm Damage Report, a true and correct copy of which is attached hereto, incorporated herein and marked as **Exhibit G**.

53.     As detailed in the Storm Damage Report, JMB's installation of the storm water system does not comply with the Project plans and specifications, 2009 International Plumbing Code and/or industry standards and is the primary cause for the storm water damage sustained in each of the Buildings.  Storm Damage Report, p. 3.

54.     AEI's investigation revealed that JMB failed to install the specified trap guards in all of the apartments.   AEI's investigation also revealed that the fittings used by JMB to connect apartment equipment closet drains to the underground storm drainage system were not compliant with industry standards, resulting in additional work and modifications to be performed in order to install the trap guards and/or inline backflow devices.  Storm Damage Report, p. 4.

55.     AEI's investigation revealed that JMB installed the pipes at insufficient and negative slopes, preventing water from draining out of the building into the underground storm drainage main and resulting in significant standing water in the pipes.   At the time of AEI's inspection, the amount of standing water ranged from 5-100% (by pipe volume), and many pipes were filled 20-50% with standing water.  Storm Damage Report, pp. 4-7.

56.     Moreover, JMB installed undersized piping, drains, laterals, conductors and storm drainage mains in Buildings A, C, D and F, in contravention of the Project plans and specifications, Pennsylvania's 100-year hourly rainfall rate requirements and the 2009 International Plumbing Code.   Storm Damage Report, pp. 7-8.

57.     In addition, JMB failed to complete the installation of the drainage system.  For example, in Building D lower level residential units, the storm drainage/clear water waste piping was not connected to the site storm water conveyance system resulting in 100% standing water within the piping; entrance canopy storm drain conductor installation was not complete; and, there was open piping within the walls. Storm Damage Report, pp. 8 – 9.

58.     AEI and Main Street also discovered that many other aspects of JMB's storm water system Work was defective/non-conforming, including but not limited to the following: (a) the storm drainage main in Building C was damaged and was filled with rock/debris; (b) the cleanouts to be installed on the horizontal drains were either not installed at all or failed to include watertight plugs/caps which prevent system backflow; (c) rocks, debris and other sediment were present in the underground storm drainage piping in each Building, reducing the flow capacity of the piping; and (d) the mechanical closet drains in the first floor apartments, in which air conditioning and water heaters drain, are concealed within walls and under water heaters and air handling units, making them inaccessible to maintenance personnel.  See Storm Damage Report.

59.     As evidenced by the repeated water infiltration into the Buildings, the storm water system fails at each rain event, repeatedly causing water to overflow into first floor common areas and apartment  units and water to bubble up from janitor sinks and other areas.

60.     The residential units and common areas in each Building have sustained, and continue to experience, significant water infiltration and water damage during rain events as a result of JMB's defective/non-conforming storm drainage systems.

61.     F&D and JMB have wrongfully refused to repair or remediate the multiple system wide defects in the storm water system and Main Street has incurred and will continue to incur

substantial sums to remediate JMB's defective/non-conforming work and to mitigate the significant damage.

62.     Remediation of JMB's defective/non-conforming storm water system will result in significant, additional disruption to tenants.

63.     Main Street has repaired water damage in approximately sixty-two (62) residential units (some multiple times) and in the common hallways, common areas and amenity areas in Buildings A, B, C, D, and E.

64.     Main Street believes, and therefore avers, that required remediation of the storm water system will result in a permanent alteration of the interior and exterior Buildings, potentially decreasing the value of the Project.

**B.  The Electrical System**

65.     JMB and/or its subcontractors installed electrical systems in each of the six buildings which were defective, did not conform to Contract Documents and/or violated electrical code requirements.

66.     Examples of JMB's defective and non-conforming work include, but are not limited to the following:

- Some smoke detectors are not wired to a dedicated circuit;

- Smoke detectors in all residential units are not connected to the central alarm system and do not send supervisory signals to the central fire alarm panel;

- Some ceiling fan boxes in the master bedrooms are not fan rated and the wiring is not properly terminated in the outlet;

- Certain appliances, such as stoves and microwaves, are on the same circuit rather than separate circuits;

- Majority of switches and electrical outlets are not grounded properly;

- Certain of the electrical panels in the residential units contain AFCI breakers with incorrect amperage and incorrect gauge wires; and

- Certain outlets fail to contain GFCI protection.

67.     Main Street made multiple requests to F&D and JMB to correct the defective, non-conforming work, but they have refused.

68.     As a result, Main Street has expended its own resources to investigate and correct JMB's defective/non-conforming electrical system in each of the six buildings to alleviate the life-safety issues created by JMB's work.

**C.  The Windows**

69.     As part of its Work on the Project, JMB furnished and installed approximately 2400 series 3800 and series 3900 vinyl, single hung windows.

70.     The Construction Contract requires JMB to provide a warranty for the windows which complies with the terms of the Contract Documents guaranteeing that the windows are free of material defects and that defective windows and/or defective window components would be replaced and repaired free of charge to Main Street.

71.     JMB represented that the proposed windows complied with the original intent of the Architect, as contained in the Contract Documents, including but not limited to the performance specifications and warranty requirements.

72.      JMB further represented that the windows passed the ASTM E283 test standard, which is the generally accepted air leakage test standard for windows.

73.     JMB's window related representations are false.

74.     Main Street reasonably believed that the representations made by JMB in the window submittal were true and relied upon same in approving the windows for the Project.

23

75.     As detailed in a Vinyl Windows Deficiencies Expert Report ("**Windows Report**") prepared by Marlin Buckley, P.C., a true and correct copy of which is attached hereto, incorporated herein and marked as **Exhibit H**, the windows supplied and installed by JMB are non-conforming and defective for multiple reasons, including but not limited to, the following:

- The windows do not meet ASTM E283 test standards and do not comply with Contract requirements;

- The window warranty does not meet Contract requirements;

- Water is infiltrating through some windows into the units during rain events;

- Despite attempted repairs, some windows have failed thermal glass with broken seals;

- Despite attempted cleaning, some windows have silicone coated glazing creating window fogging; and

- Condensation is forming on the interior of some occupied unit windows leading to mildew/ mold forming.

76.     Tenants are experiencing significant air infiltration, particularly during winter months, and water infiltration during rain events through the windows into the residential units, and despite numerous demands from Main Street, JMB has not properly or permanently repaired or replaced the defective/non-conforming windows.

**D. The Roofs**

77.     For approximately a year, the residents in the top floor units in each of the buildings have been experiencing repeated leaks in their units, which have manifested in many ways, including, but not limited to:

- Ceilings bubbling, puckering, blistering and cracking;

- Water dripping from ceilings, light fixtures, ductwork and down walls;

- Water stains, brown spots and water damage to drywall, floors, carpets and other portions of the residential units; and

24

- Water damage to tenants' personal property and furnishings.

78.      Main Street reported these leaks to JMB and F&D on an almost daily basis and demanded that the cause of the leaks be corrected and that the water damage be fixed. In response, JMB and F&D refused to make adequate roof repairs and misrepresented that the roofs had been inspected and approved by the roof manufacturer.

79.      In October, 2021, Owner learned that JMB and F&D's representations regarding the roof are false.  As evidenced by an October 5, 2021 letter from the roof manufacturer, a true and correct copy of which is attached hereto, incorporated herein and marked as **Exhibit I**, there are numerous areas on the roofs which require repair and serious deficiencies relating to JMB's installation of the roofing systems remain uncorrected.  The roof manufacturer also confirmed that "extensive punchlists" items have not been completed by JMB.

**E.  The Plumbing System**

80.      In addition to water damage and leaks caused by the defective storm water systems and roofs, the plumbing systems were defectively installed, causing constant leaks, water infiltration and water damage throughout the Project.

81.      As of December, 2021, Main Street had documented hundreds of water leaks caused by JMB's defectively installed plumbing systems, which include but are not limited to: water leaking from shower drains, hose bib connections, pipe fittings, HVAC units, drain lines, toilets, dishwashers, bathroom fixtures, showers and plumbing manifolds.

**F.  Other Defects**

82.      JMB's Work in many other areas of the Project does not conform with Contract Documents and has not been corrected at all or has not adequately been corrected by either JMB or F&D.  These include, but are not limited to:

25

- Building A gas meter feeds are not hard piped;

- The elevators are damaged;

- Duplex receptacles are non-conforming;

- Balcony fire sprinklers are non-conforming;

- Floor drains at first floor mechanical closets are not installed in proper locations and are inaccessible;

- Appliances are damaged and are missing components;

- Secondary dryer lint traps are non-conforming resulting in extreme lint build-up behind traps and inside walls; and

- JMB unilaterally substituted materials, including sinks, phone jacks, sprinkler heads, expansion tanks, secondary lint traps and other materials without approval of Main Street or the architect of record.

83.     In addition, JMB installed building systems, and components within those systems, in locations different from the locations required by the Contract Documents.  As a result, Main Street is unable to develop accurate as-built drawings and F&D and JMB refuse to provide Main Street with accurate as-built drawings.

84.     On June 16, 2021, a preliminary Remedial Construction Cost Estimate was issued detailing some of the defective Work performed by JMB discovered by Main Street at that time, including damaged elevator components, non-conforming gas manifold piping, windows with air infiltration, windows with failed thermal glass and silicone coated glazing, elevator damage and defects, non-conforming duplex receptacles, non-conforming balcony fire sprinklers, defective/non-conforming lint traps and many water leaks in multiple locations.  A true and correct copy of the Remedial Construction Cost Estimate is attached hereto, incorporated herein and marked as **Exhibit J**.

**<u>JMB's Failure To Substantially Complete The Project</u>**

85.     Under the Liquidated Damages Agreement, F&D and JMB agreed to substantially complete Buildings A, B and C by January 10, 2021.  Liquidated Damages Agreement, §II.12.

86.     Under the Liquidated Damages Agreement, F&D and JMB agreed to Substantially Complete Buildings D, E and F and the entire Project by April 10, 2021.  Liquidated Damages Agreement, §II.11.

87.     In reliance thereon, Main Street paid millions of dollars of Contract funds to F&D and JMB after the Liquidated Damages Agreement was executed.

88.     As of this date, the Project systems are not operational as designed and scheduled, a substantial amount of JMB's Work on the Project is defective/non-conforming, there remain more than minor punch list items to be completed, and JMB's Work was not completed in accordance with Project Plans and Specifications.  *See* §§9.8.1 and 9.8.2 of the Construction Contract.

89.     As a result of defective and non-conforming Work throughout the Project, JMB has failed to achieve Substantial Completion of any Building and the Project in its entirety.

90.     The Architect of Record denied Substantial Completion certification of Buildings A, B and C on January 22, 2021 and of Buildings D, E and F on April 12, 2021.  True and correct copies of the Architect of Record's letters are attached hereto, incorporated herein and marked as **<u>Exhibit K</u>**.

91.     On June 21, 2021, Main Street issued a Notice to Cure to F&D and JMB pursuant to Sections 2.4, 12.2 and 12.2.4 of the Construction Contract.  A true and correct copy of the Notice to Cure is attached hereto, incorporated herein and marked as **<u>Exhibit L</u>**.

27

92.     Despite repeated demands, F&D and JMB have failed and refused to correct the defective storm water systems, roofs, plumbing,  windows and a myriad of other defective work on the Project.

## Main Street's Damages

93.     In accordance with the Construction Contract and Liquidated Damages Agreement, Main Street withheld Contract funds to repair JMB's defective and non-conforming Work and for the liquidated damages due and owing to Main Street.

94.     Main Street has incurred and expects to incur actual damages, consequential damages,  liquidated damages and other monetary damages in excess of $10 million as a direct and proximate result of F&D's and JMB's breach of contract and breach of warranty.

95. Main Street's incurred and expected damages far exceed the withheld Contract funds.

## A.  Monetary Damages

96.     Defects in JMB's Work are discovered on a weekly, if not daily, basis.  Some of JMB's defective work is latent and not discoverable until events, such as rainstorms, occur.  Some of JMB's defective work is hidden within the walls or under the building slabs, locatable only by opening walls and ceilings or by experts using camera/video technology to view plumbing and other systems.

97.     Due to the complexity of correcting JMB's defective work and the ongoing discovery of JMB's defective work, Main Street does not have a precise or finite list of the defects and/or the required corrective work and cannot fully quantify its damages at this juncture.

98.     The categories of monetary damages which Main Street has incurred, or expects to incur as a result of JMB's defective/non-conforming work and F&D and JMB's breaches of the

Construction Contract, Performance Bond and Liquidated Damages Agreement include, but are not limited to:

- Labor, materials and supervision costs to repair, remediate and/or replace JMB's defective/non-conforming work;
- Residential tenant costs, including but not limited to, rent loss, rent concessions and tenant relocation costs;
- Diminution in value of the Property;
- Engineering, architect and professional fees;
- Investigative and other third-party costs;
- Insurance premiums and other insurance related costs;
- Increased financing costs; and
- Reputational harm.

**B.  Liquidated Damages**

99.     Main Street is entitled to two categories of liquidated damages.

100.    The Construction Contract provided for payment of liquidated damages to Main Street if JMB failed to achieve one-hundred percent completion of Buildings A through E by April 20, 2020 and one-hundred percent completion of Building F by May 18, 2020.  See Construction Contract, §3.1, and Change Order No. 2 – Exhibit B.

101.    JMB did not complete Buildings A through E by April 20, 2020 or Building F by May 18, 2020.

102.    As a result, in the Liquidated Damages Agreement, F&D and JMB agreed to pay Main Street the Stipulated LDs in the amount of $6 million for liquidated damages due and owing to Main Street as of the date of the execution of the Liquidated Damages Agreement:

> **Liquidated Damages Settlement**: For payment to the Owner in the amount of $6,000,000.00 ("Settlement Amount"), as provided for below, the Owner's claim for any and all delay damages against the Surety and JMB through the date of this Agreement is fully and finally settled and released, and any further claim for delay is limited to liquidated damages as provided for in Sections 11 and 12 below.

Liquidated Damages Agreement, §7.

103.     Main Street has received $2,073,024.00 in Stipulated LDs and $3,926,976.00 remain due and owing from F&D and JMB.

104.     The Liquidated Damages Agreement also provides that Main Street is entitled to Additional LDs in the amount of $5,000 per day in the event JMB fails to achieve Substantial Completion of Buildings A, B and C by January 10, 2021 and $25,000 per day in the event JMB fails to achieve Substantial Completion of Buildings D, E and F by April 10, 2021.  Liquidated Damages Agreement, §§11, 12.

105.     As detailed above, JMB has failed to achieve Substantial Completion of any of the Buildings.

106.     Accordingly, Main Street is entitled to the following liquidated damages as of April 30, 2022:

| | |
|---|---|
| Stipulated LDs: | $ 3,926,976.00 |
| Additional LDs: | |
| 1/10/21 – 4/9/21 @ $5,000/day | $    450,000.00 |
| 4/10/21 – 4/30/22 @ $25,000/day | $  9,625,000.00 |
| Total Liquidated Damages as of 4/30/22 | $14,001,975.00 |

107.     Main Street is also entitled to Additional LDs at a per diem rate of $25,000 from April 30, 2022 through the date that Buildings A, B, C, D, E and F are Substantially Complete.

**C.  Non-Monetary Damages/Specific Performance**

108.     As detailed below, Main Street is entitled to specific performance by F&D and JMB of their obligations under the Construction Contract and Liquidated Damages Agreement.

109.     Main Street seeks an award compelling F&D to:

a.     provide a roof warranty to Main Street which complies with the Contract Documents, Plans and Specifications;

b,       provide a window warranty to Main Street which complies with the Contract Documents, Plans and Specifications;

c.       provide as-built drawings to Main Street which accurately depict all modifications made to, and deviations from, the Contract Documents, Project Plans and Specifications, including but not limited to changes to dimensions, locations and materials;

d.       provide a warranty bond to Main Street which guarantees the correction of all Work on the Project for a period of twelve (12) months from the date of the award.

## COUNT I
## BREACH OF CONTRACT

110.     Main Street incorporates the above paragraphs as though fully set forth herein at length.

111.     Where there is a surety relationship, an obligee is entitled to performance of a contractual duty by the principal or alternatively, if the principal defaults, by the principal's surety. *Kiski Area School Dist. v.* Mid-*State Surety Corp.*, 600 Pa. 444, 967 A.2d 368 (2008).

112.     The surety stands in the shoes of the principal and must complete any obligation due the obligee at the time of default. *Id.*

113.     In issuing the Performance Bond, F&D guaranteed that JMB would furnish all labor and provide all materials necessary to complete JMB's Work on the Project as required by the Construction Contract. *See* Exhibit C.

114.     As detailed above, JMB is in default of the Construction Contract and the Liquidated Damages Agreement by failing timely to complete its Work under the Construction Contract and Liquidated Damages Agreement, failing to perform Work in accordance with the Contract Documents, and failing to correct its defective and non-conforming Work.

115.    In light of JMB's default, F&D is required under the Performance Bond to, *inter alia*:

    a.    complete JMB's Work under the Construction Contract;

    b.    correct all defective work;

    c.    indemnify Main Street for all costs, damages, losses and expenses caused by JMB's default, including but not limited to Owner's legal fees, costs for professional/design professional services and delay costs; and

    d.    pay Main Street liquidated damages as provided by the Liquidated Damages Agreement.

116.    F&D materially breached the Performance Bond by failing and/or refusing to satisfactorily and timely complete all of JMB's Work under the Construction Contract, by failing to correct all of JMB's defective Work under the Construction Contract, and by failing to indemnify Main Street for all damages incurred as a result of JMB's wrongdoing.

117.    F&D materially breached the Performance Bond by failing and/or refusing to indemnify Owner for Owner's legal, design professional and delay costs.

118.    F&D materially breached the Performance Bond and the Liquidated Damages Agreement by failing and/or refusing to pay Main Street liquidated damages due and owing to Owner as a result of JMB's failure to achieve Substantial Completion of Buildings A, B and C by January 10, 2021 and Buildings D, E and F by April 10, 2021.

119.    F&D had a duty to act in good faith in its performance and enforcement of the Performance Bond and Liquidated Damages Agreement.

120.    F&D acted in bad faith in its performance and enforcement of the Performance Bond and the Liquidated Damages Agreement, by, *inter alia*:

    a.    failing and refusing to complete JMB's Work under Construction Contract in accordance with the Contract Documents;

b.      failing and refusing to correct JMB's defective and non-conforming Work despite numerous notices from Owner;

c.      falsely representing that JMB's Work complied with Contract Documents;

d.      falsely representing that Buildings A, B and C were Substantially Complete on January 10, 2021 and demanding Substantial Completion certification for those Buildings even though F&D knew that JMB had not achieved Substantial Completion of that Work;

e.      falsely representing that Buildings D, E and F and the Project in its entirety were Substantially Complete on April 10, 2021, and demanding Substantial Completion certification for that Work, even though F&D knew that JMB had not achieved Substantial Completion of the Work;

f.      falsely representing that the Project was Finally Complete and demanding Final Completion certification, even though F&D knew that JMB had not achieved Final Completion;

g.      failing and/or refusing to indemnify Owner for Owner's legal fees, costs for professional and design professional services, delay costs and other expenses incurred as a result of JMB's default;  and

h.      failing and/or refusing to pay Owner liquidated damages due and owing to Owner as a result of JMB's failure to achieve Substantial Completion of Buildings A, B and C by January 10, 2021 and Buildings D, E and F by April 10, 2021.

121.    F&D's breach of the implied covenant of good faith and fair dealing constitutes a material breach of the Performance Bond and Liquidated Damages Agreement.

122.    As a direct and proximate result of F&D's breach of the Performance Bond and Liquidated Damages Agreement, Main Street has, and continues to, incur substantial costs, damages and expenses.

123.    As a direct and proximate result of JMB's default, F&D is obligated to pay Main Street liquidated damages in the amounts set forth in the Liquidated Damages Agreement.

124.    F&D elected to finance JMB's performance of the Contract and to take over and complete JMB's work under the Contract, and F&D  violated  its implied duty of good faith and fair dealing to Main Street.

125.    As a result, F&D is liable to Main Street for the full amount of Main Street's damages, which liability is not limited by the penal sum of the Performance Bond.

WHEREFORE, Main Street Phase II, L.P. and Main Street Phase II, L.P.  demand judgment in their favor and against Fidelity and Deposit Company of Maryland for breach of contract, together with an award of monetary damages, attorney's fees, costs and such other relief as the Court deems appropriate.

**COUNT II**
**SPECIFIC PERFORMANCE**

126.    Main Street incorporates the above paragraphs as though fully set forth herein at length.

127.    Under the Liquidated Damages Agreement, F&D and JMB were required to complete the Project and JMB's obligations under the Construction Contract.  Exhibit F, p. 1.

128.    In Section III.7. of the Liquidated Damages Agreement, the parties agreed that specific performance of their obligations under the Liquidated Damages Agreement and Construction Contract may be compelled:

> The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to **specific performance** of the terms hereof, in addition to any other remedy at law or in equity.

Liquidated Damages Agr.,  §III.7 (emphasis added).

129.    F&D and JMB are required under the Construction Contract to provide to Main Street a window warranty and a roof warranty which comply with the Contract Documents, Plans and Specifications.

130.    F&D and JMB failed and refused to produce a window warranty or a roof warranty which complies with the Contract Documents, Plans and Specifications.

131.    Main Street will be irreparably injured if F&D and JMB do not provide a roof warranty and window warranty which comply with the Contract Documents and monetary damages cannot fully compensate Main Street for such injury.

132.    F&D and JMB are required under the Construction Contract to provide as-built drawings which accurately depict all modifications made to, and deviations from, the Contract Documents, Project Plans and Specifications, including but not limited to changes to dimensions, locations and materials.

133.    F&D and JMB have failed and refused to provide as-built drawings which accurately depict all modifications made to, and deviations from, the Contract Documents, Project Plans and Specifications.

134.    Main Street will be irreparably injured if F&D and JMB do not provide accurate as-built drawings and monetary damages cannot fully compensate Main Street for such injury.

135.    JMB expressly warranted to Main Street that all materials and equipment furnished under the Contract will be of good quality and that JMB's Work will be free from defects and will conform with the requirements of the Contract Documents.  Construction Contract, §3.5.1.

136.    JMB's aforesaid express warranty runs for one (1) year following the date of Final Completion of all of JMB's Work on the Project.  *Id.*

137.    Upon information and belief, JMB does not have the financial wherewithal to perform its warranty obligations under the Construction Contract.

138.    Main Street will be irreparably injured unless F&D provides a one (1) year warranty bond which protects Main Street against JMB's defective work, equipment and materials.

139.    For the foregoing reasons, F&D should be compelled to provide Main Street with conforming/compliant roof and windows warranties, accurate as-built drawings and a one (1) year warranty bond on JMB's Work, materials and equipment.

WHEREFORE, Main Street Phase II, L.P. and Main Street Phase II, L.P. demand judgment in their favor and against Fidelity and Deposit Company of Maryland for specific performance and an order compelling Fidelity and Deposit Company of Maryland to provide Contract compliant roof and window warranties, accurate as-built drawings and a one (1) year warranty bond on JMB's Work, materials and equipment.

KAPLIN STEWART

/s/  Sandhya M. Feltes
Marc B. Kaplin, Esquire
Sandhya M. Feltes, Esquire
910 Harvest Drive
Blue Bell, PA 19422
(610) 941-2561
(610) 684-2011 facsimile
mkaplin@kaplaw.com
sfeltes@kaplaw.com

Steven M. Coren, Esquire
KAUFMAN, COREN & RESS, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA  19103
(215) 735-8700
(215) 735-5170 facsimile
scoren@kcr-law.com

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FIDELITY AND DEPOSIT COMPANY     :
OF MARYLAND,     :
    : No. 21-CV-3576
    Plaintiff,     :
    :
    v.     :
    :
MAIN STREET PHASE II, L.P. and     :
MAIN STREET PHASE III, L.P.,     :
    Defendants.     :

## CERTIFICATE OF SERVICE

I, Sandhya M. Feltes, Esquire, do hereby certify that on May 4, 2022, a true and correct copy of Defendants' Answer, Affirmative Defenses and Counterclaim was served on the following via ECF Electronic Notification:

Noah H. Charlson, Esq.
Charlson Braber McCabe & Denmark, P.C.
1628 JFK Blvd., suite 1803
Philadelphia, PA 19103

Christopher J. Brasco, Esquire
Noah R. Meissner, Esquire
Adam M. Tuckman, Esquire
Watt Tieder Hoffar & Fitzgerald, LLP
1765 Greensboro Station Place, Suite 100
McLean, VA 22102

KAPLIN STEWART

/s/ Sandhya M. Feltes
Marc B. Kaplin, Esquire
Sandhya M. Feltes, Esquire
910 Harvest Drive
Blue Bell, PA 19422
(610) 941-2561
(610) 684-2011 facsimile
sfeltes@kaplaw.com
Attorneys for Defendants