**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

FIDELITY AND DEPOSIT COMPANY    :
OF MARYLAND,         :
              : No. 21-CV-3576
    Plaintiff,       :
              :
              :
    v.         :
              :
MAIN STREET PHASE II, L.P.  and   :
MAIN STREET PHASE III, L.P.,    :
              :
    Defendants.     :

## <u>ORDER</u>

   AND NOW, this   day of     , 2022, upon consideration of Defendants'

Response in Opposition to Plaintiff's Motion to Dismiss Defendants' Counterclaim, or in the

alternative to Compel Arbitration, it is hereby Ordered that Plaintiff's Motion is DENIED.

         BY THE COURT:


         _____

         WENDY BEETLESTONE, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

FIDELITY AND DEPOSIT COMPANY :
OF MARYLAND, :
 : No. 21-CV-3576
   Plaintiff, :
 :
 :
   v. :
 :
MAIN STREET PHASE II, L.P.  and :
MAIN STREET PHASE III, L.P., :
 :
   Defendants. :


**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION TO DISMISS COUNTERCLAIM OR IN THE ALTERNATIVE
<u>TO COMPEL ARBITRATION</u>**

## **TABLE OF CONTENTS**

Table of Contents ................................................................................................ i

Table of Authorities .......................................................................................... ii

I.  INTRODUCTION ....................................................................................1

II.  STATEMENT OF FACTS AND PROCEDURAL HISTORY.........................4

   A.  JMB and F&D Agree to Build The Ashbridge Project According to the
      Contract Documents, Plans and Specifications ...................................... 4

   B.  JMB and F&D Breach the Parties' Agreements by Failing to Substantially
      Complete or Finally Complete the Project.............................................. 7

   C.  Main Street Files an Action in Chester County to Enforce its Rights and
      Recover its Damages............................................................................ 8

   D.  Main Street Files a Demand for Arbitration with the American Arbitration
      Association to Enforce its Rights and Recover its Damages ................ 10

   E.  F&D Institutes this Action .................................................................. 13

III.  ARGUMENT .........................................................................................14

   A.  Fed.R.Civ.P. 13 Requires Litigation of Main Street's Counterclaims in this
      Action.................................................................................................. 15

      1.  Main Street's Counterclaims against F&D are Compulsory
         Counterclaims ........................................................................... 15

      2.  Rule 13(a)(2) Exceptions do not Apply ..................................... 18

      3.  Main Street's Compulsory Counterclaims would be Barred if not
         Asserted in this Action.............................................................. 18

   B.  F&D must be Judicially Estopped from Taking Irreconcilably Inconsistent
      Positions Regarding the Scope of Arbitration which will Deprive Main
      Street of any Forum in which to Litigate its Claims and Recover its
      Damages............................................................................................ 19

IV.  CONCLUSION.......................................................................................24

## TABLE OF AUTHORITIES

Cases

*Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467 (1974) ................................................................ 18

*Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 836 (3d Cir. 2011) ........................................... 15

*Bristol Farmers Market v. Arlen Realty & Devel. Corp.*, 589 F.2d 1214, 1221 (3d Cir.1978).... 18

*Great Lakes Rubber v. Herbert Cooper Co.,* 286 F.2d 631, 634 (3d Cir. 1961) .......................... 16

*Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 109 (3d Cir. 1999) .......................... 19

*Matrix Grp., Inc. v. Ford Motor Credit Co.*, 2004 WL 2742835, at *3
   (E.D. Pa. Nov. 29, 2004) .......................................................................................................... 16

*Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779 (3d Cir. 2001) ........ 19

*New Hampshire v. Maine*, 532 U.S. 742, 749, (2001) ................................................................... 20

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir. 1996) ......... 19

*Westfield Ins. Co. v. Astra Foods Inc.*, 134 A.3d 1045, 1051 (Pa. Super. 2016) ......................... 20

*Xerox Corp. v. SCM Corp.*, 576 F.2d 1057, 1059 (3d Cir. 1978) ................................................. 15

Rules

Fed.R.Civ.P. 13(a) ................................................................................................. 1, 2, 14, 15, 18

7731335v2

Defendants Main Street Phase II, L.P. and Main Street Phase III, L.P. (**"Main Street"**), by and through undersigned counsel, hereby respond in opposition to Plaintiff's Motion to Dismiss Counterclaim or, in the alternative, to Compel Arbitration (**"Motion to Dismiss"**).

## I.   <u>INTRODUCTION</u>

Plaintiff Fidelity and Deposit Company of Maryland's (**"F&D"**) Motion to Dismiss should be denied in its entirety.

F&D argues in its Motion to Dismiss that Main Street's Counterclaims should be dismissed because: (1) Main Street's Counterclaims fall within the scope of Judge Sommer's Order and the parties' contractual arbitration provision; (2) the Court should give full faith and credit to Judge Sommer's Order; and (3) Main Street should be precluded from re-litigating whether its claims fall within the scope of the arbitration provision.

As an initial proposition, Main Street agrees that Judge Sommer's Order is a final Order in which the arbitrability of claims and damages arising from the Construction Contract, Liquidated Damages Agreement and Performance Bond was decided.  Main Street also agrees that Judge Sommer's Order requires adjudication of all claims and damages arising out of the Construction Contract, the Liquidated Damages Agreement and F&D's Performance Bond to be adjudicated through arbitration with the American Arbitration Association (**"AAA"**).  In fact, Main Street instituted the AAA action and asserted its claims against F&D and JMB in arbitration based on Judge Sommer's decision. However, two issues necessitated the filing of Main Street's Counterclaims against F&D.

First, Main Street's Counterclaims against F&D arise from the same transactions and occurrences as F&D's claims and must be asserted in this action as compulsory counterclaims pursuant to Fed.R.Civ.P. 13(a).

In this action, F&D demands that Main Street deposit construction contract balances into an escrow account.  To obtain the relief sought, F&D must first prove that Jeffrey M. Brown Associates, LLC (**"JMB"**) achieved Final Completion of its work under the Construction Contract, namely that JMB achieved Substantial Completion of its work, that JMB completed all of its work in accordance with the Contract Documents, Plans and Specifications, and that there are no defective/non-conforming work items or punchlist items which must be corrected or completed.[1]

Similarly, Main Street's Counterclaims arise from the work performed by JMB under the Construction Contract.  Main Street asserts in its Counterclaims that JMB did not achieve Substantial Completion or Final Completion under the Construction Contract, that JMB's work is defective/non-conforming, and that F&D failed to complete and correct JMB's work as required by F&D's Performance Bond, the Liquidated Damages Agreement and the Construction Contract. Main Street seeks approximately $20 million in actual and liquidated damages resulting from F&D's breaches of the aforesaid contracts.

Because Main Street's Counterclaims against F&D arise from the same transactions as F&D's claims, they must be litigated in this action as compulsory counterclaims under Fed.R.Civ.P. 13(a).

Second, the prosecution of Main Street's Counterclaims in this action is necessary due to irreconcilably inconsistent positions taken by F&D regarding the scope of the arbitration provision which could foreclose Main Street from prosecuting its claims and recovering its damages in full against F&D.

---

[1] Other mandatory conditions precedent to Main Street's duty to deposit funds into an escrow account are: (a) F&D must pay Main Street the full $6 million for liquidated damages assessed prior to the Liquidated Damages Agreement; and (b) there must be remaining contract balances due and owing to JMB/F&D.  None of the conditions precedent have been satified.

F&D argues to this Court that Judge Sommer determined that the parties' contractual arbitration provision is <u>broad</u> and that all of the claims asserted in Main Street's Counterclaims are within the scope of the arbitration provision and must be arbitrated. However, F&D has simultaneously objected to the American Arbitration Association's jurisdiction over Main Street's claims and damages on the grounds that the parties' contractual arbitration provision is <u>narrow</u> and limited to one specific issue.

F&D's contradictory positions are made in bad faith for the purpose of dismissing Main Street's claims in this action under the guise of the arbitration provision, while at the same time attempting to prevent Main Street from pursuing its claims and damages in arbitration.   If Main Street's Counterclaims are dismissed from this action, and F&D is successful in limiting the scope of the arbitration action, Main Street will have **no forum** in which to prosecute all of its claims and recover all of its damages against F&D.   The doctrine of judicial estoppel prohibits the litigation tactics engaged in by F&D.

7731335v2

II.   **STATEMENT OF FACTS AND PROCEDURAL HISTORY**

A.   **JMB and F&D Agree to Build The Ashbridge Project According to the Contract Documents, Plans and Specifications**

On September 17, 2018, Main Street and JMB entered into a Base Work Contract for the construction of three luxury apartment buildings, Buildings A, B and C, and amenities at the Project (the Base Work Contract, Addenda, Project Plans, Specification and Contract Documents are hereinafter referred to as the "**Construction Contract**").   The Construction Contract requires JMB to perform all Work as required by the Project Plans, Specifications and other Contract Documents for the Original Contract Sum of $31,860,715.00.   On or about April 30, 2019, Main Street and JMB entered into Change Order No. 002, which added the construction of three additional luxury apartment buildings, Buildings D, E and F, to the scope of JMB's work under the Construction Contract for the additional sum of $13,245,246.00.   JMB agreed to fully and finally complete all of its work required by the Construction Contract by May 2018.

On October 1, 2018, F&D, as Surety, and JMB, as principal, provided Main Street, as Obligee, with Performance Bond No. 9281093 in the original penal sum of $31,860,715.00 ("**Performance Bond**").   Pursuant to Section 16.5 of the Performance Bond, the penal sum of the Performance Bond automatically increased to an amount in excess of $48 million as a result of approved additive Change Orders, including Change Order No. 002.   The Performance Bond requires F&D to complete or pay for the completion of all of JMB's work in the event that JMB fails to complete its work as required by the Construction Contract.

By June 2020, JMB had not completed any of the six residential buildings and significant portions of JMB's Work were defective/non-conforming.   As a result, on June 25, 2020, Main Street issued a Notice of Default to JMB and a Notice of Contractor Default to F&D.   In its Notices,

Main Street demanded that JMB and F&D correct and complete JMB's Work on the Project as required by the Construction Contract and Performance Bond.

On November 2, 2020, Main Street, JMB and F&D entered into a Liquidated Damages Settlement Agreement and Dedication of Contract Balance ("**Liquidated Damages Agreement**").[2] The Liquidated Damages Agreement was entered into primarily to ensure that JMB's work on the Project would be fully, properly and timely completed, and to ensure that the Main Street would be compensated through liquidated damages for JMB's delayed performance. The Liquidated Damages Agreement provides for payment of $6 million to Main Street for liquidated damages assessed prior to execution of the Agreement due to JMB's failure to complete its work under the original deadlines for Substantial and Final Completion set in the Construction Contract.

Under the Liquidated Damages Agreement, Main Street agreed to extend the deadlines for JMB to achieve Substantial Completion of Buildings A, B and C to January 10, 2021 and Substantial Completion of Buildings D, E and F and the entire Project to April 10, 2021. Agr., §II.11, §II.12. The Liquidated Damages Agreement states that Main Street will receive additional liquidated damages in the amount of $5,000 per day for each day after January 10, 2021 that JMB fails to achieve Substantial Completion of Buildings A, B and C, and $25,000 per day for each day after April 10, 2021 that JMB fails to achieve Substantial Completion of Buildings D, E and F. Agr., §II.11, §II.12.

The parties agreed that the Construction Contract remained in full force and effect. Agr. §II.18. As a result, JMB – and F&D as JMB's surety – are still bound by the requirements of the Construction Contract. *Id.*

---

[2] The Liquidated Damages Agreement is attached hereto, incorporated herein and marked as **Exhibit 1.**

7731335v2

The parties agreed that at the end of the project, after JMB achieved Final Completion and Main Street received the full $6 million past liquidated damages payment from F&D, remaining contract balances, **if any**, would be deposited into an escrow account.   Importantly, the Liquidated Damages Agreement contains two conditions precedent to trigger Main Street's duty to deposit contract balances into an escrow account, if there are any remaining contract balances due and owing to JMB: (1) Final Completion of JMB's work under the Construction Contract and (2) F&D's payment of $2,403,246.00 to Main Street:

> **When Final Completion is achieved**, the Owner will either release the Retainage and any unpaid Contract Balance to the Surety, or a portion thereof **that the Owner determines is due and owing**, and deposit the remaining Retainage amount and unpaid contract Balance, **if any** into an escrow account maintained by a third party escrow agent selected by the parties ("Escrow Account")…**the Surety will simultaneously pay the Owner the sum of $2,403,246.00, in final satisfaction of the $6,000,000.00 Settlement Amount**….

Liquidated Damages Agreement, §II.7 (emphasis added).

Sections 14 and 15 of the Liquidated Damages Agreement addresses the dispute procedure. It states that the parties will submit disputes to arbitration before the American Arbitration Association (**"AAA"**):

> 14.    **Release of Escrow Funds**:  **Within thirty (30) days of Final Completion**, the parties will meet and confer regarding the release of funds deposited into the Escrow Account…**If there is a dispute among the parties as to some or all of the funds deposited in the Escrow Account, the parties will follow the procedure contained in Section 15 below regarding the disputed funds.**

> 15.    **Dispute Procedure**:  If any dispute arises among the Owner, the Surety, and/or JMB with regard to liquidated damages that are assessed and paid into the Escrow Agreement under this Agreement and/or the basis for withholding funds that are paid into the Escrow Account under this Agreement, then the following dispute resolution procedures will apply:

…

> (b)  if the amount in controversy is over $500,000.00, the dispute will be submitted to binding arbitration before a panel of three arbitrators selected by agreement of the Parties and conducted in accordance with the Construction Industry Rules of the American Arbitration Association ("AAA")….

Liquidated Damages Agreement, §II.14, §II.15 (emphasis added to body of §II.14).

### B.   JMB and F&D Breach the Parties' Agreements by Failing to Substantially Complete or Finally Complete the Project

To date, Main Street has paid over $37 million to JMB and F&D.  Despite payment of tens of millions of dollars, and despite the promises made by JMB and F&D in the Construction Contract, the Performance Bond and the Liquidated Damages Agreement, JMB and F&D did not achieve Substantial Completion or Final Completion.  Instead, there are project wide defects in plumbing, roofing, electrical and stormwater systems of the apartment complex which JMB and F&D refuse to correct.

To achieve Substantial Completion, a defined term under the Construction Contract, JMB's work must meet the criteria listed in the Construction Contract, which include, but are not limited to: (a) the work must be completed in accordance with the Contract Documents, including Project plans and specifications; (b) the work must be in such a condition that the Project (or relevant phase) is capable of being occupied for its intended purposes without any further work necessary for completion of the same other than normal 'punch list' items which do not unreasonably interfere with use or occupancy; (c) the work must meet all contract requirements for Substantial Completion; and (d) the work remaining to be performed is **minor in nature**. Construction Contract, §9.8.1, §9.8.1.1 and §9.8.2.

JMB never achieved Substantial Completion of any of the Buildings because, *inter alia*, JMB built and installed building systems such as the plumbing system, storm water system,

electrical system, windows and roof which are defective, do not comply with the contract requirements and specifications and, in some instances, violate applicable governmental and industry codes and regulations. New items of defective and non-conforming work continue to be discovered by Main Street on a weekly, if not daily, basis.

As a result of JMB's incomplete, defective and non-conforming work throughout the project, the Architect of Record denied JMB's requests to certify the buildings as Substantially Complete.

JMB also never achieved Final Completion. In order to achieve Final Completion, and therefore be entitled to final payment under the Construction Contract, JMB must not only achieve Substantial Completion, but JMB must also fully perform all work required by the Construction Contract and correct all nonconforming work. Tellingly, JMB never requested that the Architect of Record certify that JMB achieved Final Completion or issue a Final Certificate of Payment under Article 6 of the Construction Contract.

JMB's defective work has been thoroughly documented by Main Street and by construction experts who have issued detailed reports regarding the defective/non-conforming work. Although JMB and F&D were provided Main Street's documentation and the experts' reports, they refuse to correct the defective and non-conforming work.

Main Street has incurred, and expects to incur, approximately $20 million in actual and liquidated damages caused by JMB's defective, non-conforming, incomplete and untimely work and JMB/F&D refusal to correct and timely complete JMB's work.

**C.     Main Street Files an Action in Chester County to Enforce its Rights and Recover its Damages**

On September 3, 2020, Main Street filed suit against JMB, F&D, United Window & Door Manufacturing, Inc. and 84 Lumber Company in the Court of Common Pleas of Chester County,

Pennsylvania, at docket no. 2021-07066-CT ("**Chester County Action**").   Main Street asserted

claims against JMB and F&D for breach of the Construction Contract, Performance Bond and

Liquidated Damages Agreement, breach of the duty of good faith and fair dealing, and breach of

warranty arising from JMB's defective/non-conforming work and JMB's failure to achieve

Substantial Completion and Final Completion.   Main Street sought liquidated, compensatory,

consequential and other monetary damages in excess of $10 million.

In response, F&D filed Preliminary Objections to Main Street's Complaint arguing that

the arbitration provision in the Liquidated Damages Agreement was <u>broad</u> and required arbitration

of all of the claims asserted by Main Street in its Complaint.[3]

> 27.  **Consequently, by the plain language of Section II.15, the binding arbitration agreement applies to "<u>any dispute</u>" which led Main Street to assert a "withholding" of the "funds," including "liquidated damages that are assessed," which Main Street otherwise dedicated to F&D's completion effort**.  Indeed, for any dispute regarding escrowed funds, the Settlement and Dedication of Contract Balance Agreement requires a "court order <u>enforcing an arbitration award</u>" as a precondition to the distribution of funds.

F&D's Preliminary Objections at ¶ 27 (emphasis added).

> Taken together, these provisions demonstrate that **the parties' binding arbitration agreement is <u>broad</u> and all-encompassing** with respect to any claim by Main Street that it is entitled to retain the Contract Balance that it had dedicated to F&D for the completion work.

F&D's Memorandum of Law, p. 13 (emphasis added).

On November 24, 2021, the Honorable Jeffrey R. Sommer sustained F&D's Preliminary

Objections and dismissed Main Street's claims against F&D.[4]  In doing so, Judge Sommer ordered

---

[3] F&D's Preliminary Objections and Memorandum of Law (without exhibits) are attached hereto as **Exhibit 2**.

[4] Judge Sommer's November 24, 2021 Order is attached hereto as **Exhibit 3**.

7731335v2

all of Main Street's claims against F&D and JMB to be submitted to arbitration.  Specifically,

Judge Sommer opined:

> According to F&D, pursuant to the terms of the parties' Liquidated Damages Agreement, the claims asserted against F&D and JMB in this action are subject to alternative dispute resolution, including binding arbitration, and it seeks dismissal on this ground.
>
> ...
>
> As for the agreement to arbitrate, it broadly encompasses "any disputes" that arise "with regard to liquidated damages that are assessed" or the "basis for withholding funds that are paid into the Escrow Account."  The court agrees with F&D that Main Street's claims against F&D and JMB fall squarely within the scope of Section II.15.

Ex. 3, pp. 5, 7.

Neither party appealed Judge Sommer's Order. As a result, Main Street is barred from prosecuting its claims against F&D or JMB in the Chester County Court of Common Pleas.

### D.  Main Street Files a Demand for Arbitration with the American Arbitration Association to Enforce its Rights and Recover its Damages

Pursuant to Judge Sommer's Order, on January 6, 2022, Main Street filed a Demand for Arbitration and a Statement of Claim with the AAA.[5]

Main Street's Statement of Claim mirrors the claims against F&D and JMB made by Main Street in the Chester County Action.   As detailed in the Statement of Claim, Main Street seeks over $14 million in damages caused by JMB and F&D's failure to build the six apartment buildings and amenities as required by the Contract Documents and applicable construction codes, and their refusal to correct the project-wide defective/non-conforming work is a material breach of the Construction Contract, the Performance Bond and the Liquidated Damages Agreement. Main

---

[5] Main Street's Statement of Claim (without exhibits) is attached hereto as **Exhibit 4**.

Street also seeks payment of both the unpaid portion of the $6 million payment for past liquidated damages and additional liquidated damages which F&D promised to pay in the Liquidated Damages Agreement.

In the arbitration action, F&D has taken the position that: (1) the scope of arbitration provision is <u>narrow</u>; and (2) the AAA panel only has jurisdiction to determine how funds deposited into an escrow account are disbursed.  In other words, F&D contends in the arbitration action that Main Street's claims are limited to one issue - who receives disbursement of the escrowed funds - and that Main Street's damages are capped at the amount that Main Street deposits into the escrow account.  F&D's arguments, if accepted by the AAA panel, would substantially limit, or foreclose altogether, Main Street's claims and damages, which far exceed any amounts which F&D seek to have deposited into an escrow account.

On January 26, 2022, F&D filed an "Answering Statement Raising Objections to Claimant's Demand for Arbitration" with the AAA.[6]  Despite the fact that Judge Sommer  stated in his Order that **all** of Main Street's claims against F&D and JMB are subject to arbitration, F&D objects to the arbitration action, stating in its Answering Statement that some of Main Street's claims should be excluded because the scope of the arbitration provision is <u>narrow</u> and that the AAA panel's jurisdiction is limited to a single issue - to whom any escrowed funds should be disbursed:

> **D.     The Panel Should Exclude Claims That Are Outside the Scope of the Arbitration Agreement.**
>
> As set forth above, **the scope of the arbitration agreement is <u>narrow</u>**.  It submits to arbitration only disputes concerning 'liquidated damages **that are assessed and paid into the Escrow Account** under this Agreement and/or the basis for withholding

---

[6] F&D's Answering Statement Raising Objections to Claimant's Demand for Arbitration is attached hereto as **<u>Exhibit 5</u>**.

> funds **that are paid into the Escrow Account** under this
> Agreement.'     Therefore, Surety reserves the right to assert
> objections to any claims that are submitted to arbitration but outside
> of the scope of the parties' arbitration agreement.

Ex. 5, p. 5 (emphasis in original and added).

On May 4, 2022, F&D filed a Motion to Stay Arbitration with the AAA. F&D again argued

that the scope of the arbitration provision is <u>narrow</u> and that the arbitration panel only has

jurisdiction to decide to whom any escrowed funds should be disbursed[7]:

> **Section II.15 of the Agreement limits the scope of any
> arbitration to the distribution of escrowed contract funds.**
> Arbitrable disputes under Section II.15 concern contract funds that
> were escrowed because of liquidated damages assessed by Main
> Street, and contract funds that were escrowed because Main Street
> asserted a right to withhold those funds from payment.

Ex. 6, p.6 (emphasis added).

> Consistent with the overall escrow framework, **the arbitration
> under Section II.15, therefore, is only permitted to resolve those
> specific disputes so that the funds in the escrow account can be
> distributed**, as provided in Section II.8 of the Agreement, "by court
> order enforcing an arbitration award as provided in Sections 14 and
> 15 below."
>
> …
>
> Without Main Street having deposited disputed contract funds into
> escrow, **the Panel cannot fulfill its <u>only</u> charge under the
> Agreement, which is to determine whether F&D or Main Street
> is entitled to the distribution of escrowed funds**.

*Id.*, p. 11 (emphasis added).

---

[7] F&D's Motion to Stay Arbitration (without exhibits) is attached hereto as **Exhibit 6**.

7731335v2

**E.** **F&D Institutes this Action**

On August 11, 2021, F&D instituted this action.  F&D claims that the Liquidated Damages Agreement obligates Main Street to deposit approximately $7.1 million into an escrow account.[8] F&D's demand is based on the inaccurate, and unsupported, factual predicate that JMB achieved Final Completion of its work under the Construction Contract.  None of the mandatory conditions precedent to Main Street's duty to deposit funds into an escrow account were satisfied at the time this action was filed, and they have not yet been satisfied.

On January 7, 2022, Main Street filed a Motion to Dismiss or Stay this action, in part, on the basis that the parties' disputes fall within the scope of the arbitration provision.  DE 28.   In response, F&D argued that this action should not be stayed pending the AAA arbitration action because the scope of the arbitration provision is <u>narrow</u>:

> **Far from such a broad arbitration clause, Section II.15 of the Agreement <u>limits</u> the scope of any arbitration to a <u>specific type of dispute</u>.** Distinct from the Owner's duty to deposit funds in escrow in the first instance, the parties agreed to arbitrate only the disputes undergirding the Owner's decision to pay the Unpaid Contract Funds (or any portion thereof) into the escrow account rather than to the Surety.

DE 29 (emphasis added).

On May 4, 2022, Main Street filed its Answer, Affirmative Defenses and Counterclaim to F&D's Complaint in this action.  DE 36.  As detailed in its Counterclaim, Main Street seeks approximately $20 million in actual and liquidated damages caused by JMB and F&D's failure to build the six apartment buildings and amenities as required by the Contract Documents and applicable construction codes, and their failure to correct the project-wide defective/non-

---

[8] F&D fails to set off the unpaid portion of the $6 million in past liquidated damages owed to Main Street, which is to be credited against the remaining contract balance.

13

conforming work, which failures are material breaches of the Construction Contract, the Performance Bond and the Liquidated Damages Agreement.  In Count II of its Counterclaim, Main Street asserts a claim for specific performance and seeks to compel JMB and F&D to provide Main Street with warranties, as-built drawings and a maintenance bond.

On June 21, 2022, F&D filed a Motion to Dismiss Main Street's Counterclaim with prejudice, or in the alternative, to compel arbitration.  DE 37.  Although F&D is currently arguing to the AAA arbitration panel that the arbitration provision is <u>narrow</u> and that the arbitration panel does not have jurisdiction over some of Main Street's claims and damages, in its Motion to Dismiss filed with this Court, F&D states that all of Main Street's claims are within the scope of the arbitration provision, are subject to arbitration, and should be dismissed as a result.  F&D states in its Motion to Dismiss:

> Accordingly, in the alternative to dismissal based on the doctrine of issue preclusion, dismissal of the Counterclaim is still warranted based on an independent determination that **the claims Main Street seeks to simultaneously present to this Court and in arbitration are subject to the parties' agreement to arbitrate**.
>
> ***
>
> Section II.15 of the [Liquidated Damages Agreement] requires Main Street to arbitrate its liquidated damages and defect/warranty claims rather than litigate those claims in court.

DE 37-1 at pp. 2, 7.

## III.   <u>ARGUMENT</u>

F&D's Motion to Dismiss must be denied in its entirety.  Main Street's Counterclaims against F&D are compulsory counterclaims under Fed.R.Civ.P. 13(a) and must be litigated in this action.   Further, F&D must be judicially estopped from taking inconsistent positions regarding the scope of the arbitration provision.  F&D's argument to this Court that the arbitration provision

broadly encompasses Main Street's claims and damages, while simultaneously arguing to the AAA that the arbitration scope is limited to one <u>narrow</u> issue and damages are capped, could leave Main Street without any forum to prosecute all of its claims and recover all of its damages against F&D.

### A. Fed.R.Civ.P. 13 Requires Litigation of Main Street's Counterclaims in this <u>Action</u>

#### 1. Main Street's Counterclaims against F&D are Compulsory <u>Counterclaims</u>

The claims asserted against F&D are compulsory counterclaims and must be asserted within this action.

Fed.R.Civ.P. 13(a) states:

> (a) Compulsory Counterclaim.
>
> (1) In General. A pleading must state as a counterclaim any claim that--at the time of its service--the pleader has against an opposing party if the claim:
>
>> (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and
>>
>> (B) does not require adding another party over whom the court cannot acquire jurisdiction.

A compulsory counterclaim is one that arises "out of the same 'transaction or occurrence'" that is the subject matter of the claim asserted in the complaint. *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 836 (3d Cir. 2011) (quoting Fed. R. Civ. P. 13(a)(1)(A)).  To be deemed part of the same transaction or occurrence, "a claim need only bear a logical relationship to the subject matter of the complaint." *Id.* (quoting *Xerox Corp. v. SCM Corp.*, 576 F.2d 1057, 1059 (3d Cir. 1978). "Such a logical relationship exists where separate trials on each of the claims would 'involve a substantial duplication of effort and time by the parties and the courts.' " *Id.*

7731335v2

The Third Circuit Court of Appeals has described the "logical relationship" test as follows:

> [A] counterclaim is logically related to the opposing party's claim where separate trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the courts. Where multiple claims involve many of the same factual issues, or the same factual and legal issues, or where they are offshoots of the same basic controversy between the parties, fairness and considerations of convenience and of economy require that the counterclaimant be permitted to maintain his cause of action.

*Id.* (quoting *Great Lakes Rubber v. Herbert Cooper Co.,* 286 F.2d 631, 634 (3d Cir. 1961)).

In the context of a contractual dispute, such as in this action, "when one party to a contract puts provisions of it at issue, ... all actions taken pursuant to that contractual relationship become part of the relevant transaction or occurrence." *Matrix Grp., Inc. v. Ford Motor Credit Co.*, 2004 WL 2742835, at *3 (E.D. Pa. Nov. 29, 2004).

Main Street's Counterclaims and F&D's claims arise from the same construction project and the same written agreements - the Construction Contract, the Performance Bond and the Liquidated Damages Agreement.

F&D claims that there are approximately $7.1 million in unpaid contract balances due to JMB for its work under the Construction Contract which Main Street is obligated to deposit into an escrow account. Main Street, on the other hand, contends in its Counterclaim, that there are no unpaid contract balances due or owing to JMB under the Construction Contract and that, instead, JMB and F&D are liable for the approximately $20 million in actual and liquidated damages sustained by Main Street.

F&D contends that JMB achieved Final Completion and that, therefore, Main Street is obligated to deposit funds into an escrow account under Section II.7 of the Liquidated Damages Agreement. Main Street, on the other hand, contends in its Counterclaim that JMB failed to achieve Final Completion and that it has sustained damages as a result. Main Street also contends that

16

JMB's failure to achieve Final Completion is an absolute bar to F&D's claims because Section II.7 of the Liquidated Damages Agreement requires JMB to achieve Final Completion and other mandatory conditions precedent before Main Street's duty to deposit of funds into escrow is triggered:

> **When Final Completion is achieved**, the Owner will either release the Retainage and any unpaid Contract Balance to the Surety, or a portion thereof **that the Owner determines is due and owing**, and deposit the remaining Retainage amount and unpaid contract Balance, **if any** into an escrow account maintained by a third party escrow agent selected by the parties ("Escrow Account")…

Liquidated Damages Agreement, §II.7 (emphasis added).

As detailed above, Final Completion is a defined term under the Construction Contract. In order to achieve Final Completion, JMB must have first achieved Substantial Completion. Substantial Completion can only be achieved if all of the requirements detailed in the Construction Contract are met, including that the work complies with the Contract Documents, Plans and Specifications and that there are no items remaining to be completed other than minor punchlist work.

JMB's failure to achieve either Substantial Completion or Final Completion, and JMB's defective and non-conforming work are substantive factual issues at the heart of Main Street's Counterclaims against F&D. Main Street contends that F&D breached its obligations under the Performance Bond and the Liquidated Damages Agreement because it did not complete JMB's work and refused to correct JMB's defective and non-conforming work. Main Street seeks approximately $20 million in actual damages and liquidated damages resulting from JMB's defective/non-conforming work and JMB's failure to achieve Substantial Completion and Final Completion by the deadlines contained in the Construction Contract and Liquidated Damages Agreement.

17

7731335v2

Main Street's Counterclaims against F&D arise from the same transaction, occurrence and contracts as F&D's claims against Main Street.   Under Fed.R.Civ.P. 13(a), Main Street's Counterclaims are compulsory and must be asserted in this action.

### 2.      Rule 13(a)(2) Exceptions do not Apply

Fed.R.Civ.P. 13(a)(2)(A) excepts the requirement to assert all compulsory counterclaims in the same action only if there was a prior pending action in which those claims were asserted:

> (2) Exceptions.  The pleader need not state the claim if:
>
>    (a)  when the action was commenced, the claim was the subject of another pending action…

This action was filed by F&D on August 11, 2021.  When this action was commenced, neither the Chester County Action nor the arbitration matter with the AAA had been instituted.  Therefore, the claims asserted in Main Street's Counterclaim were not the subject of another pending action. The Rule 13(a)(2) exception does not apply.

### 3.      Main Street's Compulsory Counterclaims would be Barred if not Asserted in this Action

A counterclaim which is compulsory but is not brought is thereafter barred.  *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467 (1974).  A failure to plead a compulsory counterclaim bars a party from bringing a later independent action on that claim.  *Id.* at 469 n. 1.  "[T]he policy behind compelling [a party] to raise his compulsory counterclaim or have it barred from subsequent litigation is to enable the court to settle all related claims in one action, thereby avoiding a wasteful multiplicity of litigation on claims arising from a single transaction or occurrence."  *Bristol Farmers Market v. Arlen Realty & Devel. Corp.*, 589 F.2d 1214, 1221 (3d Cir.1978) (internal quotations and citation omitted).

7731335v2

Because Main Street's Counterclaims are compulsory and there are no applicable exceptions to bringing the Counterclaims, Main Street is required to bring its claims against F&D as Counterclaims in this action or be barred from asserting those claims at a later time or in another forum.

**B.    F&D must be Judicially Estopped from Taking Irreconcilably Inconsistent Positions Regarding the Scope of Arbitration which will Deprive Main Street of any Forum in which to Litigate its Claims and Recover its Damages**

F&D's Motion to Dismiss should also be denied in its entirety because F&D's arguments to this Court are directly contradictory to F&D's arguments in the arbitration action and are made for the improper purpose of preventing Main Street from prosecuting all of its claims and recovering all of its damages against F&D.  If Main Street's Counterclaims are dismissed in this action based on F&D's arguments to this Court that the arbitration provision is broad, and the AAA limits the scope of arbitration and places a cap on Main Street's damages based on F&D's arguments to the AAA that the arbitration provision is narrow, then there will be no forum in which Main Street can prosecute all of its claims and recover all of its damages against F&D.

Judicial estoppel is an equitable doctrine that "bars a litigant from asserting a position that is inconsistent with one he or she previously took before a court or agency." *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779 (3d Cir. 2001). For the doctrine to apply, the party requesting estoppel must show that three conditions are met. "First, the party to be estopped must have taken two positions that are irreconcilably inconsistent." *Id*. "Second, judicial estoppel is unwarranted unless the party changed his or her position 'in bad faith—i.e., with intent to play fast and loose with the court.'" *Id*. (quoting *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir. 1996)). Third, judicial estoppel must be "'tailored to address the harm identified,'" and the court must find that "no lesser sanction would adequately remedy the

damage done by the litigant's misconduct." *Id*. at 779–80 (quoting *Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 109 (3d Cir. 1999)).

The Supreme Court of the United States has recognized that the purpose of judicial estoppel is "to protect the integrity of the judicial process," by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749, (2001). *See also*, *Westfield Ins. Co. v. Astra Foods Inc.*, 134 A.3d 1045, 1051 (Pa. Super. 2016) ("The purpose of this doctrine is to uphold the integrity of the courts by preventing parties from abusing the judicial process by changing positions as the moment requires").

F&D should be judicially estopped from that Main Street's Counterclaims be dismissed based on the contention that the arbitration provision is <u>broad</u> and Judge Sommer's decision mandates that Main Street's Counterclaims be submitted to arbitration, while F&D simultaneously argues to the AAA that the arbitration provision is <u>narrow</u> and that the AAA panel has jurisdiction to only answer one question. F&D's Motion to Dismiss is part of a long line of litigation tactics taken by F&D for the sole and improper purpose of preventing Main Street from prosecuting all of its claims and recovering all of its damages. F&D's tactic of taking starkly divergent positions in different fora, if successful, would deprive Main Street of <u>any forum</u> in which to litigate is claims and recover its damages against F&D.

As detailed herein, F&D has intentionally promoted contradictory and irreconcilably inconsistent positions regarding the scope of the arbitration provision and whether all of Main Street's claims and damages must be arbitrated. For example,

| DATE | FILING | F&D's POSITION | F&D's GOAL |
|------|--------|----------------|------------|
| 10/24/21 | F&D's Memorandum in Support of Preliminary Objections to Main Street's Chester County Complaint. Ex. 1. | "**the parties' binding arbitration agreement is <u>broad</u> and all-encompassing**" p. 13 (emphasis added). | To dismiss Main Street's claims against F&D and JMB in the Chester County Action. |
| 1/26/22 | F&D's Opposition to Main Street's Motion to Dismiss the Federal Court Action. Ex. 6. | "Far from such a broad arbitration clause, **Section II.15 of the Agreement <u>limits</u> the scope of any arbitration to a <u>specific type of dispute</u>.**" p.6. | To prevent a stay of F&D's claims pending the arbitration action. |
| 1/26/22 | F&D's Answering Statement and Objections filed in the AAA action. | "Surety further requests that once the federal court action concludes, the Panel then decide the scope of the claims to be resolved by arbitration and **exclude the claims of Owner that are not subject to the arbitration agreement.**" p.1.<br><br>"The Panel Should Exclude Claims That Are Outside the Scope of the Arbitration Agreement…:. p. 3.<br><br>"**The Parties' Disputes Procedure Is <u>Limited</u>** to Determining the Disposition of Funds Paid Into Escrow and the Basis For Their Withholding." p. 3.<br><br>"**the scope of the arbitration agreement is <u>narrow</u>.** It submits to arbitration only disputes concerning 'liquidated damages that are assessed **and paid into the Escrow Account**" (emphasis added). | To dismiss and/or limit Main Street's claims and damages against F&D and JMB in arbitration. |

| | | | |
|---|---|---|---|
| 5/4/22 | F&D's Motion to Stay Arbitration filed in the AAA action. | **"Section II.15 of the Agreement <u>limits</u> the scope of any arbitration to the distribution of escrowed contract funds**…" (emphasis added).<br><br>**"the arbitration under Section II.15, therefore, is only permitted to resolve those <u>specific disputes</u>** so that the funds in the escrow account can be distributed…". (emphasis added). | To prevent and/or delay Main Street from pursuing its claims against F&D and JMB in arbitration. |
| 6/2/22 | F&D's Motion to Dismiss Main Street's Counterclaims in this action. | "the claims Main Street seeks to simultaneously present to this Court and in arbitration are subject to the parties' agreement to arbitrate". p. 2.<br><br>"Section II.15 of the [Liquidated Damages Agreement] requires Main Street to arbitrate its liquidated damages and defect/warranty claims rather than litigate those claims in court." p.7. | To prevent Main Street from pursuing its claims against F&D in Federal Court. |

F&D argues in its Motion to Dismiss in this action that the scope of arbitration is <u>broad</u>, that Main Street's Counterclaims fall within its scope, and that Judge Sommer's Order so held.  If Main Street's Counterclaims are dismissed in this action, AAA would be the only forum in which Main Street could prosecute its claims and seek its damages against F&D.  However, in AAA, F&D takes the position that that the scope of arbitration is <u>narrow</u>, that some of Main Street's claims are not subject to arbitration and that the AAA panel's jurisdiction is limited to the disbursement of any funds deposited into an escrow account.

The harm to Main Street would be incalculable if F&D is not judicially estopped from taking these irreconcilably inconsistent positions.

Main Street has suffered damages of approximately $20 million as a result of F&D's and JMB's actions.  However, if this Court determines that Main Street does not have an obligation to deposit any funds into an escrow account, the position espoused by F&D in the arbitration action would mean that there would be no escrow funds to distribute and Main Street could recover no damages in arbitration, despite the enormity of its damages and strength of its claims. Alternatively, even if F&D was successful in this action and Main Street is compelled to deposit $7.1 million into an escrow account, the position espoused by F&D in the arbitration action would mean that the AAA panel would only have jurisdiction to distribute the $7.1 million escrowed funds.  This would create an artificial cap on Main Street's damages and be vastly insufficient to compensate Main Street for its approximately $20 million in losses. And, there would be no other forum, including Chester County Court of Common Pleas and the Federal Court, in which Main Street could recover the full amount of its damages.

It is clear that F&D has intentionally and in bad faith espouses starkly contradictory positions with the Court and the AAA for the sole purpose of wrongfully preventing Main Street from prosecuting all of its claims and recovering all of its damages against F&D and JMB.  F&D's actions constitute an abuse of the judicial process.  F&D's judicial maneuvering would foreclose a party which has suffered millions of dollars in damages from prosecuting its claims to the fullest and recovering the entirety of its damages in any forum. Accordingly, there is no lesser sanction to remedy the damage done by F&D's misconduct than to estop F&D from demanding dismissal of Main Street's Counterclaims.

7731335v2

## IV.    <u>CONCLUSION</u>

Main Street's Counterclaims arise from the same transactions, occurrences and written agreements upon which F&D's claims are based and are, therefore, compulsory counterclaims which must be prosecuted in this action.    F&D must also be judicially estopped from promoting irreconcilably inconsistent positions by claiming in this action that Main Street's claims are subject to arbitration, while also objecting to the arbitrability of Main Street's claims and damages in AAA.  For these reasons, F&D's Motion to Dismiss Main Street's Counterclaims must be denied in its entirety.

KAPLIN STEWART

<u>/S/  Sandhya M. Feltes</u>
Marc B. Kaplin, Esquire
Sandhya M. Feltes, Esquire
910 Harvest Drive
Blue Bell, PA 19422
(610) 941-2561
(610) 684-2011 facsimile
mkaplin@kaplaw.com
sfeltes@kaplaw.com


Steven M. Coren, Esquire
KAUFMAN, COREN & RESS, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA  19103
(215) 735-8700
(215) 735-5170 facsimile
scoren@kcr-law.com

Attorneys for Defendants

**EXHIBIT 1**

## <u>LIQUIDATED DAMAGES SETTLEMENT AGREEMENT AND DEDICATION OF CONTRACT BALANCE</u>

This Agreement is entered into this __ day of November, 2020 ("Effective Date"), by and among Main Street Phase II, LP and Main Street Phase III, LP (collectively "**Owner**"), Jeffrey M. Brown Associates, LLC ("**JMB**") and Fidelity and Deposit Company of Maryland/Zurich Insurance Company ("**Surety**"). Owner, JMB and Surety are sometimes hereinafter collectively referred to as "the Parties" or individually as "Party".

### I.    RECITALS

**WHEREAS**, on September 17, 2018, JMB entered into a Base Contract with Owner (including all addenda and exhibits, the "**Contract**") for the performance of Base Contract Work and all additional work to complete a multifamily residential and commercial development in Exton, Pennsylvania (the "**Project**");

**WHEREAS**, on October 1, 2018, Surety issued Performance Bond No. 9281093, attached hereto as **Exhibit A**, in connection with the Contract and the Project ("**Performance Bond**");

**WHEREAS**, on October 1, 2018, Surety issued Payment Bond No. 9281093, attached hereto as **Exhibit B**, in connection with the Contract and the Project ("**Payment Bond**");

**WHEREAS**, on June 25, 2020, Owner issued a Notice of Default of the Contract to JMB;

**WHEREAS**, on June 25, 2020, Owner sent a Notice of Contractor Default and Request for Conference to Surety pursuant to the terms of the Performance Bond;

**WHEREAS**, on July 16, 2020, the Parties participated in a conference pursuant to § 3.1 of the Performance Bond;

**WHEREAS**, in July 2020, the Surety began funding Project completion under § 5.1 of the Performance Bond;

**WHEREAS**, Surety conducted an investigation of the Project and JMB's insolvency and default, which included, but is not limited to, a review of JMB's books and records, site inspections and a review of project documents provided by Owner; and

**WHEREAS**, in a good faith attempt to complete the Project and JMB's obligations under the Contract, the Parties agree to the following terms, and other than as addressed herein, the Parties reserve and do not waive any rights, remedies, or defenses under the Contract, Performance Bond, Payment Bond or at law or equity.

### II.   TERMS

1.    **Recitals Incorporated**: The Recitals set forth above are expressly incorporated herein and form a part of this Agreement.

1



2.    **Terms**:  Terms contained herein are defined in accordance with the terms of the Contract.

3.    **Resolution of Past Change Orders Negotiations**: The Owner will pay the Surety/JMB $500,000.00, when the work related to the particular change order(s) is completed per the Contract, in resolution of the pending and/or disputed Change Orders, which are identified by a spreadsheet attached hereto as **Exhibit C**. There are no outstanding Contractor change orders for any past work as of the date of this Agreement, other than those identified in Exhibit C.

4.    **Resolution of Change Order for Buildings D, E, and F Amenity Space**: The Owner will pay the Surety/JMB $370,000.00 in resolution of the executed change order for the amenities space in Buildings D, E and F. All winter conditions for Buildings D, E and F costs are included in this change order.  The Change Order is attached hereto as **Exhibit D.**

5.    **Current Contract Funds.** As of the effective date of this Agreement, the contract funds are as follows:

| | | |
|---|---|---|
| Original Contract Sum | $31,860,715 | |
| Net Change Orders | $16,204,208 | |
| Contract Sum | | $48,064,923 |
| | | |
| New Change Orders | | |
| Exhibit C | | $     500,000 |
| D, E, & F Amenity (Exhibit D) | | $     370,000 |
| Revised Contract | | $48,934,923 |
| | | |
| Payments | | |
| Previously Paid – App. 1-26 | | ($34,223,701) |
| Amounts Held by Owner* | | $     287,820 |
| | | |
| Unpaid Balance of Contract | | $14,999,042 |
| Less:  Retainage | | ($2,403,246) |
| | | |
| UNPAID BALANCE | | $12,595,796 |

| *Amounts previously held by Owner | |
|---|---|
| GC&F | $171,420 |
| Elevator | $    1,884 |
| Checks: | |
| Chong Kim/ABC Supply | $ 30,965 |
| Reed Street/Mikan | $ 13,500 |
| Reed Street | $ 20,911 |
| Delinco | $ 37,506 |
| Delinco | $ 11,634 |
| Total | $287,820 |

2



Confidential \ Non Personal Data

6.      **Liquidated Damages Settlement**: For payment to the Owner in the amount of $6,000,000.00 ("Settlement Amount"), as provided for below, the Owner's claim for any and all delay damages against the Surety and JMB through the date of this Agreement is fully and finally settled and released, and any further claim for delay is limited to liquidated damages as provided for in Sections 11 and 12 below.

7.      **Owner's Collection of Settlement Amount from Project Payments**: The $6,000,000.00 Settlement Amount is divided into two amounts for payment purposes: (a) $3,596,754.00 and (b) $2,403,246.00. The Owner will recoup $3,596,754.00 of the Settlement Amount by retaining a portion of pending unpaid and future progress payments prorated by the total amount to be paid via progress payments ($12,595,796.00). This pro rata distribution would result in the Owner retaining 29% of each AIA payment application until the $3,596,754.00 is recouped. See Credit Change Order attached hereto as **Exhibit E**.

The balance of the Settlement Amount will be paid as follows: The Owner is holding $2,403,246.00 in retainage (hereinafter, "**Retainage**"). When Final Completion is achieved, the Owner will either release the Retainage and any unpaid Contract Balance to the Surety, or a portion thereof that the Owner determines is due and owing, and deposit the remaining Retainage amount and unpaid Contract Balance, if any, into an escrow account maintained by a third party escrow agent selected by the parties ("**Escrow Account**"), such that the full amount of Retainage and unpaid Contract Balance has either been paid to the Surety and/or into the Escrow Account. At that point, with the unpaid Contract Balance and Retainage either paid to the Surety or into the Escrow Account, the Surety will simultaneously pay the Owner the sum of $2,403,246.00, in final satisfaction of the $6,000,000.00 Settlement Amount.  To accomplish the simultaneous release of funds by Owner and by Surety as detailed herein, Owner will provide notice to Surety fifteen (15) business days before the Retainage and any unpaid Contract Balance will be released/deposited and will provide a date certain when the Owner's funds will be released and/or deposited into the Escrow Account. Surety will confirm that its funds will be available for payment to Owner on the same date certain.

8.      **Escrow Account**: The Parties have agreed that the firm of Land Services USA will serve as the escrow agent to retain escrowed funds, in an interest-bearing account, subject only to release by agreement of Owner and Surety or by court order enforcing an arbitration award as provided in Sections 14 and 15 below.

9.      **Surety Financing of JMB**: Absent breach by the Owner of the Contract or the Performance Bond or this Agreement, Surety will advance funds to JMB up to the penal sum of the Performance Bond to assist JMB in fulfilling its obligations under the Contract or otherwise perform up to the penal sum of the Performance Bond. Surety will regularly provide Owner (at least once per month) with a transaction register of costs it has incurred to be reduced from the penal sum of the Performance Bond, as prepared in the ordinary course of business. As of October 30, 2020, Surety has expended $8,076,113.63 funding Final Completion under Section 5.1 of the Performance Bond.

10.     **Owner Payment of Contract Balance**: Owner dedicates the unpaid Contract Balance to the Surety, except as detailed in Section 7 above. Owner will pay the remaining General Conditions and Fee ("GC&F") plus $171,420.00 GC&F withheld from Payment Application #21

3

based on the total percentage completed of the remaining Contract schedule of values not including GC&F. By way of example only, if the remaining GC&F, including the $171,420, is $571,000 and remaining Contract value is $10,000,000, a payment application totaling $1,000,000 (10% of the Contract value) would result in a GC&F payment of $57,100 (10% of $571,000). All amounts previously held by Owner, as listed in Section 5, are understood by the Parties to be part of the Unpaid Balance payable to the Surety and will be included in the Unpaid Balance for invoicing in accordance with the Contract. JMB will void the two (2) joint checks payable to Delinco and JMB issued by Owner on June 5, 2020 and JMB will consent to the release of the remaining amounts withheld previously by Owner which are in a joint JMB/Owner checking account.

   11. **Interim Completion Milestone**: If Substantial Completion of Buildings A, B and C is not achieved on or prior to January 10, 2021, liquidated damages of $5,000.00 per day total will be assessed thereafter, whether one or all of Buildings A, B, and C are not Substantially Complete (non-cumulative as to the individual Buildings), which will encompass any and all Owner claims for delay related to the Interim Completion Milestone. Any liquidated damages may be assessed but not withheld until Final Completion. Any amounts assessed as liquidated damages under this Section will be paid by Owner from the remaining Contract Balance into the Escrow Account.

   12. **Project Completion Date**: If Substantial Completion of the Project is not achieved on or prior to April 10, 2021, liquidated damages of $25,000.00 per day total will be assessed thereafter, whether one or all of the Buildings have not achieved Substantial Completion (non-cumulative as to the individual Buildings and as to any liquidated damages assessed in relation to the Interim Completion Milestone, which discontinue by April 10, 2021), which will encompass any and all Owner claims for delay related to the Substantial Completion date. Any liquidated damages may be assessed but not withheld until Final Completion. Any amounts assessed as liquidated damages under this Section will be paid by Owner from the remaining Contract Balance into the Escrow Account agreed to by the parties' respective counsel.

   13. **COVID-Related Delay**: In addition to any and all rights concerning work stoppage under the Contract, all Milestones set forth herein are subject to a day-for-day extension for any day(s) in which Project work is stopped as a result of orders, directives, or guidance by public bodies with jurisdiction over the Project. If the Owner obtains a waiver allowing work to proceed, JMB or its successor shall attempt to continue performance but reserves the right to present an impact analysis for any delays arising from the impact of the COVID-19 pandemic on labor, materials, or other factors affecting JMB or its successor's ability to timely perform work on the Project. JMB/Surety will give Owner written notice of COVID-19 impact issues within two (2) business days from the occurrence and will provide Owner with any COVID-19 impact analysis within ten (10) business days thereafter and then updated every five (5) business days during the impact period.

   14. **Release of Escrow Funds**: Within thirty (30) days of Final Completion, the parties will meet and confer regarding the release of funds deposited into the Escrow Account. If there is no dispute or there is a dispute only as to a portion of the funds, then those funds which are not in dispute shall be disbursed to the appropriate party or parties within thirty (30) days per the Contract and this Agreement. If there is a dispute among the parties as to some or all of the funds deposited

4

in the Escrow Account, the parties will follow the procedure contained in Section 15 below regarding the disputed funds.

15.    **Dispute Procedure**: If any dispute arises among the Owner, the Surety, and/or JMB with regard to liquidated damages that are assessed and paid into the Escrow Account under this Agreement and/or the basis for withholding funds that are paid into the Escrow Account under this Agreement, then the following dispute resolution procedures will apply:

> (a) if the amount in controversy is under $500,000.00, the dispute will be submitted to binding arbitration before a single arbitrator selected by mutual agreement of the Parties and conducted in accordance with the Construction Industry Rules of the American Arbitration Association ("AAA");

> (b) if the amount in controversy is over $500,000.00, the dispute will be submitted to binding arbitration before a panel of three arbitrators selected by agreement of the Parties and conducted in accordance with the Construction Industry Rules of the American Arbitration Association ("AAA");

> (c) venue shall be in Philadelphia, Pennsylvania or such other location as mutually agreed to by the parties;

> (d)  all AAA costs and fees for arbitration shall be split 50-50 between the parties. Each party shall bear its own legal fees;

> (e) The award rendered by a proper awarding authority pursuant to this Section 15 shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction.

16.    JMB shall provide Owner with a thirty (30) day look ahead of residential units turnover, which will be updated on a weekly basis and shall provide an updated detailed Construction Schedule monthly.

17.    JMB shall keep the Project lien free in accordance with the terms of the Contract.

18.    **Agreements Remain in Effect**: Other than as modified herein, the Contract, Performance Bond, and Payment Bond remain in full force and effect. The Indemnity Agreement among Surety, JMB and its individual indemnitors remains in full force and effect.

## III.    GENERAL PROVISIONS

1.    **No Admissions**. This Agreement is the product of informed negotiations involving compromises of the Parties' previously stated legal and factual positions and does not reflect the Parties' views as to their rights and obligations with regard to matters or persons outside the scope of this Agreement.

2.    **No Third-Party Beneficiaries**. This Agreement is entered into solely for the benefit of the Parties and M&T Bank, N.A. and First American Title Insurance Company. This

5

Agreement is not intended to, and does not, give or create any rights in any person or entity other than the Parties, M&T Bank, N.A. and First American Title Insurance Company.

3.     **Notices**. Unless another person is designated in writing, for receipt of notices hereunder, notice to the Parties shall be sent by Email to the following:

As to the Owner:

Sandhya M. Feltes, Esq.
Kaplin Stewart
910 Harvest Drive
Blue Bell, PA 19422
sfeltes@kaplaw.com

Steven Wolfson
Main Street Phase II, LP and Main Street Phase III, LP
Meeting House Business Center
120 W. Germantown Pike, Suite 120
Plymouth Meeting, PA 19462
wolfson@wolfsongroupinc.com

Ed Moyer
Main Street Phase II, LP and Main Street Phase III, LP
Meeting House Business Center
120 W. Germantown Pike, Suite 120
Plymouth Meeting, PA 19462
emoyer@wolfsongroupinc.com

John Fiore
Main Street Phase II, LP and Main Street Phase III, LP
Meeting House Business Center
120 W. Germantown Pike, Suite 120
Plymouth Meeting, PA 19462
jfiore@wolfsongroupinc.com

Milton S. Schneider
The Glenville Group
Suite 305
450 Plymouth Road
Plymouth Meeting, PA   19462
tony@glenville.com

James R. Williams
Cozen O'Connor
One Liberty Place
1650 Market Street

6



Philadelphia, PA 19103
jrwilliams@cozen.com

As to JMB:

Greg Hill, President
Jeffrey Brown Associats, LLC
2337 Philmont Avenue
Huntingdon Valley, PA 19006
ghill@d3developers.com

As to Surety:

Marc Domres
Surety Claims Professional
Fidelity and Deposit Company of Maryland
P. O. Box 968033
Schaumburg, IL 60196
Marc.domres@zurichna.com

    4.    **Voluntary Agreement**. The Parties acknowledge that they have read the provisions of this Agreement and fully understand its terms, contents, conditions and effect and that they have had an opportunity to consult with counsel during the negotiations of its terms and that they voluntarily and knowingly agree to the terms of this Agreement.

    5.    **Authority**. Each Party represents and warrants to each other Party that it possesses the full requisite authority to enter its this Agreement and that the person signing this Agreement on behalf of the Party is fully and duly authorized to do so.

    6.    **Time is of the Essence**. With regard to all dates and time periods set forth, or referred to, in this Agreement, time is of the essence.

    7.    **Specific Performance**. The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or in equity.

    8.    **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original and all together shall be deemed one and the same. Electronic PDFs of this Agreement including email PDF signatures shall be deemed the same as the original for all purposes.

    9.    **No Interpretation of Ambiguity Against the Drafter**. This Agreement has been negotiated and jointly drafted by the Parties. The Parties expressly acknowledge and agree that this Agreement should not be deemed prepared or drafted by one Party or the other and shall be construed accordingly.

7

10.   **Severability**. If any part of this Agreement is held to be invalid, unenforceable, or illegal, such determination shall not affect any other provision of this Agreement, and this Agreement shall be construed as if the impermissible provision had never been contained herein.

**MAIN STREET PHASE II, L.P.**
its general partner
By:  Main Street Phase II GP, LLC,
      its general partner

_____                    Date: ___11-2-2020___
Steven B. Wolfson
Sole Member

**MAIN STREET PHASE III, L.P.**
its general partner
By:  Main Street Phase III GP, LLC
      its general partner

_____                    Date: ___11-2-2020___
Steven B. Wolfson
Sole Member

**JEFFREY M. BROWN ASSOCIATES, LLC**

_____                    Date:_____
Gregory Hill
President

**FIDELITY AND DEPOSIT COMPANY OF MARYLAND**

_____                    Date:_____
By:
Title:

8

**EXHIBIT 2**

Main Street Phase II, L.P.        )    IN THE COURT OF COMMON PLEAS
                                      )    CHESTER COUNTY, PA
        Plaintiff,           )
                                        )    Case No. 2021-07066-CT
v.                                   )
                                        )
JEFFREY M. BROWN ASSOCIATES,    )
LLC, et al.                     )
                                        )
        Defendants.       )
_____)

## <u>ORDER</u>

      **AND NOW**, this ___ day of _____, 2021, upon consideration of the Preliminary Objections of Defendant Fidelity & Deposit Company of Maryland ("F&D"), and any response thereto, it is hereby **ORDERED** that Defendant's Preliminary Objections are **SUSTAINED** and Plaintiff's Complaint is **DISMISSED** as to F&D and Defendant Jeffrey M. Brown Associates, LLC.


                                             _____

                                                        , J.

To: Plaintiff

You are hereby notified to file a
response to the enclosed Preliminary
Objections within twenty (20) days of
service hereof or a judgment may be entered
against you.

Filed and Attested by
PROTHONOTARY
05 Oct 2021 09:58 AM
M. BARR

_____
Attorney for Defendant

Noah H. Charlson, Esq.
PA ID No. 89210
Charlson Braber McCabe & Denmark, P.C.
1628 JFK Blvd., Suite 1803
Philadelphia, PA 19103
Tel: 215-447-7401
noah@charlsonlaw.com

*Attorneys for Defendant,*
*Fidelity and Deposit Company of Maryland*

| | | |
|---|---|---|
| **Main Street Phase II, L.P.** | ) | IN THE COURT OF COMMON PLEAS |
| | ) | CHESTER COUNTY, PA |
| Plaintiff, | ) | |
| | ) | Case No. 2021-07066-CT |
| v. | ) | |
| | ) | |
| **JEFFREY M. BROWN ASSOCIATES,** | ) | |
| **LLC, et al.** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### DEFENDANT FIDELITY AND DEPOSIT COMPANY OF MARYLAND'S PRELIMINARY OBJECTIONS TO PLAINTIFF'S COMPLAINT

Pursuant to Pa. R. Civ. P. 1028, Defendant Fidelity and Deposit Company of Maryland

("F&D") seeks dismissal of the Complaint filed by Plaintiff Main Street Phase II, L.P. ("Main

Street") as against Defendants F&D and Jeffrey M. Brown Associates, LLC ("JMB") for failure to engage in alternative dispute resolution and lack of subject matter jurisdiction.[1]

1.      This action arises from a $48 million dollar mixed-use residential and commercial development project in Exton, Pennsylvania (the "Project").  The developer, Main Street, has sued the general contractor, Jeffrey M. Brown Associates, LLC ("JMB"), as well as F&D, who is the surety that issued payment and performance bonds in support of the Project.

2.      Also named in this suit are a manufacturer and supplier of building materials used in the Project.

3.      After Main Street issued a notice of default to JMB in June 2020 and called upon F&D to complete the Project in accordance with its the performance bond ("Bond"), Main Street, F&D and JMB, executed an agreement entitled, "Liquidated Damages Settlement Agreement and Dedication of Contract Balance" ("Settlement and Dedication of Contract Balance Agreement"). The Settlement and Dedication of Contract Balance Agreement is attached as Exhibit "G" to the Complaint.  For the convenience of the Court, it is also attached as Exhibit 1 to these Preliminary Objections.

4.      The Settlement and Dedication of Contract Balance Agreement has several provisions that require any potential future disputes between Main Street and F&D regarding the Contract Balance to be resolved through binding ADR.

5.      The starting place is Section II.10.  There, Main Street agreed that it "dedicates the unpaid Contract Balance to the Surety, except as detailed in Section 7 above."  (Ex. 1, § II.10.)

---

[1] JMB has not been served with the Complaint as of the filing of these Preliminary Objections. Nevertheless, because the issues raised on behalf of F&D apply equally to JMB, and in anticipation of Plaintiff effecting service on JMB, JMB has joined in these Preliminary Objections.

6.      Turning to Section II.7, Main Street agreed that, at the time of Final Completion, it will pay all of the undisputed, unpaid Contract Balance[2] (i) to the Surety, and (ii) the remaining Contract Balance into an escrow account managed by an independent third party, such that Main Street no longer would be holding any funds that it dedicated to F&D.  Section II.7 of the Settlement and Dedication of Contract Balance Agreement specifically provides, in relevant part, the following:

> When Final Completion is achieved, the Owner will either release the Retainage and any unpaid Contract Balance to the Surety, or a portion thereof that the Owner determines is due and owing, and deposit the remaining Retainage amount and unpaid Contract Balance, if any, into an escrow account maintained by a third party escrow agent selected by the parties ("Escrow Account"), **such that the full amount of Retainage and unpaid Contract Balance has either been paid to the Surety and/or into the Escrow Account.**

(Ex. 1, § II.7 (emphasis added).)

7.      The Settlement and Dedication of Contract Balance Agreement then establishes an alternative dispute resolution process, instead of litigation in court, to resolve the parties' disputes and thereby determine how the Contract Balance in escrow should be distributed.  Section II.8 provides the framework for establishing the escrow account.  Section II.8 states:

> The Parties have agreed that the firm of Land Services USA will serve as the escrow agent to retain escrowed funds, in an interest-bearing account, subject only to release by agreement of Owner and Surety or by court order enforcing an arbitration award as provided in Sections 14 and 15 below.

(Exhibit 1, § II.8.)

8.      As referenced in Section II.8, the agreed upon ADR procedure for distribution of the escrowed funds are found in Sections II.14 and II.15.  Section II.14 requires the parties to engage in "meet and confer" negotiations where it will be determined whether the parties' "dispute"

---

[2] Except the amount due to Main Street for the liquidated damages settlement.

4

concerns all or a portion of the funds.  If there is such a "dispute," then the parties agreed to arbitrate

that dispute under the procedures contained in Section II.15:

> Within thirty (30) days of Final Completion, the parties will meet and confer regarding the release of funds deposited into the Escrow Account. If there is no dispute or there is a dispute only as to a portion of the funds, then those funds which are not in dispute shall be disbursed to the appropriate party or parties within thirty (30) days per the Contract and this Agreement. If there is a dispute among the parties as to some or all of the funds deposited in the Escrow Account, the parties will follow the procedure contained in Section 15 below regarding the disputed funds.

(Exhibit 1, § II.14 (emphasis added).)

9.      Section II.15 of the Settlement and Dedication of Contract Balance Agreement is

entitled "Dispute Procedure" and contains the provisions governing the parties' binding agreement

to arbitrate.  Of particular significance to the allegations in the Complaint, the Dispute Procedure

expressly requires Main Street to arbitrate all disputes regarding liquidated damages and any other

basis for Main Street to withhold Contract Balance funds that are required to be in the escrow.

Section II.15 states, in full:

> If any dispute arises among the Owner, the Surety, and/or JMB with regard to liquidated damages that are assessed and paid into the Escrow Account under this Agreement and/or the basis for withholding funds that are paid into the Escrow Account under this Agreement, then the following dispute resolution procedures will apply:
>
> > (a) if the amount in controversy is under $500,000.00, the dispute will be submitted to binding arbitration before a single arbitrator selected by mutual agreement of the Parties and conducted in accordance with the Construction Industry Rules of the American Arbitration Association ("AAA");
> >
> > (b) if the amount in controversy is over $500,000.00, the dispute will be submitted to binding arbitration before a panel of three arbitrators selected by agreement of the Parties and conducted in accordance with the Construction Industry Rules of the American Arbitration Association ("AAA");

5

(c) venue shall be in Philadelphia, Pennsylvania or such other location as mutually agreed to by the parties;

(d) all AAA costs and fees for arbitration shall be split 50-50 between the parties. Each party shall bear its own legal fees;

(e) The award rendered by a proper awarding authority pursuant to this Section 15 shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction.

(Exhibit 1, § II.15.)

10.    After the Settlement and Dedication of Contract Balance Agreement was signed, Main Street paid F&D previously held amounts and only **one** progress payment.  Because Main Street did not pay any monthly payment applications submitted after December 2020, F&D effectively financed the remainder of construction on its own at a loss of more than $23 million. Main Street's refusal to make payments dedicated to Project completion left an unpaid Contract Balance equaling **$7,167,708.63**.

11.    As admitted by Main Street in Paragraph 68 of its Complaint, this unpaid Contract Balance has been completely withheld from payment to F&D "in an attempt to cover the cost to repair JMB's [alleged] defective and non-conforming Work and for [alleged] liquidated damages." (Compl. ¶ 68.)

12.    In contravention of its agreement, Main Street admits in its Complaint that it has chosen to withhold the Contract Balance.  (See Compl. ¶ 68.)  Main Street has appointed itself the "escrow agent" for disputed funds under the fallacy of circular logic that it may indefinitely hold the Contract Balance until all disputed construction work items are resolved to its satisfaction.  By its refusal to deposit the Contract Balance into the escrow account, Main Street is depriving F&D of bargained-for security and is holding the contractual disputes process hostage.

6

13.     Seeking to break this impasse, F&D filed a complaint against Main Street in the United States District Court for the Eastern District of Pennsylvania ("Federal Court") on August 11, 2021 (the "Federal Court Action").  A copy of the complaint F&D filed in the Federal Court Action is attached hereto as Exhibit 2.  In the Federal Court Action, F&D asserts two causes of action, one for declaratory relief, and the second for an injunction.

14.     F&D seeks a two-part declaration from the Federal Court to address whether Main Street "has a contractual obligation … to place the Balance Due the Suety into the Escrow Account while the parties arbitrate the merit (or lack thereof) of the Owner's claims."  (Ex. 2 at 14, ¶ 62.)  First, F&D requests a declaration that Main Street is "contractually prohibited from controlling and/or holding" the Contract Balance.  (Id. at 15.)  Second, F&D requests a declaration that Main Street "must deposit the entirety of the Balance Due the Surety into the Escrow Account pending the dispute resolution required by Sections II.14 and II.15 of the Settlement and Dedication of Contract Balance Agreement."  (Id.)

15.     As for its cause of action for injunctive relief, F&D seeks an order from the Federal Court requiring Main Street "to immediately deposit the Balance Due the Surety into the Escrow Account established by Section II.8 …if the Balance Due the Surety is not paid in its entirety to the Surety directly."  (Id. ¶ 17.)

16.     Main Street was served with the summons and complaint in the Federal Court Action on August 19, 2021.  Proof of Service is attached hereto as Exhibit 3.

17.     Just over **two weeks later**, Main Street filed its Complaint in this action.  Even though Main Street agreed in the Settlement and Dedication of Contract Balance Agreement to an ADR process that includes binding arbitration for disputes concerning the Contract Balance,

7

liquidated damages assessed, and other bases for withholding payment to F&D, Main Street's Complaint seeks to litigate these very same matters.

18.     Not only has Main Street improperly pushed aside its binding arbitration agreement, it also did not "meet and confer" with F&D and JMB prior to filing this lawsuit, as required by Section II.14 of the Settlement and Dedication of Contract Balance Agreement.

**A.      The Parties Have Agreed to Arbitrate the Issues Raised in the Complaint**

19.     A "strong public policy" exists under Pennsylvania and federal law favoring the enforcement of arbitration agreements.  In re Estate of Atkinson, 231 A.3d 891, 898 (Pa. Super. 2020).

20.     In this regard, the Supreme Court of Pennsylvania has stated that is the obligation of courts in the Commonwealth "to consider questions of arbitrability with a "healthy regard for the federal policy favoring arbitration." Taylor v. Extendicare Health Facilities, Inc., 637 Pa. 195 (2016) (citing Moses H. Cone Memorial Hosp. v. Mercury Constr. Cop., 460 U.S. 1, 20 (1983)).

21.     To determine if a dispute is arbitrable, a two-part test is employed.  Saltzman v. Thomas Jefferson Univ. Hospitals, Inc., 166 A.3d 465, 471-72 (Pa. Super. 2017).   First, courts determine whether a valid agreement to arbitrate exists.  Id. at 472.  Second, courts determine whether the dispute falls within the scope of the arbitration agreement.  Id.

22.     Any doubts "concerning the scope of arbitrable issues should be resolved in favor of arbitration."  In re Estate of Atkinson, 231 A.3d at 898; see also Saltzman, 166 A.3d at 476 ("Where the parties by contract contemplate the settlement of disputes by arbitration, every reasonable intendment will be made in favor of the agreement").

23.     When both elements are found, the dispute must be submitted to arbitration.  "This directive is mandatory, requiring parties to proceed to arbitration on issues subject to a valid

arbitration agreement, even if a state law would otherwise exclude it from arbitration." <u>Saltzman</u>, 166 A.3d at 471-72.

24.     Both elements are unquestionably satisfied in this case.

25.     First, Main Street, F&D and JMB, all are parties to the Settlement and Dedication of Contract Balance Agreement.  The binding arbitration agreement applies to any disputes "among the Owner [Main Street], the Surety [F&D] and/or JMB." (<u>Id.</u> at § II.15.)  As Main Street pled the existence of the Settlement and Dedication of Contract Balance Agreement and attached a copy of it to the Complaint, Main Street cannot legitimately contest the fact that the parties executed an agreement to refer disputes to binding arbitration with the AAA.

26.     Second, the arbitration provision in Section II.15 "will apply" to "<u>any</u> dispute" among Main Street, F&D and/or JMB "with regard to liquidated damages that are assessed and paid into the Escrow Account under this Agreement and/or <u>the basis for withholding funds</u> that are paid into the Escrow Account under this Agreement."  (Ex. 1 at § II.15.)

27.     Consequently, by the plain language of Section II.15, the binding arbitration agreement applies to "<u>any</u> dispute" which led Main Street to assert a "withholding" of the "funds," including "liquidated damages that are assessed," which Main Street otherwise dedicated to F&D's completion effort.  Indeed, for any dispute regarding escrowed funds, the Settlement and Dedication of Contract Balance Agreement requires a "court order <u>enforcing an arbitration award</u>" as a precondition to the distribution of funds.  (Ex. 1 at ¶ II.8. (emphasis added).)

28.     Taken together, these provisions demonstrate that the parties' binding arbitration agreement is broad and all-encompassing with respect to any claim by Main Street that it is entitled to the Contract Balance that it had dedicated to F&D for the completion work.

29.     Main Street's claims against F&D and JMB clearly fall within the scope of Section II.15.  In the Complaint, Main Street alleges claims of defective construction work (Compl. ¶¶ 51 – 64) and delayed substantial completion resulting in the assessment of liquidated damages (Id. at ¶¶ 65 – 67).  Main Street expressly contends in Paragraph 68 of the Complaint that these claims justified the withholding of "remaining Contract funds in an attempt to cover the cost to repair JMB's defective and non-conforming Work and for liquidated damages" (Id. at 68.)

30.     Thus, the subject matter of the Complaint falls squarely within the types of disputes that the parties referred to arbitration under Section II.15 - the assessment of liquidated damages and Main Street's bases for withholding contract funds from payment to F&D.

31.     Apparently hoping to end-run its binding arbitration agreement, Main Street attempts to frame its causes of action under the Construction Contract and the Bond, not the Settlement and Dedication of Contract Balance Agreement.  Controlling precedent prohibits Main Street from relying upon such pleading artifices to escape its arbitration agreement.

32.     The Superior Court repeatedly has recognized that the "claim's substance, not its styling, controls whether the complaining party must proceed to arbitration."  Saltzman, 166 A.3d at 476 (citing Callan v. Oxford Land Dev., Inc., 858 A.2d 1229, 1233 (Pa. Super. 2004) (emphasis added); see also Shadduck v. Christopher J. Kaclik, Inc., 713 A.2d 636, 638-39 (Pa. Super. 1998).

33.     Thus, whether Main Street's claims are pled to arise under the Construction Contract, the Bond, or otherwise, does not determine whether the binding arbitration agreement in Section II.15 of the Settlement and Dedication of Contract Balance Agreement applies.

10

**B.** **Even if Main Street's Claims Were Not Arbitrable, the Court Nevertheless Should Sustain F&D's Preliminary Objection and Dismiss the Complaint Against F&D and JMB Because the Exclusive Subject Matter Jurisdiction Over this Dispute Rests with the Federal Court**

34.     Even if the Court finds that Main Street is not required to arbitrate its claims against F&D and JMB under Section II.15 of the Settlement and Dedication of Contract Balance Agreement, the Court still should dismiss the Complaint against F&D and JMB because the Federal Court already has established jurisdiction over the parties' dispute regarding the disposition of the Contract Balance.

35.     Conveniently ignored in its Complaint, Main Street already had been served with F&D's Federal Court Action at the time Main Street commenced this case on September 3, 2021. (See Proof of Service attached hereto as Exhibit 3.)

36.     In the first-filed Federal Court Action, F&D seeks judicial intervention in the parties' ongoing dispute concerning Main Street's flouting of its obligations under the Settlement and Dedication of Contract Balance Agreement to deposit disputed Contract Balance funds into an independent escrow account.  The subject matter of the Federal Court Action, thus, is the Contract Balance (approximately $7 million) and the proper disposition of those funds pending completion of the parties' disputes procedure.

37.     In this second-filed case, Main Street seeks a judgment that also pertains to the same defined subject matter – the disposition of the Contract Funds.  For the Court to resolve Main Street's claim that it is justified in withholding funds dedicated to F&D, Main Street will have to put on evidence concerning the Contract Balance and demonstrate how its alleged damages are credited against its withholdings.

38.     As the Pennsylvania Supreme Court recognized in Thompson v. Fitzgerald, "[i]t is a doctrine of law too long established to require citation of authorities, that, where a court has

11

jurisdiction, it has a right to decide every question which occurs in the cause, and where the jurisdiction of a court, and the right of a plaintiff to prosecute his suit in it, have once attached, that right cannot be arrested or taken away by proceedings in another court." Thompson v. Fitzgerald, 329 Pa. 497, 504 (1938).

39.     When a first-filed federal action involves the disposition or marshalling of assets, the federal action obtains the exclusive jurisdiction over the subject matter.  Id. at 506.  The federal court's jurisdiction "thereby withdraws [the subject matter] from the jurisdiction of every other court so far as is necessary to accomplish the purpose of the suit, and the court is entitled to retain such control as is requisite to effectuate its final judgment or decree free from the interference of every other tribunal."  Id.

40.     Rather than focusing solely on the fine distinction between proceedings *in rem*, quasi *in rem*, or *in personam*, the Supreme Court of Pennsylvania in In re Estate of Craig recognized when affirming and adopting the lower court's opinion that the "touchstone or lodestar of the courts" should be far more practical, by instead considering how the concurrent cases will affect "the orderly and efficient administration of justice."  In re Estate of Craig, 379 Pa. 157, 195 (1954) ("The line of distinction between proceedings *in personam* and those *in rem* to determine whether or not the jurisdiction acquired by the court in which they are first instituted is exclusive is not to be drawn with academic nicety.  The question is rather one of practical regard for the orderly and efficient administration of justice").

41.     Thus, the question that should be asked is whether "the cases in fact create an actual conflict between the courts which would disturb the harmonious operation of the Federal and State tribunals within the framework of the Republic?"  Id. at 194 – 95.

42.     Proceeding concurrently with both the Federal Court Action and this case absolutely will disturb the orderly and efficient administration of justice.

43.     Should this case proceed at the same time the Federal Court is resolving F&D's requests for declaratory and injunctive relief concerning the disputed Contract Balance and Main Street's escrow obligation, there remains a real risk that this Court and the Federal Court could decide the parties' rights and obligations with respect to the Contract Balance funds in a different or conflicting matter.  Under these circumstances, the Pennsylvania Supreme Court's precedent requires that the first-filed Federal Court Action proceed to the exclusion of any other case, including the one filed here by Main Street.

44.     Accordingly, F&D's Preliminary Objection under Pa. R. Civ. P. 1028(a)(1) should be sustained.

13

**WHEREFORE,** Defendant F&D respectfully requests entry of an Order sustaining its Preliminary Objections and dismissing the Plaintiff's Complaint against F&D and JMB for failure to engage in alternative dispute resolution and for lack of subject matter jurisdiction pursuant to Pa. R. Civ. P. 1028.

DATED:  October 4, 2021

Respectfully Submitted,

_____
Noah H. Charlson
PA ID No. 89210
Charlson Braber McCabe & Denmark, P.C.
1628 JFK Blvd., Suite 1803
Philadelphia, PA 19103
Tel: 215-447-7401
noah@charlsonlaw.com

Christopher J. Brasco (pro hac motion to be filed)
Adam M. Tuckman (pro hac motion to be filed)
Noah C. Meissner (pro hac motion to be filed)
Watt, Tieder, Hoffar & Fitzgerald, LLP
1765 Greensboro Station Place, Suite 1000
McLean, VA 22102
Tel: 703-749-1000
cbrasco@watttieder.com
atuckman@watttieder.com
nmeissner@watttieder.com

*Attorneys for Defendant,*
*Fidelity and Deposit Company of Maryland*

**<u>VERIFICATION</u>**

I, Noah H. Charlson, hereby verify that I am counsel for objecting defendants F&D and JMB, and that the averments in the foregoing Preliminary Objections are within my personal knowledge and this statement is made subject to the penalties of Pa. C.S.A. Section 4904 relating to unsworn falsification of authorities.

_____

Noah H. Charlson, Esq.

Dated:  October 4, 2021

2

Noah H. Charlson, Esq.
PA ID No. 89210
Charlson Braber McCabe & Denmark, P.C.
1628 JFK Blvd., Suite 1803
Philadelphia, PA 19103
Tel: 215-447-7401
noah@charlsonlaw.com

*Attorneys for Defendant,*
*Fidelity and Deposit Company of Maryland*

|  |  |
|---|---|
| **Main Street Phase II, L.P.** ) | IN THE COURT OF COMMON PLEAS |
| ) | CHESTER COUNTY, PA |
| Plaintiff, ) | |
| ) | Case No. 2021-07066-CT |
| v. ) | |
| ) | |
| **JEFFREY M. BROWN ASSOCIATES,** ) | |
| **LLC, et al.** ) | |
| ) | |
| Defendants. ) | |
| ) | |

## DEFENDANT FIDELITY AND DEPOSIT COMPANY OF MARYLAND'S MEMORANDUM IN SUPPORT OF PRELIMINARY OBJECTIONS TO PLAINTIFF'S COMPLAINT

Defendant Fidelity and Deposit Company of Maryland ("F&D") hereby files this Memorandum in Support of its Preliminary Objections to the Complaint filed by Plaintiff, Main Street Phase II, L.P. ("Main Street").

## I.   MATTER BEFORE THE COURT

The matter before the Court is Defendant Fidelity and Deposit Company of Maryland's ("F&D") Motion to Determine Preliminary Objections under Pa. R. Civ. P. 1028 seeking dismissal of Plaintiff Main Street Phase II, L.P.'s Complaint in favor of the agreed-upon arbitration process and for lack of subject matter jurisdiction.

## II.      <u>INTRODUCTION</u>

This action arises from a $48 million dollar mixed-use residential and commercial development project in Exton, Pennsylvania (the "Project").  The developer, Main Street, has sued the general contractor, Jeffrey M. Brown Associates, LLC ("JMB"), as well as F&D, who is the surety that issued payment and performance bonds in support of the Project.  Also named in this suit are a manufacturer and supplier of building materials used in the Project.  After Main Street issued a notice of default to JMB in June 2020 and called upon F&D to complete the Project in accordance with its the performance bond ("Bond"), Main Street, F&D and JMB, executed an agreement entitled, "Liquidated Damages Settlement Agreement and Dedication of Contract Balance" ("Settlement and Dedication of Contract Balance Agreement").  The Settlement and Dedication of Contract Balance Agreement sets forth the terms by which F&D would fund completion of the Project in exchange for Main Street agreeing to pay the remaining contract balance ("Contract Balance") to F&D.  The agreement requires Main Street to pay the Contract Balance in monthly progress payments as the ongoing construction work is performed.  A percentage of the earned progress payments that is withheld from payment (called "retainage"), plus any remaining earned funds, would be due to F&D at final completion.  Critical to F&D, any withholding for items in dispute was required to be deposited into an escrow account for resolution through an agreed upon disputes process culminating in arbitration.

F&D has expended over $23 million to complete the Project.  As of April 2021, the independent Architect of Record certified that the work was 99.53% complete.  Nonetheless, Main Street still holds the $7 million Contract Balance, refusing to deposit the funds into escrow as the Settlement and Dedication of Contract Balance Agreement requires.  Main Street's about-face concerning its dedication of contract funds is based on alleged construction defect claims and its

liquidated damages assessment.  F&D is confident that it will ultimately prove Main Street's claims are specious.  That notwithstanding, Main Street is improperly withholding funds that it committed to place in escrow should a dispute arise as to F&D's entitlement to the money.

Along with failing to deposit the Contract Balance into an escrow account, Main Street has further ignored its arbitration agreement in the Settlement and Dedication of Contract Funds Agreement.  Adjudication of the precise claims and disputes that Main Street raised in its Complaint do not belong in court.  In the Settlement and Dedication of Contract Balance Agreement, the parties agreed that disputes concerning a withholding of the Contract Balance are subject to alternative dispute resolution ("ADR"), including private negotiations and binding arbitration with the American Arbitration Association ("AAA").  As the claims in the Complaint directed at F&D and JMB are subject to arbitration, F&D's Preliminary Objection under Pa. R. Civ. P. 1028(a)(6) on the grounds of failure to submit this dispute to ADR should be sustained.

In the event that the Court does not dismiss F&D and JMB from this lawsuit because Main Street improperly brought arbitrable claims to court, the causes of action against F&D and JMB nevertheless should be dismissed under Pa. R. Civ. P. 1028(a)(1) for lack of subject matter jurisdiction.  The proper disposition of the $7 million Contract Balance fund is a matter over which the U.S. District Court for the Eastern District of Pennsylvania ("Federal Court") already obtained exclusive jurisdiction by the time Main Street filed its lawsuit in this Court.  More than **three weeks** prior to Main Street filing this case, F&D commenced a lawsuit in the Federal Court to enforce Main Street's contractual obligation to either pay F&D undisputed amounts of the Contract Balance, or to deposit any disputed portion of the Contract Balance in an escrow account (the "Federal Court Action").  In the Federal Court Action, F&D seeks a declaration of Main Street's present obligations with respect to the Contract Balance, as well as an injunction ordering Main

Street to deposit the funds in escrow as agreed.  Since the Federal Court first acquired jurisdiction over the parties' competing claims regarding the rightful possession of the Contract Balance, controlling precedent of the Supreme Court of Pennsylvania precludes any other court from deciding this question.  Accordingly, F&D's Preliminary Objection under Pa. R. Civ. P. 1028(a)(1) should be sustained if the Court does not dismiss Main Street's claims due to the parties' arbitration agreement.

## III.   <u>HISTORY OF THE CASE</u>

Main Street is the owner of The Ashbridge Apartments, a multi-family residential and commercial development located in Exton, Pennsylvania.  On or about September 17, 2018, Main Street and JMB, entered into a construction contract under which JMB would serve as the general contractor (the "Construction Contract").  In connection with JMB's work under the Construction Contract, F&D issued a performance bond (the "Bond") for the Project.  In broad terms, a performance bond surety in the construction industry is a secondary obligor that promises to complete the project if the general contractor (the principal) does not fulfill its obligations to the owner (the obligee) under the construction contract; provided however, that the owner, among other things, pays the unpaid portion of the contract price (referred to as the "Contract Balance") to the surety to support the completion effort.

### A.   <u>The Relevant Terms of the Settlement and Dedication of Contract Balance Agreement Governing Resolution of F&D's Preliminary Objections</u>

During the Project, on June 25, 2020, Main Street sent a Notice of Default to JMB, declaring JMB in default of the Construction Contract.  Thereafter, F&D began funding JMB's performance of the construction work under the Bond, subject to a full reservation of rights.  In connection with the parties' rights and obligations under the Bond, the parties negotiated and executed the Settlement and Dedication of Contract Balance Agreement on November 2, 2020.

4

The Settlement and Dedication of Contract Balance Agreement is attached as "Exhibit G" to the Complaint. For the convenience of the Court, it is also attached as Exhibit 1 to F&D's Preliminary Objections.

Dispositive of F&D's first Preliminary Objection, the Settlement and Dedication of Contract Balance Agreement has several provisions that require any potential future disputes between Main Street and F&D regarding the Contract Balance to be resolved through binding ADR. The starting place is Section II.10. There, Main Street agreed that it "dedicates the unpaid Contract Balance to the Surety, except as detailed in Section 7 above." (Ex. 1, § II.10.) Turning to Section II.7, Main Street agreed that, at the time of Final Completion, it will pay all of the undisputed, unpaid Contract Balance[1] (i) to the Surety, and (ii) the remaining Contract Balance into an escrow account managed by an independent third party, such that Main Street no longer would be holding any funds that it dedicated to F&D. Section II.7 of the Settlement and Dedication of Contract Balance Agreement specifically provides, in relevant part, the following:

> When Final Completion is achieved, the Owner will either release the Retainage and any unpaid Contract Balance to the Surety, or a portion thereof that the Owner determines is due and owing, and deposit the remaining Retainage amount and unpaid Contract Balance, if any, into an escrow account maintained by a third party escrow agent selected by the parties ("Escrow Account"), **such that the full amount of Retainage and unpaid Contract Balance has either been paid to the Surety and/or into the Escrow Account**.

(Ex. 1, § II.7 (emphasis added).)

The Settlement and Dedication of Contract Balance Agreement then establishes an alternative dispute resolution process, instead of litigation in court, to resolve the parties' disputes and thereby determine how the Contract Balance in escrow should be distributed. Section II.8 provides the framework for establishing the escrow account. Section II.8 states:

---

[1] Except the amount due to Main Street for the liquidated damages settlement.

> The Parties have agreed that the firm of Land Services USA will serve as the escrow agent to retain escrowed funds, in an interest-bearing account, subject only to release by agreement of Owner and Surety or by court order enforcing an arbitration award as provided in Sections 14 and 15 below.

Exhibit 1, § II.8.)

As referenced in Section II.8, the agreed upon ADR procedures for distribution of the escrowed funds are found in Sections II.14 and II.15. Section II.14 requires the parties to engage in "meet and confer" negotiations where it will be determined whether the parties' "dispute" concerns all or a portion of the funds. If there is such a "dispute," then the parties agreed to arbitrate that dispute under the procedures contained in Section II.15:

> Within thirty (30) days of Final Completion, **the parties will meet and confer** regarding the release of funds deposited into the Escrow Account. If there is no dispute or there is a dispute only as to a portion of the funds, then those funds which are not in dispute shall be disbursed to the appropriate party or parties within thirty (30) days per the Contract and this Agreement. **If there is a dispute among the parties as to some or all of the funds deposited in the Escrow Account, the parties will follow the procedure contained in Section 15 below regarding the disputed funds.**

(Exhibit 1, § II.14 (emphasis added).)

Section II.15 of the Settlement and Dedication of Contract Balance Agreement is entitled "Dispute Procedure" and contains the provisions governing the parties' binding agreement to arbitrate. Of particular significance to the allegations in the Complaint, the Dispute Procedure expressly requires Main Street to arbitrate all disputes regarding liquidated damages and any other basis for Main Street to withhold Contract Balance funds that are required to be in the escrow. Section II.15 states, in full:

> **If any dispute arises among the Owner, the Surety, and/or JMB with regard to liquidated damages that are assessed and paid into the Escrow Account under this Agreement and/or the basis for withholding funds that are paid into the Escrow Account under this Agreement**, then the following dispute resolution procedures will apply:

6

(a) if the amount in controversy is under $500,000.00, the dispute will be submitted to binding arbitration before a single arbitrator selected by mutual agreement of the Parties and conducted in accordance with the Construction Industry Rules of the American Arbitration Association ("AAA");

(b) **if the amount in controversy is over $500,000.00, the dispute will be submitted to binding arbitration** before a panel of three arbitrators selected by agreement of the Parties and conducted in accordance with the Construction Industry Rules of the American Arbitration Association ("AAA");

(c) venue shall be in Philadelphia, Pennsylvania or such other location as mutually agreed to by the parties;

(d) all AAA costs and fees for arbitration shall be split 50-50 between the parties. Each party shall bear its own legal fees;

(e) The award rendered by a proper awarding authority pursuant to this Section 15 shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction.

(Exhibit 1, § II.15.)

**B.** **Main Street Has Refused to pay the Contract Balance to F&D or Deposit Disputed Funds into an Escrow Account as the Predicate for the Parties' ADR Process, Thereby Compelling F&D to File the Federal Court Action on August 11, 2021**

After the Settlement and Dedication of Contract Balance Agreement was signed, Main Street paid F&D previously held amounts and only **one** progress payment.  Because Main Street did not pay any monthly payment applications submitted after December 2020, F&D effectively financed the remainder of construction on its own at a loss of more than $23 million.  Main Street's refusal to make payments dedicated to Project completion left an unpaid Contract Balance equaling **$7,167,708.63**.  As admitted by Main Street in Paragraph 68 of its Complaint, this unpaid Contract Balance has been completely withheld from payment to F&D "in an attempt to cover the cost to repair JMB's [alleged] defective and non-conforming Work and for [alleged] liquidated damages." (Compl. ¶ 68.)  F&D and JMB, of course, have advised Main Street that they completely disagree

with Main Street's defective work and liquidated damages claims and that the entire unpaid Contract Balance should be paid to F&D.

Nonetheless, even if the unpaid Contract Balance is not paid to F&D, Section II.7 of the Settlement and Dedication of Contract Balance Agreement, as set forth above, required Main Street to deposit the Contract Balance into the escrow account as a predicate to the parties' agreed-upon dispute procedure in Sections II.14 and II.15.  In contravention of its agreement, Main Street admits in its Complaint that it has chosen to withhold the Contract Balance.  (See Compl. ¶ 68.) Main Street has appointed itself the "escrow agent" for disputed funds instead under the fallacy of circular logic that it may indefinitely hold the Contract Balance until all disputed construction work items are resolved to its satisfaction.  By its refusal to deposit the Contract Balance into the escrow account, Main Street is depriving F&D of bargained-for security and is holding the contractual disputes process hostage.

Seeking to break this impasse, F&D filed a complaint against Main Street in the Federal Court on August 11, 2021.  A copy of the complaint F&D filed in the Federal Court Action is attached to F&D's Preliminary Objections as Exhibit 2.  In the Federal Court Action, F&D asserts two causes of action, one for declaratory relief, and the second for an injunction.  F&D seeks a two-part declaration from the Federal Court to address whether Main Street "has a contractual obligation … to place the Balance Due the Surety into the Escrow Account while the parties arbitrate the merit (or lack thereof) of the Owner's claims." (Ex. 2 at 14, ¶ 62.)  First, F&D requests a declaration that Main Street is "contractually prohibited from controlling and/or holding" the Contract Balance.  (Id. at 15.)  Second, F&D requests a declaration that Main Street "must deposit the entirety of the Balance Due the Surety into the Escrow Account pending the dispute resolution required by Sections II.14 and II.15 of the Settlement and Dedication of Contract Balance

Agreement."  (Id.)  As for its cause of action for injunctive relief, F&D seeks an order from the Federal Court requiring Main Street "to immediately deposit the Balance Due the Surety into the Escrow Account established by Section II.8 …if the Balance Due the Surety is not paid in its entirety to the Surety directly."  (Id. at 17.)

C. **Weeks After Being Served with the Federal Court Action, Main Street Filed Its Complaint in this Court Seeking to Adjudicate Claims It Agreed to Arbitrate**

Main Street was served with the summons and complaint in the Federal Court Action on August 19, 2021.  Proof of Service is attached to F&D's Preliminary Objections as Exhibit 3.  Just over **two weeks later**, Main Street filed its Complaint in this action.  Even though Main Street agreed in the Settlement and Dedication of Contract Balance Agreement to an ADR process that includes binding arbitration for disputes concerning the Contract Balance, liquidated damages assessed, and other bases for withholding payment to F&D, Main Street's Complaint seeks to litigate these very same matters.  Not only has Main Street improperly pushed aside its binding arbitration agreement, it also did not "meet and confer" with F&D and JMB prior to filing this lawsuit, as required by Section II.14 of the Settlement and Dedication of Contract Balance Agreement.

IV. **QUESTIONS PRESENTED**

1. Whether Plaintiff's Complaint against F&D and JMB should be dismissed in accordance with Pa. Civ. P. R. 1028(a)(6) because Main Street is improperly attempting to litigate claims and disputes it agreed to submit to alternative dispute resolution, including binding arbitration, under Sections II.8, II.14, and II.15 of the Settlement and Dedication of Contract Balance Agreement?

**Suggested Answer:  Yes.**

2.      If Main Street's Complaint against F&D and JMB is not considered arbitrable under the Settlement and Dedication of Contract Balance Agreement, whether F&D's Preliminary Objection to Plaintiff's Complaint should be sustained under Pa. R. Civ. P. 1028(a)(1) because the Federal Court first acquired exclusive jurisdiction over the disposition of the Contract Balance funds, and therefore only the Federal Court, to the exclusion of all courts, should determine whether Main Street or F&D is entitled to possession of the Contract Balance fund?

**Suggested Answer:  Yes.**

## V.      LEGAL ARGUMENT

F&D's Preliminary Objections to Main Street's Complaint should be sustained, and F&D and JMB, therefore, dismissed from this lawsuit, for the following two, equally dispositive reasons. First, the Complaint as against F&D and JMB is subject to alternative dispute resolution, including binding arbitration, under the parties' Settlement and Dedication of Contract Balance Agreement. Second, the Federal Court has exclusive jurisdiction to determine the rightful possessors, in whole or in part, of the Contract Balance by way of F&D's first-filed case. Therefore, even if the Court finds Main Street's claims against F&D and JMB are not arbitrable, it should nevertheless decline to adjudicate those claims, as the parties' dispute concerning the appropriate possession/allocation of the Contract Balance is already before another court.

### A.      The Parties Have Agreed to Arbitrate the Issues Raised in the Complaint

A "strong public policy" exists under Pennsylvania and federal law favoring the enforcement of arbitration agreements.  In re Estate of Atkinson, 231 A.3d 891, 898 (Pa. Super. 2020).  In this regard, the Supreme Court of Pennsylvania has stated that is the obligation of courts in the Commonwealth "to consider questions of arbitrability with a healthy regard for the federal policy favoring arbitration." Taylor v. Extendicare Health Facilities, Inc., 637 Pa. 193, 195 (2016)

(citing Moses H. Cone Memorial Hosp. v. Mercury Constr. Cop., 460 U.S. 1, 20 (1983) (internal quotations omitted)).

To determine if a dispute is arbitrable, a two-part test is employed. Saltzman v. Thomas Jefferson Univ. Hospitals, Inc., 166 A.3d 465, 471-72 (Pa. Super. 2017).[2] First, courts determine whether a valid agreement to arbitrate exists. Id. at 472. Second, courts determine whether the dispute falls within the scope of the arbitration agreement. Id. Any doubts "concerning the scope of arbitrable issues should be resolved in favor of arbitration." In re Estate of Atkinson, 231 A.3d at 898; see also Saltzman, 166 A.3d at 476 ("Where the parties by contract contemplate the settlement of disputes by arbitration, every reasonable intendment will be made in favor of the agreement"). When both elements are found, the dispute must be submitted to arbitration. "This directive is mandatory, requiring parties to proceed to arbitration on issues subject to a valid arbitration agreement, even if a state law would otherwise exclude it from arbitration." Saltzman, 166 A.3d at 471-72.

As set forth below, both elements are unquestionably satisfied in this case. An arbitration agreement exists among F&D, Main Street and JMB, in the Settlement and Dedication of Contract Balance Agreement, and that agreement covers the Complaint against F&D and JMB. Accordingly, Main Street is obligated to submit its claims against F&D and JMB to arbitration.

      1.    An Arbitration Agreement Exists Among Main Street, F&D and JMB

As described in the History of the Case in Section III above, the Settlement and Dedication of Contract Balance Agreement provides in Section II.15, entitled Dispute Procedure, an agreement to submit controversies to "binding arbitration" in accordance with the Construction

---

[2] The inquiry is the same whether the agreement is governed by the Federal Arbitration Act ("FAA") or Pennsylvania law. Id.

Industry Rules of the American Arbitration Association ("AAA").  (Ex. 1, § II.15.)   Main Street, F&D and JMB, all are parties to the Settlement and Dedication of Contract Balance Agreement. The binding arbitration agreement applies to any disputes "among the Owner [Main Street], the Surety [F&D] and/or JMB."  (Id. at § II.15.)  As Main Street pled the existence of the Settlement and Dedication of Contract Balance Agreement and attached a copy of it to the Complaint, Main Street cannot legitimately contest the fact that the parties executed an agreement to refer disputes to binding arbitration with the AAA.  Accordingly, the first element of the arbitrability test is easily satisfied.

> 2.   The Complaint as Against F&D and JMB Falls Within the Scope of Main Street's Agreement to Arbitrate

The second factor – whether the parties' dispute falls within the scope of the parties' arbitration agreement – also is easily satisfied in this case.

According to its express terms, the arbitration provision in Section II.15 "will apply" to "any dispute" among Main Street, F&D and/or JMB "with regard to liquidated damages that are assessed and paid into the Escrow Account under this Agreement and/or the basis for withholding funds that are paid into the Escrow Account under this Agreement."  (Ex. 1 at § II.15.)  It is important to recall from the History of the Case above that the term "funds" addressed in Section II.15 are the unpaid construction contract funds that Main Street dedicated to Project completion as the work progressed (i.e. the Contract Balance).  In the Settlement and Dedication of Contract Balance Agreement, Main Street dedicated the contract funds to F&D in exchange for F&D's performance under the Bond after Main Street's declaration of JMB's default.  Consequently, by the plain language of Section II.15, the binding arbitration agreement applies to "any dispute" which led Main Street to assert a "withholding" of the "funds," including "liquidated damages that are assessed," which Main Street otherwise dedicated to F&D's completion effort.  Indeed, for any

12

dispute regarding escrowed funds, the Settlement and Dedication of Contract Balance Agreement requires a "court order enforcing an arbitration award" as a precondition to the distribution of funds. (Ex. 1 at ¶ II.8. (emphasis added).)  Taken together, these provisions demonstrate that the parties' binding arbitration agreement is broad and all-encompassing with respect to any claim by Main Street that it is entitled to retain the Contract Balance that it had dedicated to F&D for the completion work.

Main Street's claims against F&D and JMB clearly fall within the scope of Section II.15. In the Complaint, Main Street alleges claims of defective construction work (Compl. ¶¶ 51 – 64) and delayed substantial completion resulting in the assessment of liquidated damages (Id. at ¶¶ 65 – 67).  Main Street expressly contends in Paragraph 68 of the Complaint that these claims justified the withholding of "remaining Contract funds in an attempt to cover the cost to repair JMB's defective and non-conforming Work and for liquidated damages" (Id. at 68.)  Thus, the subject matter of the Complaint falls squarely within the types of disputes that the parties referred to arbitration under Section II.15 - the assessment of liquidated damages and Main Street's bases for withholding contract funds from payment to F&D.  It is logically impossible for the Court to resolve Main Street's claim for monetary damages without adjudicating either the "liquidated damages that are assessed" or Main Street's "basis for withholding funds," both of which are expressly arbitrable under the Settlement and Dedication of Contract Balance Agreement.

In its Complaint, Main Street tiptoes around the plain fact that it agreed to arbitrate the very same claims alleged in its pleading by framing its causes of action as arising under the Construction Contract and the Bond, not the Settlement and Dedication of Contract Balance Agreement. Controlling precedent prohibits Main Street from relying upon such pleading artifices to escape its arbitration agreement.

The Superior Court has repeatedly recognized that the "claim's substance, not its styling, controls whether the complaining party must proceed to arbitration." Saltzman, 166 A.3d at 476 (citing Callan v. Oxford Land Dev., Inc., 858 A.2d 1229, 1233 (Pa. Super. 2004)) (emphasis added); see also Shadduck v. Christopher J. Kaclik, Inc., 713 A.2d 636, 638-39 (Pa. Super. 1998) (rejecting argument that claims for misrepresentation and violations of the Unfair Trade Practices and Consumer Protection Law were not arbitrable along with breach of contract claims because the same factual averments underlie both the tort and breach of contract claims). Thus, whether Main Street's claims are pled to arise under the Construction Contract, the Bond, or otherwise, does not determine whether the binding arbitration agreement in Section II.15 of the Settlement and Dedication of Contract Balance Agreement applies. Rather than the legal theory alleged in the Complaint, what matters is that the "factual underpinnings" of Main Street's alleged right to withhold the Contract Balance. Saltzman, 166 A.3d at 476. The "factual underpinning" of Main Street's claims is the withholding of payment funds dedicated to F&D rooted in alleged defects and liquidated damages, which squarely fall within the precise scope of the binding arbitration agreement in Section II.15. Therefore, Main Street's Complaint as against F&D and JMB must be arbitrated.[3]

For the foregoing reasons, F&D's Preliminary Objection under Pa. R. Civ. P. 1028(a)(6) should be sustained.

---

[3] Nor is it relevant that Main Street named two additional parties, United Window & Door Manufacturing, Inc. and 84 Lumber Company, as defendants. The presence of these two Defendants in the lawsuit does not preclude the Court from dismissing Main Street's claims against F&D and JMB. See Taylor, 637 Pa. at 191 ("where a plaintiff has multiple disputes with separate defendants arising from the same incident, and only one of those claims is subject to an arbitration agreement, the Court requires, as a matter of law, adjudication in separate forums").

**B.** **Even if Main Street's Claims Were Not Arbitrable, the Court Nevertheless Should Sustain F&D's Preliminary Objection and Dismiss the Complaint Against F&D and JMB Because the Exclusive Subject Matter Jurisdiction Over this Dispute Rests with the Federal Court**

Even if the Court finds that Main Street is not required to arbitrate its claims against F&D and JMB under Section II.15 of the Settlement and Dedication of Contract Balance Agreement, the Court still should dismiss the Complaint against F&D and JMB because the Federal Court already has established jurisdiction over the parties' dispute regarding the disposition of the Contract Balance.

Conveniently ignored in its Complaint, Main Street already had been served with F&D's Federal Court Action at the time Main Street commenced this case on September 3, 2021.  (Ex. 3.) In the first-filed Federal Court Action, F&D seeks judicial intervention in the parties' ongoing dispute concerning Main Street's flouting of its obligations under the Settlement and Dedication of Contract Balance Agreement to deposit disputed Contract Balance funds into an independent escrow account.  The subject matter of the Federal Court Action, thus, is the Contract Balance (approximately $7 million) and the proper disposition of those funds pending completion of the parties' disputes procedure.

In this second-filed case, Main Street seeks a judgment that also pertains to the same defined subject matter – the disposition of the Contract Funds.  For the Court to resolve Main Street's claim that it is justified in withholding funds dedicated to F&D, Main Street will have to put on evidence concerning the Contract Balance and demonstrate how its alleged damages are valid and should be credited against its withholdings.  Similarly, should this case proceed beyond Preliminary Objections, F&D would be forced to address Main Street's improper appointment of itself as the escrow agent during the pendency of the parties' dispute.  In this regard, F&D will have to counterclaim in which it affirmatively seeks to dislodge the Contract Balance from Main

15

Street's possession.  Consequently, the Complaint raises the same exact Contract Funds dispute that is already before Federal Court.

Firmly entrenched guardrails exist in the law to prevent, as here, a state court and a federal court from being asked to adjudicate the same subject matter.  As the Pennsylvania Supreme Court recognized in Thompson v. Fitzgerald, "[i]t is a doctrine of law too long established to require citation of authorities, that, where a court has jurisdiction, it has a right to decide every question which occurs in the cause, and where the jurisdiction of a court, and the right of a plaintiff to prosecute his suit in it, have once attached, that right cannot be arrested or taken away by proceedings in another court."  Thompson v. Fitzgerald, 329 Pa. 497, 504 (1938). When a first-filed federal action involves the disposition or marshalling of assets, the federal action obtains the exclusive jurisdiction over the subject matter.  Id. at 506.  The federal court's jurisdiction "thereby withdraws [the subject matter] from the jurisdiction of every other court so far as is necessary to accomplish the purpose of the suit, and the court is entitled to retain such control as is requisite to effectuate its final judgment or decree free from the interference of every other tribunal."  Id.

In the application of this rule, disputes have arisen regarding the extent to which the subject matter concurrently in two forums calls for one or both courts to exercise control over the disposition of property or assets.  Rather than focusing solely on the fine distinction between proceedings *in rem*, quasi *in rem*, or *in personam*, the Supreme Court of Pennsylvania in Estate of Craig recognized that the "touchstone or lodestar of the courts" should be far more practical, by instead considering how the concurrent cases will affect "the orderly and efficient administration of justice."  In re Estate of Craig, 379 Pa. 157, 195 (1954) ("The line of distinction between proceedings *in personam* and those *in rem* to determine whether or not the jurisdiction acquired by the court in which they are first instituted is exclusive is not to be drawn with academic nicety.

16

The question is rather one of practical regard for the orderly and efficient administration of justice").  Thus, the question that must be asked is whether "the cases in fact create an actual conflict between the courts which would disturb the harmonious operation of the Federal and State tribunals within the framework of the Republic?"  Id. at 194 – 95.

Proceeding concurrently with both the Federal Court Action and this case absolutely will disturb the orderly and efficient administration of justice.  Adjudicating this case concurrently with the Federal Court Action would present "an intolerable situation," In re Estate of Craig, 379 Pa. at 196, whereby one of the courts could determine that Main Street is obligated to deposit the Contract Funds in escrow pending resolution of the disputed defect and liquidated damages claims, while the other court concludes that the disposition of the Contract funds should be handled differently (i.e. retained by Main Street or paid directly to F&D). To be clear, F&D's position is that the Settlement and Dedication of Contract Balance Agreement is unambiguous in requiring Main Street to presently pay the Contract Balance to F&D, or if not, deposit the Contract Balance in the escrow account, in whole or in part, so that the dispute can be arbitrated under Section II.15. Nonetheless, should this case proceed at the same time that the Federal Court is resolving F&D's requests for declaratory and injunctive relief concerning the disputed Contract Balance and Main Street's escrow obligation, there remains a real risk that this Court and the Federal Court could decide the parties' rights and obligations with respect to the Contract Balance funds in a different or conflicting matter.  Under these circumstances, the Pennsylvania Supreme Court's precedent requires that the first-filed Federal Court Action proceed to the exclusion of any other case,

including the one filed here by Main Street.[4]  Accordingly, F&D's Preliminary Objection under Pa. R. Civ. P. 1028(a)(1) should be sustained.

## VI.      <u>CONCLUSION</u>

For the foregoing reasons, F&D respectfully requests that:

(1) its Preliminary Objection under Pa. R. Civ. P. 1028(a)(6) be **SUSTAINED**, resulting in the dismissal of the Complaint as against F&D and JMB; and in the alternative,

(2) its Preliminary Objection under Pa. R. Civ. P. 1028(a)(1) be **SUSTAINED**, resulting in the dismissal of the Complaint as against F&D and JMB.

DATED:  October 22, 2021

Respectfully Submitted,

_____
Noah H. Charlson
PA ID No. 89210
Charlson Braber McCabe & Denmark, P.C.
1628 JFK Blvd., Suite 1803
Philadelphia, PA 19103
Tel: 215-447-7401
noah@charlsonlaw.com

Christopher J. Brasco (pro hac motion to be filed)
Adam M. Tuckman (pro hac motion to be filed)
Noah C. Meissner (pro hac motion to be filed)
Watt, Tieder, Hoffar & Fitzgerald, LLP
1765 Greensboro Station Place, Suite 1000
McLean, VA 22102
Tel: 703-749-1000
cbrasco@watttieder.com
atuckman@watttieder.com
nmeissner@watttieder.com

---

[4] In the event that Main Street's claims in this case are not arbitrable, dismissal of this case on these grounds would not leave Main Street without a forum to assert its claims against F&D and JMB.  Main Street can simply counterclaim against F&D and assert third-party claims against JMB in the Federal Court Action.

18

*Attorneys for Defendant,*
*Fidelity and Deposit Company of Maryland*

## CERTIFICATE OF SERVICE

I certify that on the 22nd day of October 2021, the foregoing Memorandum in Support of

Preliminary Objections was served upon the following by the method indicated:

### BY ECF NOTIFICATION AND ELECTRONIC MAIL

Sandhya M. Feltes
Kaplin Stewart
910 Harvest Drive
Blue Bell, PA 19422
sfeltes@kaplaw.com

Steven M. Coren
Kaufman, Coren & Ress, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
scoren@kcr-law.com
*Attorneys for Main Street Phase II and Main Street Phase III*

William R. Murphy, III Esq.
Norris McLaughlin P.A.
515 West Hamilton Street, Suite 502
Allentown, PA 18101
wmurphy@norris-law.com
*Attorneys for United Window & Door*

### BY FIRST CLASS MAIL

84 Lumber Company
1019 Route 519
Eighty Four, PA 15330

_____
Noah H. Charlson

**EXHIBIT 3**

MAIN STREET PHASE II, L.P.      :  IN THE COURT OF COMM.

          VS.        :  CHESTER COUNTY, PEN

JEFFREY M. BROWN ASSOCIATES,  :
LLC, FIDELITY AND DEPOSIT      :
COMPANY OF MARYLAND, UNITED  :  NO. 2021-07066-CT
WINDOW & DOOR MANUFACTURING,:
INC. and 84 LUMBER COMPANY    :  CIVIL ACTION

*Filed and Attested by
PROTHONOTARY
24 Nov 2021 12:52 PM
S. Peery*

## ORDER

AND NOW, this **24**ᵗʰ day of November, 2021, upon consideration and review

of the Preliminary Objections of Defendant Fidelity and Deposit Company of Maryland

("F&D"), joined in by Defendant Jeffrey M. Brown Associates, LLC ("JMB"), and

Plaintiff's Response thereto, it is hereby ORDERED[1] that:

1. Defendants Fidelity and Deposit Company of Maryland and Jeffrey M. Brown
   Associates, LLC.'s preliminary objection under Pa.R.Civ.P. 1028 (a)(6) is
   **SUSTAINED**; and

2. Defendants Fidelity and Deposit Company of Maryland and Jeffrey M. Brown
   Associates, LLC.'s preliminary objection under Pa.R.Civ.P. 1028 (a)(1) is
   **OVERRULED**.

BY THE COURT:

Jeffrey R. Sommer        J.

---

[1] Plaintiff, Main Street Phase II, L.P. ("Main Street"), is the owner of a mixed residential and commercial development in Exton, Chester County, Pennsylvania. The residential portion, known as Ashbridge, consists of six multi-story apartment buildings with amenities (the "Project"). In 2018, Main Street and JMB entered into a contract whereby JMB agreed to perform certain construction work for the apartment buildings (the "Work") for approximately $45 million (the "Contract"). The Contract required JMB to perform the Work in accordance with the Contract and related documents and to promptly correct and pay for Work which failed to conform to the Contract's requirements. F&D, as surety for JMB, executed and delivered a Performance Bond to

Main Street in the original penal sum of $31,860,715.00 ("Performance Bond"). The factual background of the present dispute, as set forth in Plaintiff's memorandum in response to the preliminary objections, is as follows.

On June 25, 2020, Main Street issued a Notice of Default to JMB. It demanded that F&D, pursuant to its obligations under the Performance Bond, complete and correct JMB's Work. In or about July, 2020, F&D elected under the Performance Bond to provide financial and project management assistance to JMB to complete JMB's obligations under the Contract. Between July, 2020 and November, 2020, Main Street, F&D and JMB, through counsel, engaged in negotiations regarding the completion of JMB's Work, Main Street's liquidated damages, and F&D's obligations under the Performance Bond. On November 2, 2020, Main Street, F&D and JMB entered into a Liquidated Damages Settlement Agreement and Dedication of Contract Balance ("Liquidated Damages Agreement" or "Agr.").

Under the Liquidated Damages Agreement, the parties agreed to several terms, including but not limited to, an agreement that (a) JMB would complete the Project and perform all of its obligations under the Construction Contract in accordance with the Contract Documents (Defs' Memo., Ex. 1, Agr., p.1); (b) F&D would advance funds to JMB to assist JMB in fulfilling its obligations under the Contract (Agr., § II.8); (c) Main Street would receive $6 million for liquidated damages incurred through the date of the Agreement (Agr., §II.6); (d) the Substantial Completion deadlines would be extended; and (e) Main Street would receive additional liquidated damages if JMB failed to achieve Substantial Completion by the new deadlines. (Agr., §§ II.11, II.12). The Liquidated Damages Agreement also contained an arbitration provision, which is at the center of these preliminary objections.

Section 7 of the Liquidated Damages Agreement states in pertinent part:
7. **Owner's Collection of Settlement Amount from Project Payments:**

\*\*\*

When Final Completion is achieved, the Owner will either release the Retainage and any unpaid Contract Balance to the Surety, or a portion thereof that the Owner determines is due and owing, and deposit the remaining Retainage amount and unpaid Contract Balance, if any, into an escrow account maintained by a third party escrow agent selected by the parties….

(Agr., ¶ 7).

Paragraphs 14 and 15 of the Liquidated Damages Agreement thereafter provide:

14. **Release of Escrow Funds**: Within thirty (30) days of Final Completion, the parties will meet and confer regarding the release of funds deposited into the Escrow Account. If there is no dispute or there is a dispute only as to a portion of the funds, then those funds which are not in dispute shall be disbursed to the appropriate party or parties within thirty (30) days per the Contract and this Agreement. If there is a dispute among the parties as to some or all of the funds

2

deposited in the Escrow Account, the parties will follow the procedure contained in Section 15 below regarding the disputed funds.

15. **Dispute Procedure**: If any dispute arises among the Owner, the Surety, and/or JMB with regard to liquidated damages that are assessed and paid into the Escrow Account under this Agreement and/or the basis for withholding funds that are paid into the Escrow Account under this Agreement, then the following dispute resolution procedures will apply:

(a) if the amount in controversy is under $500,000.00, the dispute will be submitted to binding arbitration before a single arbitrator selected by mutual agreement of the Parties and conducted in accordance with the Construction Industry Rules of the American Arbitration Association ("AAA");

(b) if the amount in controversy is over $500,000.00, the dispute will be submitted to binding arbitration before a panel of three arbitrators selected by agreement of the Parties and conducted in accordance with the Construction Industry Rules of the American Arbitration Association ("AAA");

(c) venue shall be in Philadelphia, Pennsylvania or such other location as mutually agreed to by the parties;

(d) all AAA costs and fees for arbitration shall be split 50-50 between the parties. Each party shall bear its own legal fees;

(e) The award rendered by a proper awarding authority pursuant to this Section 15 shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction.

(Agr., ¶¶ 14, 15).

Based upon what it contends are substantial losses and damages caused by the defective and incomplete work of JMB, Main Street withheld Contract funds. According to Main Street, its estimated damages, which include liquidated damages, far exceed the amount of Contract funds withheld by Main Street. To date, no funds have been placed into escrow by Main Street.

In response to Main Street's withholding, on August 11, 2021, F&D instituted a lawsuit in the U.S. District Court for the Eastern District of Pennsylvania at Docket No. 21-cv-03576 ("Federal Action"). In the Federal Action, F&D seeks to compel Main Street to deposit funds into an escrow account. Main Street has filed a Motion to Dismiss the Federal Action based upon a lack of diversity subject matter jurisdiction. The Motion remains undecided as of the date of the parties' filings.

On September 3, 2021, Main Street commenced this case. In its Complaint, Main Street asserts claims against F&D for breach of contract, breach of the duty of good faith and fair dealing and breach of warranty against JMB and United Window & Door and 84 Lumber. Main Street seeks an award of liquidated and compensatory damages against the defendants.

3

F&D, joined in by JMB (collectively "F&D"), preliminarily objects to Main Street's Complaint on two grounds: (1) the matters addressed in this action are the subject of an agreement to arbitrate and (2) the Federal Action was the first-filed action and therefore this court lacks jurisdiction over the matter.  The court will address the dispositive question of jurisdiction first.

<u>Preliminary Objection – Dismissal Based Upon a Lack of Subject Matter Jurisdiction</u>

F&D asserts that the Federal Court has established jurisdiction over the parties' dispute as the first-filed action.  According to F&D, the subject matter of the Federal Court action is the contract balance under the parties' Agreement and the proper disposition of those funds and liquidated damages pending completion of the parties' dispute procedure.  The second-filed case, it argues, seeks a judgment that involves the same defined subject matter – the disposition of contract funds and liquidated damages.  It argues that in order for the Federal Court to resolve Main Street's claim that it is justified in withholding funds dedicated to F&D, Main Street will have to put on evidence concerning the Contract balance and demonstrate how its alleged damages are valid and should be credited against its withholdings.  Similarly, if this case were to proceed, it would necessarily need to address Main Street's withholding of funds and implicate the same Contract funds dispute that is before Federal Court.

As the Superior Court explained in *Davis Cookie Co., Inc. v. Wasley*, 389 Pa. Super. 112, 566 A.2d 870 (1989), a demand for dismissal or other form of abatement based upon the pendency of a prior action is typically referred to as one for *lis pendens*. Under this common law doctrine, if a party seeks dismissal of an action based upon the pendency of a prior action, then the strict identity requirements of the doctrine must be met.  If, however, a party does not seek dismissal, but a stay of the action, the court may exercise its discretion and grant such relief even if the strict requirements of *lis pendens* are not met.  *See Singer v. Dong Sup Cha, M.D.*, 379 Pa. Super. 556, 550 A.2d 791 (1988).  Here, F&D is seeking dismissal of the Complaint and so it is under the strict requirements of *lis* pendens that the request must be examined.

*Pendency of a Prior Action*

There is no dispute that the Federal Action was filed almost a month before the present action.  However, where dismissal is sought, the technical requirement of a complete identity of claims is essential.  A party asserting the defense of *lis pendens* must show that "the case is the same, the parties the same, and the rights asserted and relief prayed for the same...." *Penox Technologies, Inc. v. Foster Medical Corp.,* 376 Pa. Super. 450, 546 A.2d 114 (1988).   Courts have refused to dismiss causes of action under the doctrine of *lis pendens* in cases where the later cause of action derived from the same contract or events that formed the basis of the prior action but the right asserted or the relief sought in the two actions are not the same. *Id.*

4

Here, neither the parties nor the rights asserted and relief sought are identical (contract vs. declaratory judgment). Thus, the facts of this case do not meet the strict identity requirements for dismissal under the doctrine of *lis pendens*.

<u>Preliminary Objection – Dismissal in Favor of Agreed-Upon Arbitration Provision</u>

According to F&D, pursuant to the terms of the parties' Liquidated Damages Agreement, the claims asserted against F&D and JMB in this action are subject to alternative dispute resolution, including binding arbitration, and it seeks dismissal on this ground.

A "strong public policy" exists under Pennsylvania and federal law favoring the enforcement of arbitration agreements. *In re Estate of Atkinson*, 231 A.3d 891, 898 (Pa. Super. 2020). In determining the arbitrability of a claim, the court must apply a two-part test to determine: (1) does a valid agreement to arbitrate exist and (2) does the dispute fall within the scope of the arbitration agreement. *Saltzman v. Thomas Jefferson Univ. Hospitals, Inc.*, 166 A.3d 465, 471-72 (Pa. Super. 2017). The parties agree that the first requirement – a valid arbitration agreement – is met here. Their dispute centers upon whether this action falls within the scope of the parties' arbitration agreement.

Main Street contends that the acknowledged arbitration provision is "narrowly tailored" and does not require arbitration of its breach of contract or warranty claims against F&D or JMB. According to Main Street, arbitration is required only if (1) funds have been deposited into an Escrow Account and (2) there is a dispute regarding entitlement to those funds. In other words, the depositing of funds is a prerequisite for arbitration and Main Street has not deposited any funds. Therefore, there is no requirement to arbitrate. Finally, Main Street argues that F&D waived any right to compel arbitration by filing the Federal Action. The court will address the waiver argument first.

*Waiver*

A party may waive the right to enforce an agreement to arbitrate either expressly or by waiver inferred from the party's conduct if that conduct is so inconsistent with the purpose of the contract arbitration provision that it leaves no opportunity for a reasonable inference to the contrary. *Goral v. Fox Ridge, Inc.*, 453 Pa. Super. 316, 683 A.2d 931, 933 (1996). Public policy in favor of arbitration dictates that waiver will not be lightly inferred. *Id.*

In defending against Main Street's claim that it waived any right to seek arbitration, F&D argues that the Federal Action only seeks declaratory and injunctive relief and asks that the federal court require Main Street to make a deposit into an escrow account, which by agreement, is the predicate to resolution of the parties' substantive construction disputes in ADR, including arbitration. It further argues that that it has asserted its right to compel arbitration throughout the Federal Action, thus indicating its intention to fulfill the parties' agreement to arbitrate.

The court agrees that F&D's right to arbitration has not been waived.  To infer waiver, the court must determine whether the party seeking to enforce arbitration has "accepted the judicial process" *in lieu* of arbitration.  *O'Donnell v. Hovnanian Enterprises, Inc.,* 29 A.3d 1183 (Pa. Super. 2011).

> Acceptance of the judicial process is demonstrated when the party (1) fails to raise the issue of arbitration promptly, (2) engages in discovery, (3) files pretrial motions which do not raise the issue of arbitration, (4) waits for adverse rulings on pretrial motions before asserting arbitration, or (5) waits until the case is ready for trial before asserting arbitration.

*St. Clair Area Sch. Dist. Bd. of Educ. v. E.I. Assocs.,* 733 A.2d 677, 682 n. 6 (Pa. Cmwlth. 1999).

The mere filing of a complaint or an answer in a court proceeding will not result in waiver of the right to compel arbitration. *Keystone Tech. Grp., Inc. v. Kerr Grp., Inc.,* 824 A.2d 1223, 1226 (Pa. Super. 2003).  The party asserting waiver must show prejudice to it or undue advantage gained by the other party to be successful on the waiver argument. *Id.*

In this case, F&D raised the issue of arbitration by the filing of preliminary objections less than two months after the Federal Action and one month following the filing of the Complaint in this matter.  No discovery has taken place in this case, and importantly, Main Street has not demonstrated that it has suffered any prejudice or that F&D gained any unfair advantage by filing the Federal Action.  Accordingly, the court concludes that F&D did not waive its right to compel arbitration by initiating the Federal Action. *Id.*

*Arbitrability: Scope of the Arbitration Agreement*

In ascertaining the intent of the parties to a contract, a court should consider an interpretation that is most reasonable and probable bearing in mind the objects which the parties intended to accomplish through the agreement.  *Laudig v. Laudig,* 624 A.2d 651, 653 (Pa. Super. 1993).  "If it appears that a dispute relates to a contract's subject matter and the parties agreed to arbitrate, all issues of interpretation and procedure are for the arbitrators to resolve." *Warwick Twp. Water and Sewer Authority v. Boucher & James, Inc.,* 851 A.2d 953, 955 (Pa. Super. 2004).

The title of the parties' negotiated agreement is the first clear indication of their intentions in executing the Liquidated Damages Agreement.  As titled, the "Liquidated Damages Settlement Agreement and Dedication of Contract Balance" served to resolve any and all claims, past and future, for liquidated damages.  It is those damages which Main Street seeks in this action.

The negotiated provisions of the Liquidated Damages Agreement then specifically address the collection of settlement funds, the calculation and imposition of liquidated damages and the disposition and dedication of the unpaid Contract Balance.

The mechanism for doing so was an escrow account funded in accordance with Paragraphs 7, 8, 10, 11, 12 and 14.

As for the agreement to arbitrate, it broadly encompasses "any disputes" that arise "with regard to liquidated damages that are assessed" or the "basis for withholding funds that are paid into the Escrow Account." The court agrees with F&D that Main Street's claims against F&D and JMB fall squarely within the scope of Section II.15. In its Complaint, Main Street alleges claims of defective construction work (Compl. ¶¶ 51–64) and delayed substantial completion resulting in the assessment of liquidated damages (Id. at ¶¶ 65–67). Main Street expressly contends in Paragraph 68 of the Complaint that these claims justified the withholding of "remaining Contract funds in an attempt to cover the cost to repair JMB's defective and non-conforming Work and for liquidated damages" (*Id.* at 68.) It is a "claim's substance, not its styling," that controls whether the complaining party must proceed to arbitration." *Callan v. Oxford Land Dev., Inc.*, 858 A.2d 1229, 1233 (Pa. Super. 2004)).

Main Street's contention that its Complaint and the claims asserted therein arise under the Construction Contract and the Bond, not the Liquidated Damages Agreement, which are still in effect, is without merit. Although the Liquidated Damages Agreement at Paragraph 18 acknowledges the force and effect of the other contractual agreements, it does so only to the extent not "modified herein." In fact, Main Street's claims to the Contract Balance and liquidated damages asserted in this matter were modified by the Liquidated Damages Agreement. The modification was that any claim to those funds would be arbitrated.

Finally, Main Street argues that its claims against Defendants United Window & Door and 84 Lumber are inextricably intertwined with its claims against F&D and JMB and thus the court should deny the objections in order to avoid piecemeal litigation. The court disagrees.

As the Pennsylvania Supreme Court explained in *Taylor v. Extendicare Health Facilities, Inc.*, 147 A.3d 490 (2016), "the prospect of inefficient, piecemeal litigation proceeding in separate forums is no impediment to the arbitration of arbitrable claims." Rather, "where a plaintiff has multiple disputes with separate defendants arising from the same incident, and only one of those claims is subject to an arbitration agreement, it is required as a matter of law for an adjudication to occur in separate forums." *Id.* at 191-192, 507. The court sees no valid basis for ignoring this precedent or the parties' agreed-to obligation to arbitrate.

**EXHIBIT 4**

AMERICAN ARBITRATION ASSOCIATION®

**CONSTRUCTION ARBITRATION RULES
DEMAND FOR ARBITRATION**

**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box ☐. There is no additional administrative fee for this service.

Name of Respondent:  Jeffrey M. Brown Associates, LLC and Fidelity and Deposit Company of Maryland

Address:  2337 PHILMONT AVENUE

| City:  HUNTINGDON VALLEY | State:  Pennsylvania | Zip Code:  19006 |
|---|---|---|

| Phone No.:  215-938-5000 | Fax No.:  215-938-5005 |
|---|---|

Email Address:

Name of Representative (if known):  NOAH H. CHARLSON, ESQUIRE

Name of Firm (if applicable):  Charlson Braber McCabe & Denmark

Representative's Address:  Eight Penn Center, 1628 JFK Boulevard, Suite 1803

| City:  Philadelphia | State:  Pennsylvania | Zip Code:  19103 |
|---|---|---|

| Phone No.:  215-447-7401 | Fax No.:  215-660-0180 |
|---|---|

Email Address:  noah@charlsonlaw.com

The named claimant, a party to an arbitration agreement dated  11/2/2021                           , which provides for arbitration under the Construction Industry Rules of the American Arbitration Association, hereby demands arbitration.

**Arbitration Clause:** Please indicate whether the contract containing the dispute resolution clause governing this dispute is a standard industry form contract (such as AIA, ConsensusDOCS or AGC) or a customized contract for the specific project.

Contract Form:  Customized

The Nature of the Dispute:

 See Statement of Claim which is attached hereto and incorporated herein.

Dollar Amount of Claim: $  in excess of $10,000,000.00

Other Relief Sought: ☑ Attorneys Fees  ☑ Interest  ☑ Arbitration Costs  ☐ Punitive/Exemplary
☑ Other:  actual damages, consequential damages, liquidated damages and specific performance.

Amount Enclosed: $  10,000.00
In accordance with Fee Schedule: ☐ Flexible Fee Schedule  ☑ Standard Fee Schedule

Please describe appropriate qualifications for arbitrator(s) to be appointed to hear this dispute:

 20+ years construction industry experience.

Hearing Locale Requested:  Chester County, Pennsylvania

Project Site:  Exton, Chester County, Pennsylvania



AMERICAN ARBITRATION ASSOCIATION®

**CONSTRUCTION ARBITRATION RULES
DEMAND FOR ARBITRATION**

| Estimated Time Needed for Hearings Overall: | hours or 7 | days |
|---|---|---|

Specify Type of Business:

Claimant: Owner                    Respondent: Construction Contractor, Surety Company

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

| Signature (may be signed by a representative): *Sandhya M. Feltes* | Date: 1/7/2022 |
|---|---|

Name of Claimant: MAIN STREET PHASE II, L.P.

Address (to be used in connection with this case): 120 West Germantown Pike

| City: Plymouth Meeting | State: Pennsylvania | Zip Code: 19462 |
|---|---|---|

| Phone No.: 610-277-8899 | Fax No.: 610-277-8880 |
|---|---|

Email Address: wolfson@wolfsongroupinc.com

Name of Representative: Marc B. Kaplin, Esquire and Sandhya M. Feltes, Esquire

Name of Firm (if applicable): Kaplin Stewart Meloff Reiter & Stein, P.C.

Representative's Address: Union Meeting Corporate Center, 910 Harvest Drive, Suite 200

| City: Blue Bell | State: Pennsylvania | Zip Code: 19422 |
|---|---|---|

| Phone No.: 610-941-2561 | Fax No.: 610-684-2011 |
|---|---|

Email Address: mkaplin@kaplaw.com, sfeltes@kaplaw.com

Notice: To begin proceedings, **please file online at www.adr.org/fileonline.** You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee.

*Please visit our website at www.adr.org/support to file this case online.
AAA Customer Service can be reached at 800-778-7879.*

## AMERICAN ARBITRATION ASSOCIATION

**MAIN STREET PHASE II, L.P.**      :
120 W. Germantown Pike      :
Plymouth Meeting, PA 19462,      :
     :
     :     NO.
       Claimant,      :
     :
       v.      :
     :
**JEFFREY M. BROWN ASSOCIATES, LLC**      :
2337 Philmont Avenue      :
Huntingdon Valley, PA 19006,      :
     :
**FIDELITY AND DEPOSIT COMPANY**      :
**OF MARYLAND**      :
1299 Zurich Way      :
Schaumburg, IL 60196,      :
     :
       Respondents.      :

## STATEMENT OF CLAIM

### I.  INTRODUCTION

In this arbitration proceeding, Claimant Main Street Phase II, L.P., seeks to recover monetary damages and to compel specific performance from a general contractor and its surety—Respondents Jeffrey M. Brown Associates, LLC ("**JMB**") and Fidelity and Deposit Company of Maryland ("**F&D**") respectively—arising out of JMB's delayed, defective and shoddy construction of six luxury apartment buildings in Exton, Pennsylvania.  Simply stated, massive project delays entitle Claimant to contractually agreed-upon liquidated damages, and defective, non-conforming and shoddy construction—rendering entire building systems, including storm water systems, plumbing, roofs and windows defective and noncompliant with applicable building codes and governing contract documents—have caused millions in additional damages for which the Claimant is entitled to recover.

1

II.     **THE AGREEMENTS**

      A.     **The Construction Contract**

1.     Claimant is the owner of a mixed residential and commercial development in West Whiteland Township, Chester County, Pennsylvania.

2.     The residential portion, known as Ashbridge, is a luxury residential community consisting of six three to four story apartment buildings with amenities such as a pool, fully equipped gym, dog park and historic mansion (the "**Project**").

3.     On or about September 17, 2018, Claimant and JMB entered into a Base Work Contract (the Base Work Contract, Addenda, Project Plans, Specification and Contract Documents are hereinafter referred to as the "**Construction Contract**").  A true and correct copy of the Construction Contract (without Exhibits, Project Plans, Specifications and other Contract Documents) is attached hereto, incorporated herein and marked as **Exhibit A**.

4.     Under the Construction Contract, JMB agreed to perform certain Work for the construction of three luxury apartment buildings, Buildings A, B and C, as detailed in the Contract Documents, on the Project for the Original Contract Sum of $31,860,715.00.

5.     On or about April 30, 2019, Claimant and JMB agreed to add the construction of three additional residential buildings, Buildings D, E and F, to the scope of JMB's work under the Construction Contract for the additional sum of $13,245,246.00.  A true and correct copy of Change Order No. 002 (without exhibits) is attached hereto, incorporated herein and marked as **Exhibit B**.

6.     The Construction Contract and Change Order No. 002 contain dates for the completion of various Critical Path Items, including dates for the completion of each Building. Construction Contract, Addendum § 3.1 and Change Order No. 002, § 3.1.

7402137v1

7.    JMB agreed that Buildings A, B and C would be one-hundred percent complete, with completed punch lists and certificates of occupancy by the following dates:  Building A– March 16, 2020; Building B – March 16, 2020; and Building C – April 1, 2020.   See e.g. Construction Contract, Addendum § 3.1.

8.    JMB also agreed that Buildings D, E and F would be one-hundred percent complete, with completed punch lists and certificates of occupancy by the following dates:  Building D – March 25, 2020; Building E – April 20, 2020; and Building F – May 18, 2020.  See e.g. Change Order No. 002, § 3.1.

9.    Claimant and JMB agreed that time was of the essence and that it would be difficult to ascertain and impractical to fix the actual damages suffered by Owner as a result of JMB's failure to timely complete the Work.  Construction Contract, Addendum § 3.1.

10.    As a result, Claimant and JMB agreed that liquidated damages would be fair and reasonable compensation to Owner for JMB's default of the Critical Path deadlines.  Construction Contract § 3.1.

11.    The Construction Contract requires JMB to perform the Work in accordance with the Contract Documents which include, but are not limited to, the Project Plans, Specifications, Project Manual and Submittals approved by the Project Architect ("**Contract Documents**"). See e.g. Construction Contract §3.2.3.

12.    The Construction Contract requires JMB to promptly correct Work which fails to conform to the requirements of the Contract Documents and to bear the cost to correct defective and non-conforming Work, including but not limited to, the cost of additional testing and inspections and compensation for the Architect's and other professionals' services and expenses made necessary thereby.  Construction Contract § 12.2.1.

3

13.    The Construction Contract authorizes Claimant to withhold Contract funds to protect itself from loss due to, *inter alia*, JMB's defective work, JMB's failure to perform Work in accordance with the Contract Documents, JMB's failure to complete its Work by the Critical Path Deadlines, and for any claims which Owner may have against JMB under or in connection with the Contract.  Construction Contract, §9.5.1 – §9.5.8; §9.6.1.

**B.    F&D's Performance and Payment Bonds**

14.    On or about October 1, 2018, JMB, as principal, and Respondent F&D, as surety, for a valuable consideration, executed and delivered to Claimant, as obligee, a performance bond with an original penal sum of $31,860,715.00 to guarantee the furnishing by JMB of all labor and materials required under the Construction Contract ("**Performance Bond**"). A true and correct copy of the Performance Bond is attached hereto, incorporated herein and marked as **Exhibit C**.

15.    F&D waived notice of any changes to the Construction Contractor to related subcontracts, purchase orders and other obligations.  Performance Bond, § 10.

16.    F&D agreed that the penal sum of the Performance Bond shall be automatically increased in the amount of any additive Change Orders and Construction Change Directives. Performance Bond, § 16.5.

17.    During the Project, the penal sum of the Performance Bond increased to approximately $45,614,207.00 as a result of additive Change Orders issued by Owner increasing JMB's scope of work and increasing the Contract Sum.

18.    The Performance Bond guarantees that: "[t]he Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner

4

for the Performance of the Construction Contract, which is incorporated herein by reference". Performance Bond, §1.

19. F&D is obligated under the Performance Bond for:

    a.    the responsibilities of the Contractor for correction of defective/non-conforming work and completion of the Construction Contract;

    b.    additional legal, design professional, professional services and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety; and

    c.    liquidated damages due and owing to the Owner under the Construction Contract. Performance Bond, §7.

20. On October 1, 2018, F&D also issued Payment Bond No. 9281093 in the original amount of $31,860,715.00. The Payment Bond states that F&D and JMB will be jointly and severally liable to Owner for labor, materials and equipment furnished in connection with JMB's performance of the Construction Contract. Payment Bond, §1.

**C.**     **JMB'S Initial Default of the Construction Contract**

21. Claimant issued a Notice to Proceed to JMB on September 28, 2018 to begin Work on the Project.

22. Between September 2018 and early 2020 Claimant paid JMB in excess of $30 million for labor and materials supplied by JMB on the Project.

23. However, in 2020, it became clear that JMB was in default of many provisions of the Construction Contract.

24. JMB had not completed any of the six residential buildings by the Critical Path Deadlines contained in the Construction Contract or in Change Order No. 2.

25.   Significant portions of JMB's Work was defective/non-conforming and JMB was refusing to correct the defective/non-conforming Work despite notices from Claimant.

26.   JMB also failed to pay some of its subcontractors and suppliers, who were threatening to file mechanic's liens against the Project.

27.   As a result, on June 25, 2020, Claimant issued a Notice of Default to JMB ("**Notice of Default**").   A true and correct copy of the Notice of Default is attached hereto, incorporated herein and marked as **Exhibit D**.

28.   On the same date, Claimant provided Notice of Contractor Default to F&D and made a demand under the Performance Bond that F&D complete and correct JMB's Work in accordance with the Contract Documents.   A true and correct copy of the Notice of Contractor Default is attached hereto, incorporated herein and marked as **Exhibit E**.

   **D.    The Liquidated Damages Agreement**

29.   From July, 2020 to November, 2020, Claimant and Respondents, through counsel, engaged in lengthy negotiations regarding the completion of JMB's Work on the Project, Claimant's liquidated damages, and F&D's obligations under the Performance Bond.

30.   On November 2, 2020, Claimant and Respondents entered into a Liquidated Damages Settlement Agreement and Dedication of Contract Balance ("**Liquidated Damages Agreement**").   A true and correct copy of the Liquidated Damages Agreement (without exhibits) is attached hereto, incorporated herein and marked as **Exhibit F**.

31.   The Liquidated Damages Agreement provides, *inter alia*, that:

   a.      JMB will complete the Project and perform all of its obligations under the Construction Contract in accordance with the Contract Documents (Liquidated Damages Agreement, p.1);

b.     F&D will advance funds and provide project management and other assistance to JMB to ensure that JMB timely and fully completes its obligations under the Contract Liquidated Damages Agreement, §II.8;

c.     Claimant will receive $6 million in liquidated damages incurred through the date of the Liquidated Damages Agreement as a result of JMB's failure to complete the Project according to the original Critical Path Deadlines contained in the Construction Contract and Change Order No. 002 ("**Stipulated Past LDs**").  The parties agreed that payment of the Stipulated Past LDs would be made through a pro-rata deduction from each of JMB's progress payments and through a payment from F&D in the amount of $2,403,246.00. Liquidated Damages Agreement, §§II.6, II.7;

d.     JMB will achieve Substantial Completion of Buildings A, B and C by January 10, 2021, and Substantial Completion of the entire Project by April 10, 2021. Liquidated Damages Agreement, §II.11, §II.12;  and

e.     If JMB fails to achieve Substantial Completion as aforesaid, Claimant will receive additional liquidated damages in the amount of $5,000 per day if Buildings A, B or C are not Substantially Complete by January 10, 2021 and $25,000 per day if the entire Project is not Substantially Complete by April 10, 2021 ("**Additional LDs**"). Liquidated Damages Agreement, §II.11, §II.12.

32.     In order for JMB's Work to be deemed Substantially Complete, the Construction Contract requires that JMB's Work must be, *inter alia*, (a) completed in accordance with the Contract Documents, including Project plans and specifications;  (b) in such a condition that the Project (or relevant phase) is capable of being occupied for its intended purposes

7

without any further work necessary for completion of the same other than normal 'punch list' items which do not unreasonably interfere with use or occupancy; (c) all requirements for Substantial Completion are met; and (d) the remaining Work is minor in nature. Construction Contract, §§ 9.8.1, 9.8.1.1.

33.    Section 9.8.1 of the Construction Contract states:

**The Work will not be considered suitable for Substantial Completion review until all Project systems included in the Work** and which are required for the commencement of occupancy and business operation of tenants **are operational as designed and scheduled**, all designated or required governmental inspections and certifications which are required for the commencement of occupancy and intended use by tenants have been made and posted, designated instruction of Owner's personnel in the operation of system has been completed to the extent required for the commencement of occupancy and use of tenants. In general, **the only remaining Work shall be minor in nature**, so that the Owner or Owner's tenants or other intended occupants could occupy the building on that date and use all areas adjacent thereto, including, without limitation, parking areas, and all such are visually attractive and clean, the use by such tenants or other intended occupants will not be diminished because such Work has not been completed, and the completion of the Work by the Contractor would not interfere or hamper the Owner's or Owner's tenants' (or those claiming by, through or under Owner) intended use. As a further condition of Substantial Completion acceptance, the **Contractor shall certify that all remaining Work will be completed within thirty (30) consecutive calendar days or as agreed upon following the Date of Substantial Completion**.

Construction Contract, § 9.8.1 (emphasis added).

34.    Section 9.8.1.1. of the Construction Contract states:

**The Project (and each phase thereof specified herein for completion as of a specific date) shall be deemed Substantially Completed for purposes of this Contract only when** (i) the Architect shall have certified to the Owner and Lender in writing that **the Project (or the relevant phase) has been substantially completed in accordance with the Plans and Specifications and other Contract Documents** (as they may have been amended and supplemented with the written approval of the Owner), the Lease Agreement (as defined in Section 14.12) and, as to the performance of the Work, in accordance with all applicable statutes, laws and ordinances, and with the rules, regulations and requirements of all regulatory authorities having jurisdiction, and in conformity with requirements of the applicable department of fire underwriters or comparable body having jurisdiction over the geographic area in which the Project site is situated, or any other body now or hereafter constituted exercising similar functions, that all buildings and

8

improvements are wholly within the building restriction lines (however established), do not encroach upon or overhang any easements, rights-of-way or land of others, and which certificate shall indicate that all buildings and all on-site and off-site (if any) improvements included in the Work (or to the extent included in the relevant phase to be completed), including parking, is in such a condition that the Project (or relevant phase) is capable of being occupied for its intended purposes without any further work necessary for the completion of the same other than normal "punch list" items which do not unreasonably interfere with the usual and customary intended use and occupancy of the Project (or relevant phase); (ii) Contractor shall have performed all Work required under this Contract to permit issuance of certificates of occupancy and such other certificates, permits, approvals, documents, and writings by the authorized governmental departments or agencies, evidencing that the Work (or relevant phase) is in compliance with all applicable statutes, laws, ordinances, rules, regulations or requirements, and allowing occupancy and operation of the Project (or relevant phase) for its intended purposes, and any conditions contained in such certificates and constituting a part of the Work shall have been fulfilled to the extent included in the Work required under this Contract; (iii) Intentionally Omitted; (iv) Intentionally Omitted; (v) **Contractor shall have delivered to Owner all as-built drawings and specifications, operating manuals, warranties and guarantees required of Contractor under the Contract Documents** (as to the relevant phase, if such determination is made as to a phase); as to any portion of the Work which is to be occupied or utilized primarily by any one tenant of the Project, such Work shall have been accepted by such tenant for fixturing; (vi) the Work shall have been approved by the inspector of each Lender and each Major Tenant, as herein defined.

Construction Contract, §9.8.1.1. (emphasis added). See also, Construction Contract, §9.8.2.

35.     The date on which the last of all of the events set forth in Section 9.8 has occurred is the date of Substantial Completion. Construction Contract, § 8.1.3.

36.     Claimant and Respondents agreed that **time is of the essence** with regard to all dates and time periods set forth in the Liquidated Damages Agreement. Liquidated Damages Agreement, §III.6.

37.     Particularly important, the Liquidated Damages Agreement did not supplant the Construction Contract, Construction Documents the Performance Bond or the Payment Bond, which remained in full force and effect:

9

**Agreements Remain in Effect**:  Other than as modified herein, the Contract, Performance Bond, and Payment Bond remain in full force and effect.  The Indemnity Agreement among Surety, JMB and its individual indemnitors remains in full force and effect.

Liquidated Damages Agreement, §II.18 (emphasis in original).

## III.    JMB'S SHODDY, DEFECTIVE AND NON-CONFORMING WORK

38.    In or around July, 2020, F&D began financing JMB and took control over the JMB's Work and all of JMB's financial and construction decisions on the Project, both directly and through its on-site representative Beacon Consulting.

39.    However, F&D's involvement did not eliminate Project delays or cause JMB to meet agreed-upon deadlines, nor did it correct JMB's shoddy, defective and non-conforming Work (as highlighted in detail below).

40.    To this day, JMB has failed to fully perform the Work under the Construction Contract, and significant portions of JMB's Work remain defective, non-conforming and in need of repair or replacement.

41.    In fact, new items of defective and non-conforming Work are discovered on an almost weekly basis, including the following.

### A.    The Storm Water System

42.    The storm drainage system designed for each building consists of primary drains at the roof level and each solid surface balcony to internal conductors which then convey the storm water to an underground storm drainage main beneath the first floor slab.  Non-potable clear water waste from HVAC equipment and water heater drain pans is also discharged to the storm drainage system.

43.    JMB defectively constructed and improperly installed the storm drainage systems within each of the six (6) buildings.

10

44.   During rain events on August 19, 2021, September 1, 2021 and September 23, 2021, the storm drainage system failed, causing water to overflow into the first floor apartments and common areas in each of the six (6) buildings.

45.   Residents repeatedly complained to Claimant about the water damage to the Property and to the their personal property and demanded compensation, relocation and termination of their leases.

46.   Claimant's initial investigation revealed that JMB failed to install trap guards in all floor drains and in funnel floor drains, although required by the Project plans and specifications. The lack of trap guards is believed to be one of the causes of the water overflow.

47.   Respondents refused Claimant's demands to install the trap guards, despite Respondents' contractual obligation to do so.  As a result, Claimant was forced to utilize its own resources to install trap guards in each floor drain to try to stop water from overflowing into the common spaces and apartments in each Building.

48.   In addition to conducting its own investigation, Claimant retained the Project engineer, Advanced Engineering Incorporated ("AEI"), to thoroughly test and investigate the storm water system installed by JMB.

49.   On November 16, 2021, AEI issued a Storm Damage Report, a true and correct copy of which is attached hereto, incorporated herein and marked as **Exhibit G**.

50.   As detailed in the Storm Damage Report, JMB's installation of the storm water system does not comply with the Project plans and specifications, 2009 International Plumbing Code and/or industry standards and is the primary cause for the storm water damage sustained in each of the Buildings.  Storm Damage Report, p. 3.

51.     AEI's investigation revealed that JMB failed to install the specified trap guards in all of the apartments.  AEI's investigation also revealed that the fittings used by JMB to connect apartment equipment closet drains to the underground storm drainage system were not compliant with industry standards, resulting in additional work and modifications to be performed in order to install the trap guards and/or inline backflow devices.  Storm Damage Report, p. 4.

52.     AEI's investigation revealed that JMB installed the pipes at insufficient and negative slopes, preventing water from draining out of the building into the underground storm drainage main and resulting in significant standing water in the pipes.  At the time of AEI's inspection, the amount of standing water ranged from 5-100% (by pipe volume), and many pipes were filled 20-50% with standing water.  Storm Damage Report, pp. 4-7.

53.     Moreover, JMB installed undersized piping, drains, laterals, conductors and storm drainage mains in Buildings A, C, D and F, in contravention of the Project plans and specifications, Pennsylvania's 100-year hourly rainfall rate requirements and the 2009 International Plumbing Code.    Storm Damage Report, pp. 7-8.

54.     In addition, JMB failed to complete the installation of the drainage system.  For example, in Building D lower level residential units, the storm drainage/clear water waste piping was not connected to the site storm water conveyance system resulting in 100% standing water within the piping; entrance canopy storm drain conductor installation was not complete; and, there was open piping within the walls. Storm Damage Report, pp. 8 – 9.

55.     AEI and Claimant also discovered many other aspects of JMB's defective/non-conforming storm water system, including but not limited to the following: (a) the storm drainage main in Building C was damaged and was filled with rock/debris; (b) the cleanouts to be installed

on the horizontal drains were either not installed at all or failed to include watertight plugs/caps which prevent system backflow; (c) rocks, debris and other sediment were present in the underground storm drainage piping in each Building, reducing the flow capacity of the piping; and (d) the mechanical closet drains in the first floor apartments, in which air conditioning and water heaters drain, are concealed within walls and under water heaters and air handling units, making them inaccessible to maintenance personnel.  See Storm Damage Report.

56.   As evidenced by the repeated water infiltration into the Buildings, the storm water system fails at each rain event, repeatedly causing water to overflow first floor common areas and apartment  units and water to bubble up from janitor sinks and other areas.

57.   The residential units and common areas in each Building have sustained, and continue to experience, significant water infiltration and water damage during rain events as a result of JMB's defective/non-conforming storm drainage systems.

58.   Respondents have wrongfully refused to repair or remediate the multiple system wide defects in the storm water system and Claimant has incurred and will continue to incur substantial sums to remediate JMB's defective/non-conforming work and to mitigate the significant damage.

59.   Remediation of JMB's defective/non-conforming storm water system will result in significant, additional disruption to tenants.

60.   Claimant has repaired water damage in approximately sixty-two (62) residential units (some multiple times) and in the common hallways, common areas and amenity areas in Buildings A, B, C, D, and E.

7402137v1

61.     Claimant believes, and therefore avers, that required remediation of the storm water system will result in a permanent alteration of the interior and exterior Buildings, potentially decreasing the value of the Project.

**B.      The Windows**

62.     As part of its Work on the Project, JMB furnished and installed approximately 2400 series 3800 and series 3900 vinyl, single hung windows.

63.     The Construction Contract requires JMB to provide a warranty for the windows which complies with the terms of the Contract Documents guaranteeing that the windows are free of material defects and that defective windows and/or defective window components would be replaced and repaired free of charge to Claimant.

64.     JMB represented that the proposed windows complied with the original intent of the Architect, as contained in the Contract Documents, including but not limited to the performance specifications and warranty requirements.

65.     JMB further represented that the windows passed the ASTM E283 test standard, which is the generally accepted air leakage test standard for windows.

66.     JMB's window related representations are false.

67.     Claimant reasonably believed that the representations made by JMB in the window submittal were true and relied upon same in approving the windows for the Project.

68.     As detailed in a Vinyl Windows Deficiencies Expert Report ("**Windows Report**") prepared by Marlin Buckley, P.C., a true and correct copy of which is attached hereto, incorporated herein and marked as **Exhibit H**, the windows supplied and installed by JMB are non-conforming and defective for multiple reasons, including but not limited to, the following:

14

- The windows do not meet ASTM E283 test standards and do not comply with Contract requirements.
- The window warranty does not meet Contract requirements.
- Water is infiltrating through some windows into the units during rain events.
- Despite attempted repairs, some windows have failed thermal glass with broken seals.
- Despite attempted cleaning, some windows have silicone coated glazing creating window fogging.
- Condensation forming on the interior of some occupied unit windows leading to mildew/ mold forming.

69.    Tenants are experiencing significant air infiltration, particularly during winter months, and water infiltration during rain events through the windows into the residential units, and despite numerous demands from Claimant, JMB has not properly or permanently repaired or replaced the defective/non-conforming windows.

### C.    The Roofs

70.    For approximately a year, the residents in the top floor units in each of the buildings have been experiencing repeated leaks in their units, which have manifested in many ways, including, but not limited to:

- Ceilings bubbling, puckering, blistering and cracking.
- Water dripping from ceilings, light fixtures, ductwork and down walls.
- Water stains, brown spots and water damage to drywall, floors, carpets and other portions of the residential units.
- Water damage to tenants' personal property and furnishings.

71.    Claimant reported these leaks to JMB and F&D on an almost daily basis and demanded that the cause of the leaks be corrected and that the water damage be fixed. In response, JMB and F&D refused to make adequate roof repairs and misrepresented that the roofs had been inspected and approved by the roof manufacturer.

72.    In October, 2021, Owner learned that JMB and F&D's representations regarding the roof are false.  As evidenced by an October 5, 2021 letter from the roof manufacturer, a true and correct copy of which is attached hereto, incorporated herein and marked as **Exhibit**

**I**, there are numerous areas on the roofs which require repair and serious deficiencies relating to JMB's installation of the roofing systems remain uncorrected.  The roof manufacturer also confirmed that "extensive punchlists" items have not been completed by JMB.

**D.**     **The Plumbing System**

73.     In addition to water damage and leaks caused by the defective storm water systems and roofs, the plumbing systems were defectively installed, causing constant leaks, water infiltration and water damage throughout the Project.

74.     As of December, 2021, Claimant had documented hundreds of water leaks caused by JMB's defectively installed plumbing systems, which include but are not limited to: water leaking from shower drains, hose bib connections, pipe fittings, HVAC units, drain lines, toilets, dishwashers, bathroom fixtures, showers and plumbing manifolds.

**E.**     **Other Defects**

75.     JMB's Work in many other areas of the Project does not conform with Contract Documents and has not been corrected at all or has not adequately been corrected by either JMB or F&D.  These include, but are not limited to:

- Building A gas meter feeds are not hard piped.
- The elevators are damaged.
- Duplex receptacles are non-conforming.
- Balcony fire sprinklers are non-conforming.
- Floor drains at first floor mechanical closets are not installed in proper locations and are inaccessible.
- Appliances are damaged and are missing components.
- Secondary dryer lint traps are non-conforming resulting in extreme lint build-up behind traps and inside walls.
- JMB unilaterally substituted materials, including sinks, phone jacks, sprinkler heads, expansion tanks, secondary lint traps and other materials without approval of Claimant or the architect of record.

16

7402137v1

76.     In addition, JMB installed building systems, and components within those systems, in locations different from the locations required by the Contract Documents.  As a result, Claimant is unable to develop accurate as-built drawings and Respondents refuse to provide Claimant with accurate as-built drawings.

77.     On June 16, 2021, a preliminary Remedial Construction Cost Estimate was issued detailing some of the defective Work performed by JMB discovered by Claimant at that time, including damaged elevator components, non-conforming gas manifold piping, windows with air infiltration, windows with failed thermal glass and silicone coated glazing, elevator damage and defects, non-conforming duplex receptacles, non-conforming balcony fire sprinklers, defective/non-conforming lint traps and many water leaks in multiple locations. A true and correct copy of the Remedial Construction Cost Estimate is attached hereto, incorporated herein and marked as **Exhibit J**.

## IV.   JMB'S FAILURE TO  SUBSTANTIALLY COMPLETE THE PROJECT

78.     Under the Liquidated Damages Agreement, Respondents agreed to substantially complete Buildings A, B and C by January 10, 2021.  Liquidated Damages Agreement, §II.12.

79.     Under the Liquidated Damages Agreement, Respondents agreed to Substantially Complete Buildings D, E and F and the entire Project by April 10, 2021.  Liquidated Damages Agreement, §II.12.

80.     In reliance thereon, Claimant paid millions of dollars of Contract funds to Respondents after the Liquidated Damages Agreement was executed.

81.     As of this date, the Project systems are not operational as designed and scheduled, a substantial amount of JMB's Work on the Project is defective/non-conforming, there remain more than minor punch list items to be completed, and JMB's Work was not

17

completed in accordance with Project Plans and Specifications.  See §§ 9.8.1 and 9.8.2 of the Construction Contract.

82.    As a result of defective and non-conforming Work throughout the Project, JMB has failed to achieve Substantial Completion of any Building and the Project in its entirety.

83.    The Architect of Record denied Substantial Completion certification of Buildings A, B and C on January 22, 2021 and of Buildings D, E and F on April 12, 2021.  True and correct copies of the Architect of Record's letters are attached hereto, incorporated herein and marked as **Exhibit K**.

84.    On June 21, 2021, Claimant issued a Notice to Cure to Respondents pursuant to §2.4, §12.2 and §12.2.4 of the Construction Contract.  A true and correct copy of the Notice to Cure is attached hereto, incorporated herein and marked as **Exhibit L**.

85.    Despite repeated demands, Respondents have failed and refused to correct the defective storm water systems, roofs, plumbing,  windows and a myriad of other defective work on the Project.

## V.    CLAIMANT'S DAMAGES

86.    In accordance with the Construction Contract and Liquidated Damages Agreement, Claimant withheld Contract funds to repair JMB's defective and non-conforming Work and for the liquidated damages due and owing to Claimant.

87.    Claimant has incurred and expects to incur actual damages, consequential damages, liquidated damages and other monetary damages in excess of $10 million as a direct and proximate result of Respondents' breach of contract and breach of warranty.

88.    Claimant's incurred and expected damages far exceed the withheld Contract funds.

A.    **Monetary Damages**

89.   Defects in JMB's Work are discovered on a weekly, if not daily, basis.  Some of JMB's defective work is latent and not discoverable until events, such as rainstorms, occur.  Some of JMB's defective work is hidden within the walls or under the building slabs, locatable only by opening walls and ceilings or by experts using camera/video technology to view plumbing and other systems.

90.   Due to the complexity of correcting JMB's defective work and the ongoing discovery of JMB's defective work, Claimant does not have a precise or finite list of the defects and/or the required corrective work and cannot fully quantify its damages at this juncture.

91.   The categories of monetary damages which Claimant has incurred, or expects to incur as a result of JMB's defective/non-conforming work and Respondents' breaches of the Construction Contract, Performance Bond and Liquidated Damages Agreement include, but are not limited to:

- Labor, materials and supervision costs to repair, remediate and/or replace JMB's defective/non-conforming work.

- Residential tenant costs, including but not limited to, rent loss, rent concessions and tenant relocation costs.

- Diminution in value of the Property.

- Engineering, architect and professional fees.

-  Investigative and other third-party costs.

- Insurance premiums and other insurance related costs.

- Increased financing costs.

- Reputational harm.

19

### B. **Liquidated Damages**

92.   Claimant is entitled to two categories of liquidated damages, for which Respondents are jointly and severally liable.

93.   The Construction Contract provided for payment of liquidated damages to Claimant if JMB failed to achieve one-hundred percent completion of Buildings A through E by April 20, 2020 and one-hundred percent completion of Building F by May 18, 2020.   See Construction Contract, § 3.1, and Change Order No. 2 – Exhibit B.

94.   JMB did not complete Buildings A through E by April 20, 2020 or Building F by May 18, 2020.

95.   As a result, in the Liquidated Damages Agreement, Respondents agreed to pay Claimant the Stipulated LDs in the amount of $6 million for liquidated damages due and owing to Claimant as of the date of the execution of the Liquidated Damages Agreement:

> 6. **Liquidated Damages Settlement**: For payment to the Owner in the amount of $6,000,000.00 ("Settlement Amount"), as provided for below, the Owner's claim for any and all delay damages against the Surety and JMB through the date of this Agreement is fully and finally settled and released, and any further claim for delay is limited to liquidated damages as provided for in Sections 11 and 12 below.

Liquidated Damages Agreement, ¶ 7.

96.   Claimant has received $2,073,024.00 in Stipulated LDs and $3,926,976.00 remain due and owing from Respondents.

97.   The Liquidated Damages Agreement also provides that Claimant is entitled to Additional LDs in the amount of $5,000 per day in the event JMB fails to achieve Substantial Completion of Buildings A, B and C by January 10, 2021 and $25,000 per day in the event JMB fails to achieve Substantial Completion of Buildings D, E and F by April 10, 2021. Liquidated Damages Agreement, ¶¶ 11, 12.

7402137v1

98.     As detailed above, JMB has failed to achieve Substantial Completion of any of the Buildings.

99.     Accordingly, Claimant is entitled to the following liquidated damages as of January 7, 2022:

| | |
|---|---|
| Stipulated LDs: | $3,926,976.00 |
| Additional LDs: | |
| 1/10/21 – 4/9/21 @ $5,000/day | $   450,000.00 |
| 4/10/21 – 1/7/22 @ $25,000/day | $6,800,000.00 |
| Total Liquidated Damages as of 1/7/22 | $11,176,976.00 |

100.    Claimant is also entitled to Additional LDs at a per diem rate of $25,000 from January 8, 2022 through the date that Buildings A, B, C, D, E and F are Substantially Complete.

### C.     Non-Monetary Damages/Specific Performance

101.    As detailed below, Claimant is entitled to specific performance by Respondents of their obligations under the Construction Contract and Liquidated Damages Agreement.

102.    Claimant seeks an award compelling Respondents to:

a.      provide a roof warranty to Claimant which complies with the Contract Documents, Plans and Specifications;

b,      provide a window warranty to Claimant which complies with the Contract Documents, Plans and Specifications;

c.      provide as-built drawings to Claimant which accurately depict all modifications made to, and deviations from, the Contract Documents, Project Plans and Specifications, including but not limited to changes to dimensions, locations and materials.

7402137v1

d.    provide a warranty bond to Claimant which guarantees the correction of all Work on the Project for a period of twelve (12) months from the date of the award.

## VI.    RESPONDENTS ARE LIABLE FOR CLAIMANT'S DAMAGES

### A.    Respondent JMB Is Liable For Breach Of The Construction Contract And The Liquidated Damages Agreement

103.    As set forth above, JMB materially breached the Construction Contract and the Liquidated Damages Agreement by failing to timely perform its Work as required by the Construction Contract and Liquidated Damages Agreement, including, but not limited to:

a.    failing to Substantially Complete Buildings A, B and C by January 10, 2021;

b.    failing to Substantially Complete Buildings D, E and F and the entire Project by April 10, 2021;

c.    failing to perform its Work in accordance with the Contract Documents;

d.    failing and refusing to correct its defective Work;

e.    failing to provide correct and complete submittals, schedules, as-built drawings and other Project documents required by the Construction Contract;

f.    substituting non-conforming materials without authorization of the Architect and/or Owner;

g.    demanding Substantial Completion certification when JMB knew or should have known that the Project is not Substantially Complete;

h.    demanding Final Completion certification when JMB knew or should have known that the Project is not Finally Complete; and

i.    performing an inadequate and impermanent repair of the windows without the authorization or consent of the Architect or Owner.

7402137v1

104.  Every contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in its performance and its enforcement.  *Donahue v. Federal Exp. Corp.*, 753 A.2d. 238, 242 (Pa. Super. 2000).

105.  JMB had a duty to act in good faith in its performance and enforcement of the Construction Contract and the Agreement.

106.  JMB acted in bad faith in its performance and enforcement of the Construction Contract and the Liquidated Damages Agreement, by, *inter alia*:

a.  failing and refusing to perform its Work under the Construction Contract in accordance with the Contract Documents;

b.  failing and refusing to correct its defective and non-conforming Work despite numerous notices from Owner;

c.  falsely representing that the windows purchased from United and installed at the Project met Project specifications and requirements;

d.  falsely representing that the Work performed complied with Contract Documents;

e.  falsely representing that Buildings A, B and C were Substantially Complete on January 10, 2021 and demanding Substantial Completion certification for those Buildings even though JMB knew that it had not achieved Substantial Completion of that Work;

f.  falsely representing that Buildings D, E and F and the Project in its entirety were Substantially Complete on April 10, 2021, and demanding Substantial Completion certification for that Work, even though JMB knew that it had not achieved Substantial Completion of the Work;

7402137v1

g.      falsely representing that the Project was Finally Complete and demanding Final Completion Certification, even though JMB knew that it had not achieved Final Completion;

h.      refusing to provide submittals, product lists, as-built drawings and other critical and necessary documents required by the Construction Contract;

i.      proceeding with an inadequate and impermanent repair of the windows without the authorization or consent of the Architect or Owner;

j.      making repeated demands for contract time extensions based on COVID-19 not allowed by the Contract Documents or Liquidated Damages Agreement; and

k.      falsely representing that the roofs were installed in accordance with Contract Documents and approved by the roof manufacturer.

107.    JMB's breaches of the implied covenant of good faith and fair dealing constitute material breaches of the Construction Contract and Liquidated Damages Agreement.

108.    As a direct and proximate result of JMB's material breaches of the Construction Contract and Liquidated Damages Agreement, Claimant has incurred, and continues to incur, substantial costs, damages and expenses.

**B.      Respondent JMB Is Liable For Breach Of Express And Implied Warranties**

109.    JMB expressly and implicitly warranted that the materials installed at the Project would be free from defects, merchantable and safe to use for their general and intended purpose.

110.    JMB warranted to Claimant that the windows complied with the original intent of the Architect, as contained in the Contract Documents, including but not limited to the performance specifications and warranty requirements.

111.   JMB warranted to Claimant that the windows passed the ASTM E283 test standard, which

is the generally accepted air leakage test standard for windows.

112.   JMB's affirmations of fact and promises to Owner as set forth above constitute an express

warranty to Claimant that the windows and other installed materials conform to those

affirmations and promises under the common law and the Uniform Commercial Code

("UCC").  UCC § 2-313.

113.   JMB breached any and all express warranties made or relating to the windows that became

part of the basis of the bargain for the sale of the windows in derogation of the common

law and UCC 13  Pa.C.S.A. § 2-313 because, *inter alia*:

a.      the windows do not conform to the requirements of the Contract Documents;

b.      the windows did not meet the ATSM E283 test standard;

c.      the windows have material defects; and

d.      JMB failed and refused to provide a permanent repair to the material defects and/or

replace the windows with conforming/non-defective windows.

114.    JMB breached the implied warranty of fitness for a particular purpose under the common

law and as contained in 13 Pa.C.S.A. § 2-315 in that materials installed at the Project,

including but not limited to the windows, are not fit for the particular purpose for which

they are intended.

115.   JMB breached the implied warranty of merchantability as contained in 13 Pa.C.S.A. § 2-

314(c), inasmuch as materials installed at the Project, including but not limited to the

windows, are not fit for their ordinary use.

116.   JMB did not install materials, including but not limited to the windows, in a proper and

workmanlike manner.

25

117. As a direct and proximate result of the defective/non-conforming windows, substantial air infiltration into the residential units and other problems have occurred. See Windows Report.

118. As a direct and proximate result of JMB's breach of its implied and express warranties, Claimant has suffered, and continues to suffer substantial costs, damages, losses and expenses, the full extent of which is not determined at this time.

**C.     Respondent F&D Is Liable For Breach Of The Performance Bond And The Liquidated Damages Agreement**

119. Where there is a surety relationship, an obligee is entitled to performance of a contractual duty by the principal or alternatively, if the principal defaults, by the principal's surety. *Kiski Area School Dist. v. Mid-State Surety Corp*., 600 Pa. 444, 967 A.2d 368 (2008).  The surety stands in the shoes of the principal and must complete any obligation due the obligee at the time of default.  *Id*.

120. In issuing the Performance Bond, F&D guaranteed that JMB would furnish all labor and provide all materials necessary to complete JMB's Work on the Project as required by the Construction Contract.  See Exhibit C.

121. As detailed above, JMB is in default of the Construction Contract and the Liquidated Damages Agreement by failing timely to complete its Work under the Construction Contract and Liquidated Damages Agreement, failing to perform Work in accordance with the Contract Documents, and failing to correct its defective and non-conforming Work.

122. In light of JMB's default, F&D is required under the Performance Bond to, *inter alia*:

    a.      complete JMB's Work under the Construction Contract;

    b.      correct all defective work;

c.      indemnify Claimant for all costs, damages, losses and expenses caused by JMB's default, including but not limited to Owner's legal fees, costs for professional/design professional services and delay costs; and

d.      pay Claimant liquidated damages as provided by the Liquidated Damages Agreement.

123.    F&D materially breached the Performance Bond by failing and/or refusing to satisfactorily and timely complete all of JMB's Work under the Construction Contract, by failing to correct all of JMB's defective Work under the Construction Contract, and by failing to indemnify Claimant for all damages incurred as a result of JMB's wrongdoing.

124.    F&D materially breached the Performance Bond by failing and/or refusing to indemnify Owner for Owner's legal, design professional and delay costs.

125.    F&D materially breached the Performance Bond and the Agreement by failing and/or refusing to pay Claimant liquidated damages due and owing to Owner as a result of JMB's failure to achieve Substantial Completion of Buildings A, B and C by January 10, 2021 and Buildings D, E and F by April 10, 2021.

126.    F&D had a duty to act in good faith in its performance and enforcement of the Performance Bond and Agreement.

127.    F&D acted in bad faith in its performance and enforcement of the Performance Bond and the Agreement, by, *inter alia*:

a.      failing and refusing to complete JMB's Work under Construction Contract in accordance with the Contract Documents;

b.      failing and refusing to correct JMB's defective and non-conforming Work despite numerous notices from Owner;

27

c.      falsely representing that JMB's Work complied with Contract Documents;

d.      falsely representing that Buildings A, B and C were Substantially Complete on January 10, 2021 and demanding Substantial Completion certification for those Buildings even though F&D knew that JMB had not achieved Substantial Completion of that Work;

e.      falsely representing that Buildings D, E and F and the Project in its entirety were Substantially Complete on April 10, 2021, and demanding Substantial Completion certification for that Work, even though F&D knew that JMB had not achieved Substantial Completion of the Work;

f.      falsely representing that the Project was Finally Complete and demanding Final Completion certification, even though F&D knew that JMB had not achieved Final Completion;

g.      failing and/or refusing to indemnify Owner for Owner's legal fees, costs for professional and design professional services, delay costs and other expenses incurred as a result of JMB's default;

h.      failing and/or refusing to pay Owner liquidated damages due and owing to Owner as a result of JMB's failure to achieve Substantial Completion of Buildings A, B and C by January 10, 2021 and Buildings D, E and F by April 10, 2021; and

i.      instituting a meritless lawsuit against Owner in the U.S. District Court for the Eastern District of Pennsylvania at docket no.  21-CV-3576, a court without subject matter jurisdiction.

128.    F&D's breach of the implied covenant of good faith and fair dealing constitutes a material breach of the Performance Bond and Liquidated Damages Agreement.

7402137v1

129.   As a direct and proximate result of F&D's breach of the Performance Bond and Liquidated Damages Agreement, Claimant has, and continues to, incur substantial costs, damages and expenses.

130.   As a direct and proximate result of JMB's default, F&D is obligated to pay Claimant liquidated damages in the amounts set forth in the Liquidated Damages Agreement.

131.   F&D elected to finance JMB's performance of the Contract and to take over and complete JMB's work under the Contract, and F&D violated its implied duty of good faith and fair dealing to Claimant.

132.   As a result, F&D is liable to Claimant for the full amount of Claimant's damages, which liability is not limited by the penal sum of the Performance Bond.

**D.     Specific Performance**

133.   Under the Liquidated Damages Agreement, Respondents were required to complete the Project and JMB's obligations under the Construction Contract.  Exhibit F, p. 1.

134.   In Section III.7. of the Liquidated Damages Agreement, the parties agreed that specific performance of their obligations under the Liquidated Damages Agreement and Construction Contract may be compelled:

> The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to **specific performance** of the terms hereof, in addition to any other remedy at law or in equity.

Exh. F (emphasis added).

135.   JMB is required under the Construction Contract to provide to Claimant a window warranty and a roof warranty which comply with the Contract Documents, Plans and Specifications.

136.   Respondents have failed and refused to produce a window warranty or a roof warranty which complies with the Contract Documents, Plans and Specifications.

137.  Claimant will be irreparably injured if Respondents do not provide a roof warranty and window warranty which comply with the Contract Documents and monetary damages cannot fully compensate Claimant for such injury.

138.  JMB is required under the Construction Contract to provide as-built drawings which accurately depict all modifications made to, and deviations from, the Contract Documents, Project Plans and Specifications, including but not limited to changes to dimensions, locations and materials.

139.  Respondents have failed and refused to provide as-built drawings which accurately depict all modifications made to, and deviations from, the Contract Documents, Project Plans and Specifications.

140.  Claimant will be irreparably injured if Respondents do not provide accurate as-built drawings and monetary damages cannot fully compensate Claimant for such injury.

141.  JMB expressly warranted to Claimant that all materials and equipment furnished under the Contract will be of good quality and that JMB's Work will be free from defects and will conform with the requirements of the Contract Documents.  Construction Contract, § 3.5.1.

142.  JMB's aforesaid express warranty runs for one (1) year following the date of Final Completion of all of JMB's Work on the Project.  *Id.*

143.  Upon information and belief, JMB does not have the financial wherewithal to perform its warranty obligations under the Construction Contract.

144.  Claimant will be irreparably injured unless Respondents provide a one (1) year warranty bond which protects Claimant against JMB's defective work, equipment and materials.

145.    For the foregoing reasons, Respondents should be compelled to provide Claimant with
conforming/compliant roof and windows warranties, accurate as-built drawings and a one
(1) year warranty bond on JMB's Work, materials and equipment.

## VII.    CONCLUSION

Claimant demands an award in its favor for monetary damages in excess of $10 million
along with Additional LDs in the amount of $25,000 per diem from January 8, 2022 through the
date of the award.  Claimant also demands an award compelling Respondents to provide Contract
compliant roof and window warranties, accurate as-built drawings and a one (1) year warranty
bond on JMB's Work, materials and equipment.

Respectfully,

KAPLIN STEWART

_____
Marc B. Kaplin, Esquire
Sandhya M. Feltes, Esquire
910 Harvest Drive
Blue Bell, PA 19422
(610) 941-2561
(610) 684-2011 facsimile
mkaplin@kaplaw.com
sfeltes@kaplaw.com


Steven M. Coren, Esquire
KAUFMAN, COREN & RESS, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA  19103
(215) 735-8700
(215) 735-5170 facsimile
scoren@kcr-law.com

Attorneys for Claimant

**EXHIBIT 5**

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| **MAIN STREET PHASE II, L.P.**, | |
| Claimant, | |
| v. | Case No. 01-22-0000-1078 |
| **JEFFREY M. BROWN ASSOCIATES, LLC** | |
| and | |
| **FIDELITY AND DEPOSIT COMPANY OF MARYLAND**, | |
| Respondents. | |

## RESPONDENT'S ANSWERING STATEMENT RAISING OBJECTIONS TO CLAIMANT'S DEMAND FOR ARBITRATION

### I.      Introduction

In accordance with Rule R-9 of the American Arbitration Association ("AAA") Construction Industry Arbitration Rules (the "AAA Rules"), Respondent Fidelity and Deposit Company of Maryland ("Surety") objects to the jurisdiction of this arbitral forum to presently consider the substantive issues raised by Claimant Main Street Phase II, L.P. ("Owner") in the Owner's Demand for Arbitration ("Demand"). Surety requests that the Panel stay this proceeding pending resolution of Surety's previously filed lawsuit in federal court, which must be resolved before the Panel exercises its jurisdiction. Surety further requests that, once the federal court action concludes, the Panel then decide the scope of the claims to be resolved by arbitration and exclude claims of Owner that are not subject to the arbitration agreement.

### II.      Background

Before this matter can be properly considered by the Panel, the action filed by the Surety in the United States District Court for the Eastern District of Pennsylvania ("Federal Court") on

August 11, 2021 (the "Federal Action") must conclude with rulings from the Federal Court on issues outside of the parties' arbitration agreement. Surety and Owner are parties to an agreement, the Liquidated Damages Settlement Agreement and Dedication of Contract Balance ("Agreement"), by which Surety agreed to provide funding to its principal, Jeffrey M. Brown Associates, LLC ("JMB"), and Owner agreed to pay Surety unpaid contract funds ("Unpaid Contract Funds") in connection with performing the remaining work on the project in question. See Demand, Exhibit F. If disputes arose among the parties concerning the distribution of the Unpaid Contract Funds, Owner agreed to place any disputed funds into an escrow account pending resolution of the disputes by negotiation between the parties or, if necessary, arbitration. Despite Owner's material breach of the Agreement by refusing to make progress payments during construction, Surety financed JMB through project completion. Owner is now claiming damages in excess of the remaining contract balance but refuses to pay the dedicated Unpaid Contract Funds totaling over $7 million into escrow. The Federal Action seeks to establish and enforce Owner's obligation to pay the disputed funds into escrow and permit the parties to proceed according to their agreed-upon dispute resolution procedures.

Owner's Demand does not raise the same claims and disputes that Surety asserted in the Federal Action, including any question regarding Owner's obligation to pay into escrow the Unpaid Contract Funds that were dedicated to completion and not paid to Surety. Yet the Federal Action has a critical nexus to this proceeding because a ruling on Owner's escrow obligation from the Federal Court must precede the Panel's determination concerning the disposition of the escrowed funds. This is so because the scope of the parties' agreement to arbitrate is premised upon the disposition of the disputed Unpaid Contract Funds paid into escrow.

**III.     The Panel Should Issue A Stay Pending Resolution of the Federal Court Action and Limit the Scope of this Proceeding to Issues the Parties Agreed to Arbitrate.**

The AAA Rules empower the Panel to determine whether it has jurisdiction over a dispute. Rule R-9 states: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement." Surety does not dispute the existence of the parties' agreement to arbitrate but contends that the arbitral forum has not yet been vested with jurisdiction. Surety reserves the right to assert specific objections to the scope of the arbitration and the nature of the claims to be arbitrated at the appropriate time when this forum is vested with jurisdiction.

**A.     The Parties' Disputes Procedure Is Limited to Determining the Disposition of Funds Paid Into Escrow and the Basis For Their Withholding.**

The parties' agreement to arbitrate is expressed in the Agreement's Section II.14, entitled "Release of Escrow Funds," and Section II.15, entitled "Dispute Procedure." Demand, Exhibit F, §§ II.14, II.15. Section II.14 states, in pertinent part, "[w]ithin thirty (30) days of Final Completion, the parties will meet and confer regarding the release of funds deposited into the Escrow Account." To address any unresolved disputes concerning the disposition of escrowed funds, the clause continues as follows, "[if] there is a dispute among the parties as to some or all of the funds deposited in the Escrow Account, the parties will follow the procedure contained in Section 15 below regarding the disputed funds." Demand, Exhibit F, §II.14. Section II.15 explicitly delineates the narrowly defined scope of the parties' agreement to arbitrate:

> If any dispute arises among the Owner, the Surety, and/or JMB with regard to liquidated damages that are assessed and paid into the Escrow Account under this Agreement and/or the basis for withholding funds that are paid into the Escrow Account under this Agreement, then the following dispute resolution procedures will apply:
>
> …

(b) if the amount in controversy is over $500,000.00, the dispute will be submitted to binding arbitration ….

Demand, Exhibit F, §II.15.

### B.    The Panel Should Stay Proceeding Pending the Outcome of the Federal Action.

Owner's refusal to pay the disputed Unpaid Contract Funds into escrow necessitated the Surety's filing of the Federal Action to enforce its security rights under the Agreement and to allow the parties to follow their agreed-upon dispute resolution process. By filing the Demand with the Federal Action still pending, Owner seeks to arbitrate before the Federal Court rules on whether the Owner is presently obligated to deposit the Unpaid Contract Funds into the established escrow account, thereby establishing the funds subject to the Panel's disposition in this arbitration. Owner does not reference its obligation to pay the disputed Unpaid Contract Funds into escrow in its Demand, leaving the Federal Court as the only forum to which that issue has been raised and which has jurisdiction to resolve it. As such, the Owner's Demand is not ripe for decision before the Federal Court issues its rulings on the merits of the Surety's action. Surety therefore respectfully requests a ruling on this preliminary matter from the Panel that this proceeding be stayed pending resolution of the Federal Action.

### C.    The Panel Should Stay Proceeding Until the Parties Meet and Confer Concerning the Disposition of Escrowed Funds.

The Agreement's dispute resolution procedure contemplates a meet and confer between the parties regarding the disposition of escrowed funds under Section II.14 prior to the initiation of arbitration proceedings. The meet and confer has yet to occur. Owner's current filing of its Demand is also premature for this separate reason, and this proceeding should be stayed until the obligation to meet and confer is satisfied.

**D.      The Panel Should Exclude Claims That Are Outside the Scope of the Arbitration Agreement.**

As set forth above, the scope of the arbitration agreement is narrow. It submits to arbitration only disputes concerning "liquidated damages that are assessed and paid into the Escrow Account under this Agreement and/or the basis for withholding funds that are paid into the Escrow Account under this Agreement." Demand, Exhibit F, §II.15. Therefore, Surety reserves the right to assert objections to any claims that are submitted to arbitration but outside the scope of the parties' arbitration agreement. Surety will assert any such objections when this arbitration is ripe to proceed.

**IV.     Surety Generally Denies the Allegations In Owner's Demand and Reserves the Right to File a Detailed Answering Statement and Counterclaim When the Substantive Issues In This Matter Are Properly Before the Panel.**

Once the Federal Court rules on the merits of the Surety's action, and thereby triggers the Panel's jurisdiction to decide the parties' substantive disputes properly within the scope of the parties' arbitration agreement, Surety intends to file a more comprehensive answering statement that addresses the substance of the Owner's claims before the Panel. Surety also intends to assert a counterclaim showing that the escrowed funds rightfully should be awarded to Surety. The cornerstone of the Agreement was the Owner's dedication of the Unpaid Contract Funds to Surety in furtherance of Surety's commitment to fund the remaining work. Less than three months after entering the Agreement, Owner ceased making payments to Surety and forced Surety to singularly finance the remaining work. As an initial matter, Owner's claims should be barred because it materially breached the Agreement by refusing to pay for work as it was performed. Moreover, Owner's breaches were not limited to its failure to make payments. Owner's claims regarding defects and delays either lack merit or should be separately barred based on Owner's interference and refusal to cooperate with the efforts of JMB and Surety.

Where not impeded by Owner, JMB's work was performed in accordance with plans, specifications, and industry standards. Owner has been leasing apartments since the fall of 2020, with only 10 out of 412 total units presently listed as available to lease. All warranty issues raised by Owner have been and continue to be addressed by JMB. With regard to the alleged delays, Owner interfered with JMB's performance in many ways, both delaying progress and interfering with completion. Owner's actions included imposing arbitrary inspection standards, interfering with turnover efforts, refusing to grant time extensions or change orders, undermining third-party inspections, and frustrating the acceptance process.

Surety looks forward to presenting these issues to the Panel in further detail once the parties' substantive disputes are properly before the Panel. In contrast to Owner's breaches of the Agreement, Surety more than fulfilled its obligations to finance completion of the work and is now entitled to be reimbursed for the costs it was unjustly forced to shoulder.

## V.    Conclusion

Surety respectfully requests that the Panel stay this proceeding pending the outcome of the Federal Action. Once the Panel is appointed, Surety requests that a briefing schedule be established to resolve the objections raised herein and that Surety be permitted to file its detailed answering statement and counterclaim as provided for in the Panel's scheduling order when the arbitration properly proceeds.

Dated: January 25, 2022                    Respectfully Submitted,

                                           Watt, Tieder, Hoffar & Fitzgerald, LLP

                                           _____/s/_____
                                           Christopher J. Brasco, Esq.
                                           Adam M. Tuckman, Esq.
                                           Noah R. Meissner, Esq.
                                           1765 Greensboro Station Place, Suite 1000

Mclean, VA 22102
Tel: 703-749-1000
Fax: 703-893-8029
cbrasco@watttieder.com
atuckman@watttieder.com
nmeissner@watttieder.com

Attorneys for Respondent, Fidelity and Deposit
Company of Maryland

**EXHIBIT 6**

## AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| Main Street Phase II, L.P., | ) | |
| | ) | Case No. 01-22-0000-1078 |
| Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Jeffrey M. Brown Assocs., LLC, | ) | |
| et. al., | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

_____

### FIDELITY AND DEPOSIT COMPANY OF MARYLAND'S
### MOTION TO STAY ARBITRATION

In accordance with the Panel's direction in the Preliminary Conference held on April 18, 2022, Respondent Fidelity and Deposit Company of Maryland ("F&D") respectfully moves the Panel to stay this arbitration filed by Claimant Main Street Phase II, L.P. ("Main Street") for the reasons set forth herein.

## I.      INTRODUCTION

Main Street's dual commitment in the Liquidated Damages Settlement Agreement and Dedication of Contract Balance ("Settlement and Dedication of Contract Balance Agreement" or "Agreement") to support the surety's completion effort with payment of the contract balance, and to escrow disputed contract funds if Main Street had a good faith basis to withhold payment, were critical provisions that induced F&D to finance over $25 million to complete Main Street's project after Main Street declared Jeffrey M. Brown Associates, LLC ("JMB") to be in default of the construction contract.  Main Street, however, did not release over $7 million earned for work performed and completed.  It then compounded that breach of the Agreement by not depositing

the contract balance into the escrow account as it withheld payment for its (disputed) claims of delay and defective work.

To secure the millions of dollars in the contract balance that the Agreement required to be placed into escrow, F&D filed a lawsuit in August 2021 in the U.S. District Court for the Eastern District of Pennsylvania ("Court").  In this action (the "Federal Action"), F&D seeks rulings from the Court that would compel Main Street to fulfill its contractual obligation to deposit the contract balance into the escrow account in advance of addressing Main Street's contested delay and defect claims under the Agreement's Disputes Procedure.  For its part, Main Street has refused to place the contract balance in escrow, yet it hopes to press forward with arbitrating its disputed claims. In a feat of circular logic, Main Street argues that its duty to fund the escrow account is not triggered until all disputes regarding its withholdings are resolved to its satisfaction.  Thus, the central question posited to the Federal Court is whether the Agreement requires Main Street to deposit the contract balance in escrow before the Dispute Procedure commences, or whether, as Main Street maintains, it can effectively control/spend the disputed funds while the validity of its unilateral withholdings is resolved.

After much procedural maneuvering by Main Street in both state and federal forums since August 2021, a summary of which the Panel received during the preliminary conference, the Court denied Main Street's Motion to Dismiss and/or Stay the Federal Action on April 25, 2022. Accordingly, F&D's Federal Action to enforce Main Street's escrow obligation is now underway. A copy of the Federal Court's Order dated April 25, 2022, as well as the Court's Scheduling Order, are attached to this Motion as Exhibit A.

In view of the foregoing and the precise nature of the arbitration agreement between the parties, this arbitration of Main Street's disputed claims cannot be arbitrated while the Federal

Action is pending.  Under the Disputes Procedure set forth in the Settlement and Dedication of Contract Balance Agreement, the Panel's duty is to decide which of the parties – F&D or Main Street – should receive the disputed contract funds that are in an escrow account.   Thus, the Agreement requires Main Street's funding of the escrow account *before* either party invokes the Disputes Procedure.   If Main Street has resolved to move forward with arbitrating its claims now, then Main Street is necessarily obligated to immediately fund the escrow account in order to schedule the arbitration hearing.   If, on the other hand, Main Street maintains that it has no obligation to fund the escrow account before arbitrating its claims, then the Federal Action must proceed to its conclusion, and the Panel must defer to the Court and await a decision on the escrow dispute before scheduling the hearings in this matter.   Accordingly, F&D respectfully requests that the Panel grant this Motion to Stay.

## II.     BACKGROUND

The following background addresses the relevant terms and procedures of the parties' Settlement and Dedication of Contract Balance Agreement (attached as Exhibit B), as well as the nature of the prior and pending litigation relating to the Agreement.

### A.     Summary of the Relevant Provisions of the Parties' Liquidated Damages Settlement Agreement and Dedication of Contract Balance

The Settlement and Dedication of Contract Balance Agreement was executed in connection with a construction project undertaken by Main Street to build a multifamily residential and commercial property at the Main Street at Exton shopping center in Exton, Pennsylvania (the "Project").  F&D issued a performance bond to the general contractor, JMB, for the Project.  (Ex. C.)  After Main Street declared JMB in default of its construction contract, it requested that F&D finance the remaining performance of the work.  Upon Main Street's request, F&D began funding JMB's performance in July 2020 subject to a full reservation of rights.  In August 2020, F&D sent

Main Street an irrevocable letter of direction executed by JMB that directed all payments due under the construction contract to be paid into a special account for the use and benefit of JMB. Thereafter, F&D, Main Street, and JMB, executed the Settlement and Dedication of Contract Balance Agreement, in part, to address how completion of the Project would be financed.  Project financing necessarily included the contract balance, with the Agreement reinforcing Main Street's obligation as obligee under the Performance Bond to "commit[] the Balance of the Contract Price to F&D" in support of F&D's completion efforts.  (Ex. C.)  Consistent with Main Street's initial request, it was agreed that JMB would continue to serve as the Contractor and that, absent breach by Main Street of the contract, performance bond, or the Agreement, F&D would "advance funds to JMB up to the penal sum of the Performance Bond to assist JMB in fulfilling its obligations under the Contract…" (Ex. B, § II.9.)

Satisfying and reaffirming Main Street's obligation under the performance bond to commit contract funds to F&D, the Agreement states in Section II.7 that Main Street "dedicates the unpaid Contract Balance to F&D, except as detailed in Section 7 above." (Ex. B.)  Providing a limited carve-out of Main Street's obligation to pay the entire unpaid contract balance to F&D, Section II.7 of the Agreement further states that Main Street will release contract funds in progress payments, paid monthly, except that Main Street may retain 29% of each pay application to partially compensate Main Street for previously accrued liquidated damages settled under Section II.6 of the Agreement.

In addition, Section II.7 of the Agreement addresses how the parties would resolve any claims by Main Street to withhold unpaid contract funds dedicated to F&D.  In that provision, Main Street agreed that, by the time of Final Completion, it will have paid all unpaid contract funds (i) through the monthly progress payment process explained above as work was performed, and

then the release of retainage at Final Completion, or (ii) in the event Main Street asserts any claims

to withhold payments requested, then Main Street would deposit those disputed funds into an

escrow account managed by an independent third party, pending the conclusion of the Disputes

Procedure.  (Id. at § II.7.)

      Section II.7 of the Agreement specifically provides, in relevant part, the following:

> When Final Completion is achieved, the Owner will either release the Retainage
> and any unpaid Contract Balance to the Surety, or a portion thereof that the Owner
> determines is due and owing, and deposit the remaining Retainage amount and
> unpaid Contract Balance, if any, into an escrow account maintained by a third party
> escrow agent selected by the parties ("Escrow Account"), **such that the full
> amount of Retainage and unpaid Contract Balance has either been paid to the
> Surety and/or into the Escrow Account**.

(Id.)

      By the Settlement and Dedication of Contract Balance Agreement, the parties, thus,

negotiated an agreement that required Main Street to participate in financing the work as progress

was made.  Specifically, the Agreement obligates Main Street to either to pay the contract funds,

or to deposit with the third-party escrow agent any portion of unpaid contract balance that Main

Street disputes is owed.  What Main Street cannot do under the Agreement is possess contract

funds based upon its self-determined right to withhold.[1]

      Section II.8 provides the framework for establishing the escrow account.  Section II.8 also

recognizes that unpaid contract funds deposited by Main Street in the escrow account can be

released only by agreement of Main Street and F&D, or by a confirmed arbitration award:

> The Parties have agreed that the firm of Land Services USA will serve as the escrow
> agent to retain escrowed funds, in an interest-bearing account, subject only to
> release by agreement of Owner and Surety or by court order enforcing an arbitration
> award as provided in Sections 14 and 15 below.

---

[1] According to Section II.18, the Settlement and Dedication of Contract Balance Agreement controls over any
contrary provision of the construction contract.  (Ex. B, § II.18 ("**Other than as modified herein**, the Contract,
Performance Bond, and Payment Bond remain in full force and effect.") (emphasis added).)

(Ex. B, § II.8.)

As referenced in Section II.8, the agreed-upon procedures for deciding disputes regarding the escrowed funds are found in Sections II.14 and II.15.  Section II.14 requires the parties to engage in "meet and confer" negotiations to determine whether the parties can resolve any "dispute" concerning all or a portion of the escrowed funds.  If any ongoing "dispute" regarding these escrowed funds remains unresolved after these negotiations, then the parties agreed to arbitrate that dispute under the procedures in Section II.15. (Ex. B, § II.14.)

Section II.15 is the section of the Agreement entitled "Dispute Procedure."  Of particular significance, the Dispute Procedure <u>does not</u> contain a provision typically found in standard form construction contracts in which the parties agree to arbitrate any dispute arising from, or relating to, the contract or the Project.  Unlike such an arbitration clause, Section II.15 of the Agreement limits the scope of any arbitration to the distribution of escrowed contract funds.  Arbitrable disputes under Section II.15 concern contract funds that were escrowed because of liquidated damages assessed by Main Street, and contract funds that were escrowed because Main Street asserted a right to withhold those funds from payment.  Section II.15 provides, in part:

> If any dispute arises among the Owner, the Surety, and/or JMB with regard to liquidated damages that are assessed and **paid into the Escrow Account** under this Agreement and/or the basis for withholding funds **that are paid into the Escrow Account** under this Agreement, then the following dispute resolution procedures will apply…

(Ex. B, § II.15) (emphasis added).)

### B.   Main Street Failed to Pay F&D and Deposit Disputed Contract Funds into Escrow, Leading to the Filing of the Federal Action

After the Settlement and Dedication of Contract Balance Agreement was signed in November 2020, F&D continued to finance construction, notwithstanding Main Street's decision not to pay, or put into escrow, funds earned for progress in 2021.  Ultimately, F&D injected well

over $25 million of its own funds into Main Street's construction Project.  As a result, Final Completion was achieved in accordance with the construction plans, specifications, and industry standards, leaving only disputed issues remaining.  Failing to uphold its end of the bargain, however, Main Street refused to release $7,167,708.63 in contract balances.  This balance consists of funds requested in monthly payment applications after December 2020, as well as retainage due at the end of the Project.  Compounding its breach by failing to make progress payments, Main Street also has not fulfilled its commitment to deposit these contract funds into the escrow account. In fact, Main Street has not deposited any money into the escrow account.

Effectively appointing itself the "escrow agent" for the last thirteen (13) months, Main Street refuses to pay the remaining contract balance or deposit those funds into escrow.  Main Street, however, is not content with merely holding the disputed contract funds in derogation of its contractual obligations.  In its Motion to Dismiss in the Federal Action, Main Street revealed that it is spending an unspecified sum of those funds addressing its disputed defect claims before resolution of those claims can occur through the parties' dispute procedure.  (Mot. to Dismiss 21 ("any other unpaid contract balances have been used and/or allocated to repair/replace JMB's defective and non-conforming work").)  The protections afforded to F&D under the escrow account provisions are, thus, being gutted daily as Main Street depletes the funds it dedicated to F&D's completion effort.

On August 11, 2021, F&D filed the Federal Action seeking the following relief: (1) a declaration that Main Street is obligated to pay any disputed portion of the contract balance into the escrow account (Count One); (2) injunctive relief that requires Main Street to deposit the disputed portion of the contract balance into the escrow account (Count Two); and (3) a cause of action for specific performance, in accordance with Section III.7 of the Agreement (Count Three).

7

It bears emphasis that F&D did not request that the Court resolve who is entitled to the disputed contract balance that presently should be in the escrow account; F&D is only seeking an order that Main Street must immediately fund the escrow account to prevent any further draining of the contract balance dedicated to F&D and so the Disputes Procedure can occur as agreed once the disputed funds are in escrow.

     **C.**    **<u>Main Street Has Been Seeking to Arbitrate its Claims Without Funding the Escrow Account</u>**

Eschewing its escrow obligations, Main Street has tried three times in three different forums to litigate/arbitrate its disputed claims without funding the escrow account and thereby deny F&D its right to bargained-for security:

    i.    A few weeks after F&D filed the Federal Action to enforce Main Street's escrow obligation, Main Street filed an action in the Court of Common Pleas of Chester County against F&D and JMB, among others (the "Chester County Action"), where it sought to litigate its construction defect and delay claims prior to, or concurrently with, the Federal Action.  F&D and JMB were ultimately dismissed from the Chester County Action due to the court sustaining F&D/JMB's Preliminary Objections based upon Main Street's claims being arbitrable under Section II.15 of the Settlement and Dedication of Contract Balance Agreement.

    ii.    After the state court dismissed F&D and JMB from the Chester County Action, Main Street returned to the Federal Action to renew its earlier motion to dismiss F&D's causes of action to enforce Main Street's escrow obligation.  This time, Main Street coupled its renewed motion to dismiss with the filing of its Arbitration Demand.  As such, in addition to moving to dismiss, Main Street moved the Court to indefinitely stay the Federal Action pending arbitration of its own claims.  By

moving for a stay of the Federal Action, Main Street sought to have its escrow obligations considered only *after* a hearing on the merits of the claims forming the basis for its unilateral withholdings.  Ordering the proceedings in this manner would have been a fruitless exercise in that bargained-for security during a pending dispute cannot be obtained after a decision on the merits.  Notwithstanding Main Street's efforts, the Court denied Main Street's Motion to Dismiss and attempt to stay the Federal Action.

iii.     As noted above, concurrent with renewing its motion to dismiss, Main Street filed its Demand for Arbitration and Statement of Claim with the American Arbitration Association on January 7, 2022 (the "Arbitration Demand").  At the preliminary conference held on April 18, 2022, Main Street requested that the Panel develop the pre-hearing schedule and reserve hearing dates for its disputed claims without the Court in the Federal Action resolving whether Main Street has a present duty to deposit the unpaid contract balance into the escrow account.  Just like its two prior attempts in the Federal Action and state court case, Main Street is asking yet another neutral – this time the Panel – to effectively negate the entire escrow framework specifically negotiated to ensure the availability of funds from a special purpose entity in the event of a decision Panel for F&D on the merits. Main Street's request to schedule the arbitration, while the Federal Action is pending and without the contract funds in escrow, compelled this Motion to Stay.

### III.    <u>MAIN STREET'S CLAIMS CANNOT BE ARBITRATED WITHOUT THE DISPUTED CONTRACT FUNDS IN ESCROW</u>

As evidenced by the very title of the Settlement and Dedication of Contract Balance Agreement (as well as its terms), Main Street committed to: (i) assist F&D in financing completion

through its dedication of the contract balance as construction progressed and (ii) to secure disputed contract funds in escrow.  Since December 2020, however, Main Street has not paid for any construction progress.  JMB's payment applications, totaling $7,167,798.63, remain unpaid.  F&D and JMB have contested Main Street's withholdings as without merit.  As such, the Settlement and Dedication of Contract Balance Agreement required Main Street to deposit disputed withholdings into the agreed upon escrow account for resolution through the Disputes Procedure set forth in Sections II.14 and II.15.  It is undisputed that Main Street has not deposited any disputed contract funds into the established escrow account.  Main Street has instead ignored this fundamental obligation and is presently holding (and spending) the contract funds dedicated to F&D, thereby depriving F&D of bargained-for security protections, and increasing the risks that the unpaid contract balance will be non-collectible.

Main Street's obligation to fund the escrow account is the subject of the Federal Action. Main Street has not voluntarily funded the escrow account even as it attempts to withhold the entire remaining contract balance and force the arbitration of its disputed claims.  F&D's Complaint, therefore, seeks a declaration from the Court that the escrow account must be presently funded, as well as an order compelling Main Street to deposit the funds.  As the recent Orders of the Court reflect, the Federal Action is ongoing, and therefore, the Court has not yet ruled whether Main Street's duty to escrow contract funds has arisen.

Besides failing to satisfy its escrow obligation, Main Street also seeks to advance its claims prior to satisfying the requirement to meet with F&D and JMB and discuss the disposition of escrowed funds.  Section II.14 is explicit – if, after the "meet and confer" meeting, "there is a dispute among the parties as to some or all of the funds deposited in the Escrow Account, the parties will follow the procedure contained in Section 15 below regarding the disputed funds." (Ex.

B (emphasis added).)  Yet, no such "meet and confer" has occurred prior to Main Street filing its Arbitration Demand and commencing this arbitration.

Further addressing the timing of this arbitration, the "procedure contained in Section 15" is the sole arbitration agreement between the parties.  Section II.15 builds upon Section II.14 by more specifically defining the scope of arbitrable disputes under the Agreement, stating that the arbitration will decide the parties' disputes regarding (i) liquidated damages assessed and paid into the escrow account, and (ii) all other bases for withholdings of funds that are paid into the escrow account.  The phrase "paid into the Escrow Account" merits emphasis.  Section II.15 only allows arbitration of assessments of liquidated damages and withholding of payment from F&D after those funds are "paid into the Escrow Account under this Agreement."  Section II.15 does not allow for an arbitration to decide the validity of Main Street's liquidated damages assessment or withholding of payments prior to, or in the absence of, the disputed assessments and withholdings being in the escrow account.  Consistent with the overall escrow framework, the arbitration under Section II.15, therefore, is only permitted to resolve those specific disputes so that the funds in the escrow account can be distributed, as provided in Section II.8 of the Agreement, "by court order enforcing an arbitration award as provided in Sections 14 and 15 below."  (Ex. B.)

By its express terms, the entire Disputes Procedure summarized above is predicated upon the existence of a funded escrow account containing all withholdings from payment.  Without Main Street having deposited disputed contract funds into escrow, the Panel cannot fulfill its only charge under the Agreement, which is to determine whether F&D or Main Street is entitled to the distribution of escrowed funds.  There being an empty escrow account necessarily means that Main Street's disputed claims presently cannot be arbitrated and must await the voluntary or court-ordered funding of the escrow account.

**IV.**     **THE CHESTER COUNTY COURT OF COMMON PLEAS DID NOT ORDER THE**
            **PARTIES TO ARBITRATE WITHOUT ESCROWED CONTRACT FUNDS**

In the preliminary conference on April 18, 2022, Main Street argued that the Panel should proceed with scheduling the hearing of its claims before the Federal Action concludes, and consequently, before the disputed contract funds are placed into escrow as the Agreement provides. Main Street told the Panel in the conference that its claims must proceed to arbitration even without a decision in the Federal Action because the Chester County Court of Common Pleas ("Chester County Court") ruled in November 2021 that Main Street must submit its claims to arbitration. After the preliminary conference occurred, the Panel received a copy of the Chester County Court's order and it can see that Main inaccurately described the state court's rulings.

The Chester County Court decided *whether* Main Street's claims in its state court action were arbitrable; the court did not decide *when* the claims should be arbitrated, or under what conditions Main Street's claims are properly submitted to arbitration.  Indeed, no rulings were made in the Chester County Court's order regarding the timing of arbitration, whether Main Street should have funded the escrow account, or the interplay between the issues being resolved in the Federal Court Action and the arbitration process.  Put simply, the Chester County Court only decided that Main Street's claims were arbitrable and do not belong in court.  All other issues, including the issues to be resolved here by the Panel on F&D's Motion to Stay, did not exist at the time of the Chester County Court's decision (this arbitration was commenced after) and were not before the Chester County Court.

Accordingly, when Main Street invoked the Disputes Procedure in Section II.15 of the Agreement and commenced this arbitration in January 2022, it did so voluntarily, not out of compulsion to comply with a court order.  By voluntarily availing itself to the Disputes Procedure of the Settlement and Dedication of Contract Balance Agreement, Main Street thereby triggered

12

its obligation to fund the escrow account so that the disputed claims can be resolved in the manner that the Agreement requires.

## V.     <u>CONCLUSION</u>

Put simply, Main Street controls whether this arbitration presently can move forward, or it should not.  Main Street could allow this arbitration to proceed immediately and expeditiously if it were to deposit the disputed contract balance into the escrow account as it agreed.  Once the escrow account is funded, Main Street's claims to the escrowed funds can be promptly addressed in a meeting as Section II.14 requires.  Assuming no amicable agreement under Section II.14 of the Agreement is reached, Main Street's claims for withholding and liquidated damages then can be arbitrated under Section II.15 where the Panel can decide the proper disposition of the escrowed funds.  Until such time as Main Street voluntarily complies with the Settlement and Dedication of Contract Balance Agreement, however, the Panel must defer to the Federal Action where F&D seeks to enforce Main Street's escrow obligation and break this logjam so that the Disputes Procedure can be followed as written.

WHEREFORE, F&D respectfully requests that the Panel stay further proceedings in this arbitration until (1) either Main Street voluntarily deposits the remaining contract balance into the escrow account established by the Settlement and Dedication of Contract Balance Agreement, or the Court in the Federal Action issues a final judgment that resolves the parties' dispute whether Main Street must fund the escrow account; and (2) after the contract funds are escrowed, the parties hold a "meet and confer" meeting per Section II.14 of the Agreement.

DATED:  May 4, 2022

Respectfully Submitted,

/s/

_____

Christopher Brasco
Adam Tuckman
Noah Meissner
**Watt, Tieder, Hoffar & Fitzgerald, LLP**
1765 Greensboro Station Place, Suite 1000
McLean, VA 22102
Tel: (703) 749-1000
Fax: (703) 893-8029
cbrasco@watttieder.com
atuckman@watttieder.com
nmeissner@watttieder.com

*Attorneys for Respondent Fidelity and Deposit Company of Maryland*

14

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

FIDELITY AND DEPOSIT COMPANY   :
OF MARYLAND,        :
    Plaintiff,      : No. 21-CV-3576
            :
    v.        :
            :
MAIN STREET PHASE II, L.P.  and   :
MAIN STREET PHASE III, L.P.,    :
    Defendants.     :

## CERTIFICATE OF SERVICE

   I, Sandhya M. Feltes, Esquire, do hereby certify that on June 15, 2022, a true and correct copy of Defendants' Response in Opposition to Plaintiff's Motion to Dismiss Counterclaim or, in the alternative, to Compel Arbitration was served on the following via ECF Electronic Notification:

Noah H. Charlson, Esq.
Charlson Braber McCabe & Denmark, P.C.
1628 JFK Blvd., suite 1803
Philadelphia, PA 19103

Christopher J. Brasco, Esquire
Noah R. Meissner, Esquire
Adam M. Tuckman, Esquire
Watt Tieder Hoffar & Fitzgerald, LLP
1765 Greensboro Station Place, Suite 100
McLean, VA 22102

     KAPLIN STEWART

      /s/  Sandhya M. Feltes
     Sandhya M. Feltes, Esquire
     910 Harvest Drive
     Blue Bell, PA 19422
     (610) 941-2561
     sfeltes@kaplaw.com
     Attorneys for Defendants

7731335v2