**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FIDELITY AND DEPOSIT COMPANY | : | |
| OF MARYLAND, | : | |
| | : | No. 21-CV-3576 |
| Plaintiff, | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| MAIN STREET PHASE II, L.P.  and | : | |
| MAIN STREET PHASE III, L.P., | : | |
| | : | |
| Defendants. | : | |

## ORDER

**AND NOW**, this      day of                , 2022, upon consideration of Defendants' Motion to Quash Plaintiff's Subpoena to M&T Bank, it is hereby ordered that Defendants' Motion to Quash is **GRANTED** and Plaintiff's Subpoena directed to M&T Bank is **QUASHED**.

BY THE COURT:

_____

**WENDY BEETLESTONE, J.**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

FIDELITY AND DEPOSIT COMPANY : 
OF MARYLAND, :
: No. 21-CV-3576
Plaintiff, :
:
:
v. :
:
MAIN STREET PHASE II, L.P. and :
MAIN STREET PHASE III, L.P., :
:
Defendants. :

## MOTION TO QUASH PLAINTIFF'S SUBPOENA TO M&T BANK

Defendants Main Street Phase II, L.P. and Main Street Phase III, L.P. ("**Main Street**"), by and through their undersigned counsel, respectfully move to quash the "Subpoena To Produce Documents, Information, or Objects" issued by Plaintiff Fidelity and Deposit Company of Maryland ("**F&D**") and directed to non-party M&T Bank (the "**Subpoena**") on the grounds that the Subpoena: (i) seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in violation of Fed.R.Civ.P. 26(b), (ii) seeks highly sensitive, confidential commercial and financial information, which is protected from disclosure under Fed.R.Civ.P. 45(d)(3)(A)(iii) and (B)(i), and (iii) is overbroad and issued for the improper purpose of harassing Main Street.[1]  In support thereof, the moving parties hereby incorporate their Memorandum of Law as though fully set forth herein at length.

---

[1] A true and correct copy of the Subpoena is attached hereto as **Exhibit 1**.

**WHEREFORE**, Main Street respectfully requests that the Motion to Quash be granted, and F&D's Subpoena to M&T Bank be quashed in its entirety.

KAPLIN STEWART

/s/  Sandhya M. Feltes
Marc B. Kaplin, Esquire
Sandhya M. Feltes, Esquire
910 Harvest Drive
Blue Bell, PA 19422
(610) 941-2561
(610) 684-2011 facsimile
mkaplin@kaplaw.com
sfeltes@kaplaw.com

Steven M. Coren, Esquire
KAUFMAN, COREN & RESS, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA  19103
(215) 735-8700
(215) 735-5170 facsimile
scoren@kcr-law.com

Attorneys for Defendants
Main Street Phase II, L.P. and Main Street Phase
III, L.P.

Dated: July 25, 2022

7799668v1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

FIDELITY AND DEPOSIT COMPANY  :
OF MARYLAND,                  :
                              :  No. 21-CV-3576
        Plaintiff,            :
                              :
                              :
        v.                    :
                              :
MAIN STREET PHASE II, L.P.  and  :
MAIN STREET PHASE III, L.P.,   :
                              :
        Defendants.           :

**MEMORANDUM OF LAW IN SUPPORT OF MOTION
TO QUASH PLAINTIFF'S SUBPOENA TO M&T BANK**

Defendants Main Street Phase II, L.P. and Main Street Phase III, L.P. (**"Main Street"**), by and through their undersigned counsel, respectfully submit this Memorandum of Law in Support of their Motion to Quash Fidelity and Deposit Company of Maryland's (**"F&D"**) Subpoena To Produce Documents, Information or Objects" directed to non-party M&T Bank (the **"Subpoena"**). For the reasons set forth herein, the Subpoena should be quashed.

I.      **STATEMENT OF FACTS**

        A.      **The Project and the Claims at Issue in this Action**

        This action involves the construction of six luxury apartment buildings (with amenities) owned by Main Street located in Exton, Chester County, Pennsylvania (the **"Project"**).[2]  In September 2018, Main Street entered into a Base Work Contract[3] with Jeffrey M. Brown Associates, LLC (**"JMB"**) for the performance of certain construction work on the Project as

_____

[2] The residential portion of the Project is known as "Ashbridge".
[3] The Base Work Contract, Addenda, Project Plans, Specifications and Contract Documents are hereinafter referred to as the **"Construction Contract"**.

7799668v1

detailed therein.  Thereafter, F&D, as surety issued a Performance Bond whereby F&D guaranteed the furnishing by JMB of all labor and materials required under the Construction Contract, Project Plans and Project Specifications (**"Performance Bond"**).

In 2020, when it became clear that JMB was in default of many provisions of the Construction Contract, Main Street made a demand on F&D under the Performance Bond to complete and correct JMB's work.  In or about July, 2020, F&D elected under the Performance Bond to finance JMB to and to manage JMB's work on the Project.

 On November 2, 2020, Main Street, JMB and F&D entered into a Liquidated Damages Settlement Agreement and Dedication of Contract Balance (**"Liquidated Damages Agreement"**) to ensure, *inter alia*, JMB's completion of the Project in accordance with the Construction Contract.  The Liquidated Damages Agreement expressly provides that, *inter alia*, (i) F&D will advance funds to JMB to ensure that JMB completes  its obligations under the Construction Contract, and (ii) Main Street would be compensated for past liquidated damages in the negotiated amount of $6 million as well as future liquidated damages.

JMB's defective, non-conforming, incomplete and untimely work ("**Defective Work**") was not resolved or alleviated by F&D's involvement.  JMB has not achieved Substantial Completion or Final Completion of any of the six apartment buildings or of the Project in its entirety.  Despite repeated demands, JMB and F&D had failed and refused to correct the Defective Work on the Project and/or to pay Main Street the full amount of liquidated damages due and owing under the Liquidated Damages Agreement.

In August, 2021, F&D commenced this action contending that Main Street breached the Liquidated Damages Agreement by failing to deposit funds into an escrow account.  In response, Main Street asserts that JMB and F&D breached the Construction Contract, Performance Bond

2

and Liquidated Damages Agreement by, *inter alia*, failing to complete the Project in accordance with the Contract Documents and by failing to pay Main Street the full amount of liquidated damages due and owing to Main Street.

   **B.     The Subpoena**

On July 13, 2022, F&D served the Subpoena on non-party, M&T Bank, Main Street's construction lender on the Project.   The Subpoena demands the production of information regarding the construction financing obtained by Main Street for the Project, including, *inter alia*, documents and communications relating to the Mortgage, Note, construction loan, loan agreements and letters of credit issued in connection with the Project.  The Subpoena also demands the production of documents and communications relating to Main Street's loan payments, amounts currently owed on the loan(s), and/or defaults under the loan documents.

On July 18, 2022, Main Street objected to the Subpoena under Fed.R.Civ.P. 26 and 45 and demanded that the Subpoena be withdrawn on or before July 19, 2022 in order to avoid motion practice.[4]  The parties met and conferred regarding the Subpoena on July 19, 2022,  but F&D has failed and/or refused to withdraw the Subpoena.[5]

**II.     THE SUBPOENA SHOULD BE QUASHED**

Fed.R.Civ.P. 45(d)(3)(A) provides:

> "[o]n timely motion, the issuing court must quash or modify a subpoena that:
>
>> (i) fails to allow a reasonable time to comply;
>>
>> (ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person--except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to

---

[4] A true and correct copy of Main Street's July 18, 2022 letter is attached hereto as **Exhibit 2**.
[5] A true and correct copy of Main Street's July 25, 2022 letter is attached hereto as **Exhibit 3**.

attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden."

A Court may quash or modify a subpoena if the Court determines that compliance with the subpoena would be unreasonable, embarrassing, or oppressive. *See Composition Roofers Union Local 30 Welfare Trust Fund v. Graveley Roofing Enterprises, Inc*., 160 F.R.D. 70, 72 (E.D. Pa. 1995). With respect to subpoenas to third parties, federal courts have determined that discovery is limited "to protect third parties from harassment, inconvenience, or disclosure of confidential documents." *Slater Steel, Inc. v. Vac-Air Alloys Corp*. 107 F.R.D. 246, 248 (W.D.N.Y. 1985). The status of a witness as a non-party should be factored into any consideration concerning expense and inconvenience. *See Concord Boat Corp. v. Brunswick Corp*., 169 F.R.D. 44, 49 (S.D.N.Y.1996) (citing Fed. R. Civ. Pro. 45(c)(2)(B)).

Courts use a burden-shifting framework to analyze motions to quash. *See Green v. Cosby*, 314 F.R.D. 164, 169 (E.D. Pa. 2016). First, the subpoenaing party must show that its request falls within the scope of Rule 26. *Id*.; *see also ITOCHU Int'l., Inc. v. Devon Robotics, LLC*, 303 F.R.D. 229, 232 (E.D. Pa. 2014). Thus, a party may use a subpoena only to seek "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Once a motion to quash a subpoena is filed, the subpoena's issuer must show good cause for discovery requested. *See In re Eagle-Picher Indus., Inc.*, 169 B.R. 130, 134 (Bankr.S.D.Ohio 1994).

## A.    The Subpoena Seeks Information Beyond the Scope of Discovery

F&D seeks to obtain information from M&T Bank that is beyond the scope of permissible discovery.  The Subpoena should be quashed because it (i) seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in violation of Fed.R.Civ.P. 26(b), (ii) seeks highly sensitive, confidential commercial and financial information, which is protected from disclosure under Fed.R.Civ.P. 45(d)(3)(A)(iii) and (B)(i), and (iii) is overbroad and issued for the improper purpose of harassing Main Street.

### 1.    The Subpoena Seeks Information That is Neither Relevant Nor Reasonably Calculated to Lead to Discovery of Admissible Evidence

As a threshold matter, the Subpoena should be quashed for seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in violation of Rule 26(b)(1).  *See* Fed.R.Civ.P. 26(b)(1).

Rule 26(b) allows for the discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case…".  Fed.R.Civ.P. 26(b); *see also Morrison v. Philadelphia Housing Auth.*, 203 F.R.D. 195, 196 (E.D. Pa. 2001)(discovery encompasses that which "appears reasonably calculated to lead to the discovery of admissible evidence.").  "The Third Circuit has upheld district court orders quashing subpoenas due to the responding party's failure to demonstrate the relevance of the desired information." *Moffitt v. Tunkhannock Area Sch. Dist.*, 2016 WL 4271773, at * 3 (M.D. Pa. Aug. 12, 2016)(citing *Smith v. BIC Corp.*, 869 F.2d 194, 202 (3d Cir. 1989); *Ekhato v. Rite Aid Corp.*, 529 Fed.Appx. 152, 154, n. 3 (3d Cir. 2013)). "Therefore, relevance of the information demanded is a significant factor in determining whether to quash a subpoena." *Moffitt, supra* at * 3.

The disputes between Main Street, F&D and JMB arise from the Construction Contract, the Performance Bond and the Liquidated Damages Agreement.  Main Street contends that JMB

and F&D breached these agreements by, *inter alia*, failing to complete the Project in accordance with the Contract Documents and by failing to pay Main Street the full amount of liquidated damages due and owing to Main Street.  F&D contends that Main Street breached the Liquidated Damages Agreement by failing to deposit certain funds into an escrow account.

M&T Bank's records regarding the construction loan obtained by Main Street to finance the Project have no bearing on the parties' breach of contract claims .  There is no claim or defense which implicates the construction financing.  In fact, there is no contention that the construction financing in any way caused or affected JMB's/F&D's failure to properly or timely construct the Project or Main Street's alleged obligation to deposit funds into an escrow account.  Since the information sought in the Subpoena is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this matter, it violates Rule 26(b)(1).

### 2. The Subpoena Improperly Seeks Confidential Information in Violation of Rule 45

Assuming *arguendo* that the information sought in the Subpoena was relevant, which is denied, the Subpoena should  be quashed as it demands the disclosure of Main Street's confidential commercial and financial information, which information is protected from disclosure under Rule 45(d)(3)(A)(iii) and (B)(i).  *See* Fed.R.Civ.P. 45(d)(3)(A)(iii) and (B)(i).

Rule 45 authorizes parties to serve subpoenas on parties or non-parties commanding the production of books, documents, electronically stored information, or tangible things.  *Id.*  Rule 45(d)(3)(A) mandates that "a court quash or modify a subpoena, 'upon timely motion,' for 1) failing to provide a reasonable time to comply; 2) requiring a person to comply beyond the geographical limits as stated in the Rule; 3) ***required 'disclosure of privileged or other protected matter'***; or 4) subjecting a person to an 'undue burden.'"  *Moffitt, supra* at * 3 (citing Fed.R.Civ.P. 45(d)(3)(A); emphasis added).  Rule 45(d)(3)(B) also mandates that a court may quash a subpoena

if it requires, *inter alia*, disclosure of "confidential research, development, or commercial information." Fed.R.Civ.P. 45(d)(3)(B)(i).

"[C]ourts have generally found that 'personal rights claimed with respect to bank account records give a party sufficient standing to challenge third-party subpoenas served upon financial institutions holding such information.'" *ITOCHU Int'l., Inc. v. Devon Robotics, LLC*, 303 F.R.D at 232 (citing *Ace Hardware Corp. v. Celebration Ace Hardware, LLC*, 2009 WL 2753197, at * 1 (D. Del. Aug. 28, 2009)). "'Businesses have a legitimate interest in the privacy of their financial information that can confer standing to challenge a subpoena to a third party to produce that information.'" *Id.* (quoting *Countryman v. Cmty. Link Fed. Credit Union*, 2012 WL 1143572, at * 3 (N.D. Ind. Apr. 3, 2021)); *see also Green v. Cosby*, 216 F. Supp. 3d 560, 564 (E.D. Pa. 2016)(explaining that personal rights or interests exist in bank accounts).

Courts recognize that "production of bank records [can] create [a] high potential to disclose a whole host of irrelevant and confidential business related information." *Mackenzie Architects, P.C. v. VLG Real Estate Developers, LLC*, 2017 WL 4898743, at * 3 (N.D.N.Y. Mar. 3, 2017)(unpublished; declining to compel production); *see also Pitch v. Lipsey*, 2016 WL 4851301, at * 6-7 (Pa. Super. July 16, 2016)(protective order necessary because documents sought included "confidential and sensitive financial information of [Appellant] and his entities, including, without limitation, bank records … and financial statements"; "[i]t is true that the .. financial records of Appellant and the entities Appellant controls are private, confidential, and sensitive."); *Moser v. Health Ins. Innovations, Inc.*, 2019 WL 2271804, at * 5 (S.D. Cal. May 28, 2019)(unpublished; denying compelled production of "bank records" which court described as "private, confidential documents"); *Ma v. Dept. of Ed.*, 2019 WL 1915663, at * 6 (W.D. Wash. April 30, 2019)(unpublished; granting protective order against production where "information sought –

7

bank records … -- is highly sensitive."); *Elsayed v. Fam. Fare LLC*, 2019 WL 8586708, at * 4 (M.D. N.C. Oct. 31, 2019)(production of bank records creates "a high potential to disclose a whole host of irrelevant and confidential" information).

In this case, the information sought by F&D from M&T Bank is highly sensitive and confidential and, therefore, beyond the scope of discovery under Rule 26(b). By its very nature, the information and documentation sought in the Subpoena would undoubtedly reveal commercial confidential information about Main Street and its finances, as well as the finances of Main Street's partners. Indeed, as the construction lender for the Project, M&T Bank is in possession of highly sensitive and confidential information and documentation such as Main Street's evaluations, costs analyses, profit projections, negotiations and development of a strategic business plan for the development of the Project (and entry into the Exton area marketplace), as well as its financial projections relative to such a venture. Main Street has a private interest in maintaining their confidentiality with respect to the information and documentation at issue, which should be protected against production in order to avoid harm to Main Street and its partners.

The documents and information sought in the Subpoena also subject M&T Bank to violate its duty – as a matter of law – to keep Main Street's financial information confidential. *See McGuire v. Shubert*, 722 A.2d 1087, 1091 (Pa. Super. 1998)("[w]e find that the duty on a bank and its employees to keep a customer's bank account information confidential, which has long been recognized by the above-mentioned jurisdictions, is present as an implied contractual duty under Pennsylvania common law, as well."; citing a number of jurisdictions holding that "a bank has an implied contractual duty, as a matter of law, to keep financial information concerning a depositor confidential."). Thus, disclosure of the protected confidential commercial and financial

8

information would not only harm Main Street and its partners, but could expose M&T Bank to liability for violating its duty to keep its customers financial information confidential.

Since the Subpoena seeks confidential material that is beyond the scope of discovery permissible under Rule 26(b), it should be quashed.

### 3.   The Subpoena is  Overbroad and Was Issued for the Purpose of Harassing Main Street

The Subpoena should also be quashed as overbroad. For example, the Subpoena demands the production of communications and documents, not only from Main Street, but also from and to Main Street's "members, partners, directors, officers, employees, agents, affiliates, representatives, consultants and attorneys." Such requests are vastly overbroad and clearly issued with the intent to harass Main Street and to interfere with and/or harm its business relationship with M&T Bank.  Such a fishing expedition is not permissible under the Rules and/or Pennsylvania law (especially where the request seeks irrelevant, non-discoverable material).

Consequently, the Subpoena should be quashed.

## III.   <u>CONCLUSION</u>

The information sought by F&D from M&T Bank is highly sensitive and confidential and, therefore, beyond the scope of discovery under Rule 26(b).  The Subpoena is also improper because it seeks information which is not relevant to parties' claims or defenses at issue in this case.  The Subpoena is also vastly overbroad and seeks clearly non-discoverable material for only one purpose – to harass and annoy both Main Street and non-party M&T Bank.

For the foregoing reasons, Main Street respectfully requests that the Motion to Quash be granted, and the Subpoena be quashed.

7799668v1

Respectfully submitted,

KAPLIN STEWART

/s/  Sandhya M. Feltes
Marc B. Kaplin, Esquire
Sandhya M. Feltes, Esquire
910 Harvest Drive
Blue Bell, PA 19422
(610) 941-2561
(610) 684-2011 facsimile
mkaplin@kaplaw.com
sfeltes@kaplaw.com

Steven M. Coren, Esquire
KAUFMAN, COREN & RESS, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA  19103
(215) 735-8700
(215) 735-5170 facsimile
scoren@kcr-law.com

Attorneys for Defendants
Main Street Phase II, L.P. and Main Street Phase
III, L.P.

Dated: July 25, 2022

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FIDELITY AND DEPOSIT COMPANY      :
OF MARYLAND,      :
     : No. 21-CV-3576
         Plaintiff,      :
     :
     :
         v.      :
     :
MAIN STREET PHASE II, L.P.  and      :
MAIN STREET PHASE III, L.P.,      :
     :
         Defendants.      :

## **CERTIFICATE OF GOOD FAITH**

        I, Sandhya M. Feltes, Esquire, do hereby certify that, pursuant to Fed. R. Civ. P. 37(a)(1), I attempted in good faith to confer with Plaintiffs' counsel to resolve the discovery dispute.

        On July 18, 2022, I sent a letter to Plaintiff's counsel, Noah H. Charlson, Esquire, advising that Defendants objected to the Subpoena as violative of Fed.R.Civ.P. 26 and 45.  In that letter, I demanded that Plaintiff withdraw the Subpoena no later than close of business on July 19, 2022 in order to avoid motions practice.  I also advised counsel for Plaintiffs that I was available to meet and confer regarding this discovery dispute on or before July 19, 2022.   On July 19, 2022, the parties met and conferred about the dispute.  Despite my attempts to resolve this discovery dispute, Plaintiff has failed and/or refused to withdraw the Subpoena.

                 KAPLIN STEWART

                 /s/  Sandhya M. Feltes
                 Sandhya M. Feltes, Esquire
                 910 Harvest Drive
                 Blue Bell, PA 19422
                 (610) 941-2561
                 (610) 684-2011 facsimile
                 sfeltes@kaplaw.com
                 Attorneys for Defendants

# EXHIBIT 1

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Pennsylvania

| | |
|---|---|
| Fidelity and Deposit Company of Maryland | ) |
| *Plaintiff* | ) |
| v. | ) |
| Main Street Phase II, L.P., et al. | ) |
| | ) |
| *Defendant* | ) |

Civil Action No. 2:21-cv-03576-WB

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:      M&T Bank, via Corporation Service Company, Registered Agent
2595 Interstate Drive, Suite 103, Harrisburg, PA 17110

*(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A, attached.

| Place: *2595 Interstate Drive, Suite 103 Harrisburg, PA 17110 | Date and Time: 08/04/2022 5:00 pm |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

        The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   07/13/2022

* Production can be made electronically to noah@charlsonlaw.com in lieu of an in-person production.

*CLERK OF COURT*

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                    /s/ Noah H. Charlson
                                                                      *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Fidelity and Deposit Company of Maryland _____, who issues or requests this subpoena, are:

Noah H. Charlson, 1628 JFK Boulevard, Suite 1803, Philadelphia, PA 19103, noah@charlsonlaw.com, 215-447-7401

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  2:21-cv-03576-WB

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒  I served the subpoena by delivering a copy to the named person as follows: _____

_____   on *(date)* _____ ; or

❒  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                        *Server's signature*

                                                    _____
                                                        *Printed name and title*

                                                    _____
                                                        *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# Exhibit A

**FIDELITY AND DEPOSIT COMPANY OF MARYLAND'S SUBPOENA**
**FOR THE PRODUCTION OF DOCUMENTS FROM M&T BANK**

**INSTRUCTIONS**

The following instructions apply to each of the document requests set forth below and are deemed to be incorporated into each request:

1.      Under Federal Rule of Civil Procedure ("FRCP") 45(e)(1)(A), the documents you produce in response to this Subpoena must be produced as they are kept in the ordinary course of business, or you must organize and label them to correspond to the categories in the request.

2.      Under FRCP 37(a) of the Federal Rules of Civil Procedure, the propounding party may move for an order with respect to any objection to or other failure to respond to the request or any part thereof, or any failure to permit inspection as requested.

3.      Under FRCP 45(e)(1)(B), if this Subpoena does not specify a form for producing electronically stored information, you must produce it in a form or forms in which it is ordinarily maintained or in a reasonably useable form or forms.

4.      Even though these document requests are directed to you, furnish all documents which are available to, or in the possession, custody, or control of you, your board members, directors, officers, employees, agents, representatives, consultants, or anyone acting on your behalf, including, without limitation, bankruptcy trustees, and, unless otherwise privileged, your counsel and their employees, representatives, agents, investigators, or consultants.

5.      To the extent you consider any of the following document requests or subparts thereof to be objectionable, answer the portion of the document request (or subpart thereof) to which you do not have an objection, and separately state which portion of the document request (or subpart thereof) is considered objectionable, along with the specific grounds for the objection.

## **DEFINITIONS**

The following definitions apply to each of the document requests set forth below and are deemed to be incorporated into each request:

1.      The term "Communication" means the transmittal of information by any means. Without limiting the foregoing, "Communication" includes all documents, (whether paper, electronic, or otherwise), email communications, text messages, instant messages, telephone conversations or face-to-face conversations, negotiations, meetings, or conferences.

2.      The term "Document" is used in its customary sense and is meant to have the broadest possible meaning provided under the Federal Rules of Civil Procedure, Local Rules, and other applicable law. It includes the original and any copies of all written, typed, printed, electronic, recorded, or graphic statements, Communications, or other matter, however produced, reproduced, or stored, in your possession, custody, or control, including, without limitation, all drafts and final correspondence, letters, electronic mail, facsimile transmissions, memoranda, notes and notations, notepapers, interoffice communications, transcripts, notes and minutes of telephone and other conversations, or of conferences or meetings, books, pamphlets, periodicals, articles, requisitions, resolutions, certificates, opinions, reports, studies, analyses, evaluations, contracts, licenses, agreements, financial statements, ledgers, checks, check stubs, invoices, receipts, estimates, bills, applications for payment, books or records of account, credit memoranda, credit files, notations in credit files, statistical records, desk calendars, books, diaries, lists, tabulations, summaries, charts, graphs, maps, surveys, plans, drawings, specifications, sound recordings, photographs, computer tapes or printouts, magnetic tapes, and all other records kept by electronic, photographic or mechanical means, and papers and things similar to any of the foregoing, however denominated, and in their original form, by you or any other person. If copies, reproductions, drafts, or facsimiles of a document are not identical by reason of hand-written

notations, initials, identification marks or other modification, each such non-identical copy is a separate document within the meaning of this definition.

3.      The terms "Person" and "Individual" include any natural person, partnership, corporation, proprietorship, joint venture, unincorporated association or other business association or legal entity, and any other domestic or foreign governmental body, commission, board, agency, authority, branch, department, or component thereof.

4.      The term "each" includes the word "every," and "every" includes the word "each." "Any" includes the word "all," and "all" includes the word "any." "And" includes the word "or," and "or" includes the word "and." As used herein, the words "or" and "and" shall mean "and/or."

5.      Terms in the plural include the singular, and terms in the singular include the plural.

6.      The terms "include" and "including" mean "including, but not limited to."

7.      The terms "relating" or "concerning" mean consisting of, or referring to, reflecting, or being in any way legally, logically, or factually connected with the matter discussed, and includes referring to, relating to, concerning, embodying, connected with, commenting on, responding to, showing, describing, analyzing, reflecting or constituting.

8.      Terms referring to one gender include both genders.

9.      The terms "you," "your," and "M&T" refer to M&T Bank and its members, partners, directors, officers, employees, agents, affiliates, representatives, consultants, and attorneys.

10.     The phrase "Main Street" refers collectively to Main Street Phase II, L.P. and Main Street Phase III, L.P. and their members, partners, directors, officers, employees, agents, affiliates, representatives, consultants, and attorneys.

11.     The term "F&D" refers to Fidelity and Deposit Company of Maryland, its officers, directors, employees, agents, affiliates, representatives, consultants, and attorneys.

12.     The term "JMB" refers to Jeffrey M. Brown Associates, LLC, its officers, directors, employees, agents, affiliates, representatives, consultants, and attorneys.

13.     The term "NorthStar" refers to NorthStar Owners Representation, which served as Main Street's representative on the Project.

14.     The term "Architect" refers to (i) Bohler Engineering, Inc., 36 Technology Drive, Warren, NJ 07069, with respect to the interpretation, implementation, and approval of any of the Work to be performed in accordance with any of the Plans and Specifications prepared by such engineering firm; (ii) McMahon Associates, Inc., 425 Commerce Drive, Suite 200, Ft. Washington, PA 19034, with respect to the interpretation, implementation, and approval of any of the Work to be performed in accordance with any of the Plans and Specifications prepared by such engineering firm; and (iii) Bernardon, LLC, The Philadelphia Building, 1315 Walnut Street, Suite 600, Philadelphia, PA 19107, with respect to the interpretation, implementation and approval of any of the Work to be performed in accordance with any of the Plans or Specifications prepared by such architectural firm; and (iv) Advantage Engineers, LLC, 435 Independence Ave, Suite C, Mechanicsburg, PA 17055, with respect to the interpretation, implementation and approval of any of the Work to be performed in accordance with any of the Plans or Specifications prepared by such engineering firm. The definition for "Architect" as used herein also includes all owners, members, partners, directors, officers, employees, agents, or representatives of the foregoing architectural and engineering firms.

15.     The term "Action" refers to the lawsuit captioned <u>Fidelity and Deposit Company of Maryland v. Main Street Phase II, L.P. and Main Street Phase III, L.P.</u>, Case No: 21-cv-03576, pending in the United States District Court for the Eastern District of Pennsylvania.

16.     The term "Arbitration" refers to the dispute captioned <u>Main Street Phase II, L.P. v. Jeffrey M. Brown Associates, Inc. and Fidelity and Deposit Company of Maryland</u>, Case No. 01-22-0000-1078, pending before a three-member panel of arbitrators of the American Arbitration Association.

17.     The term "Project" refers to the Ashbridge Apartments, a mixed-use commercial and multifamily residential property developed by Main Street and for which Main Street contracted with JMB to serve as prime contractor. The Project is located at the Main Street at Exton shopping center in Exton, Pennsylvania.

18.     The phrase "Open-End Mortgage" refers to that certain Open-End Mortgage recorded in the land records of Chester County, Pennsylvania on or about September 27, 2018 identifying M&T as the Mortgagee and Main Street as the Mortgagor.

19.     The term "Note" refers to that certain Construction-to-Permanent Loan dated on or about September 18, 2018.

20.     The phrase "Base Contract" refers to the contract between Main Street and JMB executed on or about September 17, 2018 in furtherance of the construction of the Project.

21.     The phrase "Settlement and Dedication of Contract Balance Agreement" refers to the agreement among Main Street, JMB, and F&D entitled Liquidated Damages Settlement Agreement and Dedication of Contract Balance that was executed on or about November 2, 2020.

22.     These Requests for the Production of Documents incorporate by reference all definitions and terms set forth in the Base Contract and the Settlement and Dedication of Contract Balance Agreement.

23.     The document requests below should not be construed as requesting the production of documents, or information within documents, that are protected from disclosure by the attorney-client privilege or the attorney work-product doctrine.

## DOCUMENT REQUESTS

1.     Documents, including but not limited to, Communications, transmitted by, between, or among M&T and Main Street on or after June 25, 2020, and that relate to the Project.

2.     Documents and Communications related to all request(s) for payment and/or draw(s) under the Open-End Mortgage and/or the Note. A copy of the Open-End Mortgage is attached to these document requests as Exhibit A.1.

3.     Documents and Communications referencing or evidencing payments, draws, releases of funds, or other transfers of money pursuant to the Open-End Mortgage or the Note, Construction Loan, Loan Agreement, or Letter of Credit Documents, as such terms are defined in the Open-End Mortgage.

4.     Documents and Communications referencing or evidencing any decision on the part of M&T to fund, in full or in part, any payment, draw, or release of funds or other transfers of money pursuant to the Open-End Mortgage or the Note, Construction Loan, Loan Agreement, or Letter of Credit Documents, as such terms are defined in the Open-End Mortgage.

5.     Copies of the Note, Construction Loan, Loan Agreement, and Letter of Credit Documents, and all amendments thereto, referenced in the Open-End Mortgage.

6.     Submittals, drafts, and correspondence related to payment applications made to M&T in connection with the Project.

7.      Documents and Communications, including, without limitation, notices sent by or on behalf of M&T and responses by the Main Street thereto, related to any default under the Open-End Mortgage or the Note, Construction Loan, Loan Agreement, or Letter of Credit Documents, as such terms are defined in the Open-End Mortgage.

8.      A statement reflecting the amount presently owed to M&T under the Open-End Mortgage or the Note, Construction Loan, Loan Agreement, and/or Letter of Credit Documents, as such terms are defined in the Open-End Mortgage.

9.      Documents and Communications transmitted by, between, or among M&T and Main Street relating to F&D, the Settlement and Dedication of Contract Balance Agreement, any default or allegations of default against JMB, the Arbitration, and this Action.

# Exhibit A.1

Prepared by:  Meredith Bieber, Esquire
Return to:  Meredith Bieber, Esquire
White and Williams LLP
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA  19103-7395

Tax Parcel Nos.  41-5-133.1, 41-5-138.6,
41-5-138.8, 41-5-138.9

RECORDER OF DEEDS

When Recorded Return To:
First American Title Insurance Company
National Commercial Services
Two Liberty Place 50 S. 16th St., Suite 3010
Philadelphia, PA 19102
File No: NCS _____ 897378

# OPEN-END MORTGAGE

## MAIN STREET PHASE II, L.P.,

and

## MAIN STREET PHASE III, L.P.

(collectively, Mortgagor)

TO

## M&T BANK,

(Mortgagee)

Execution Version

DOC # 11631766 09/27/201801:39 PM
Receipt #:18-31563
Rec Fee: $273.75
Chester County, Recorder of Deeds

11631766   B: 9820 P: 358   MTG
09/27/201801:39 PM       Page 1 of 37
FIRST AMERICAN TITLE INSURANCE COMPANY


**M&T Bank**
Manufacturers and Traders Trust Company

**OPEN-END MORTGAGE**
**(Construction)**
**Pennsylvania**

**THIS OPEN-END MORTGAGE SECURES FUTURE ADVANCES**

**Dated**: September **18**, 2018 and effective as of September **27**, 2018

**Mortgagor:**  Main Street Phase II, L.P., a Pennsylvania limited partnership FKA MAIN STREET CINEMA LP
Main Street Phase III, L.P. a Pennsylvania limited partnership FKA MAIN STREET ASHBRIDGE LP
120 West Germantown Pike, Suite 120
Plymouth Meeting, PA  19462

**Mortgagee:** M&T BANK, a New York banking corporation having offices at One M&T Plaza, Buffalo, New York 14203, Attn: Office of General Counsel.

WITNESSETH, to secure the payment of (i) an indebtedness in the principal sum of Seventy Five Million Four Hundred Thousand Dollars ($75,400,000), lawful money of the United States, together with interest thereon and other charges with respect thereto, to be paid according to a Construction-to-Permanent Loan Note dated on or about the date hereof, made and delivered by Mortgagor to Mortgagee (the "**Note**"), and (ii) all obligations of Mortgagor pursuant to (x) that certain Letter of Credit Agreement dated September 27, 2018 by and between Mortgagee and Mortgagor pursuant to which Mortgagee has issued its Letter of Credit No. SB2184130001 in the maximum amount available to be drawn of $3,411,606, (the "**Township Letter of Credit**") (and for avoidance of doubt the amount available to be drawn under the Township Letter of Credit shall be a sublimit of the loan evidenced by the Note) and (y) that certain Letter of Credit Agreement to be entered into by and between Mortgagee and Mortgagor pursuant to which Mortgagee shall issue a letter of credit in the maximum amount available to be drawn of $200,000 (the "**PECO Letter of Credit**") (and for the avoidance of doubt the amount available to be drawn under the PECO Letter of Credit does not constitute a sublimit of the loan evidenced by the Note) (collectively, the "**Letter of Credit Documents**"), Mortgagor hereby mortgages to Mortgagee, as continuing and collateral security for the payment of any and all indebtedness, liabilities and obligations now existing or which may hereafter arise by reason of the Note, the Letter of Credit Documents, this Mortgage or any amendments, renewals, extensions, modifications or substitutions of the Note, or this Mortgage, together with all interest, actual, reasonable costs, expenses and outside attorneys' fees accruing or incurred in connection therewith, and all other existing and future liabilities and obligations of every kind, including,

**11631766  B: 9820 P: 359  MTG**
09/27/201801:39 PM   Page 2 of 37
FIRST AMERICAN TITLE INSURANCE COMPANY

© M&T Bank, 2014

without limitation, those arising pursuant to any interest rate swap agreement, and in whatever amount of Mortgagor to Mortgagee (the principal sum and the items set forth in this section are hereinafter collectively referred to as the "**Indebtedness**"), the premises described on the attached **Schedule A**.  The loan from Mortgagee to Mortgagor which is evidenced by the Note is hereinafter referred to as the "**Construction Loan**".  The obligations of Mortgagor under the Letter of Credit Documents are hereinafter referred to as the "**Letter of Credit Facility**" and, together with the Construction Loan, the "**Loan**".  As used in this Mortgage, the "**Loan Documents**" are, collectively, the (x) documents defined as such in the Loan Agreement (as defined below), and (y) the Letter of Credit Documents.  Notwithstanding anything to the contrary herein contained, the maximum principal indebtedness secured by this Mortgage shall in no event exceed $75,600,000, PLUS ALL MONIES AS MAY BE ADVANCED BY MORTGAGEE UNDER THIS MORTGAGE OR THE LOAN AGREEMENT TO PROTECT THE PREMISES AND/OR THE LIEN OF ITS MORTGAGE.

TOGETHER with all of Mortgagor's right, title and interest in and to all buildings, structures, additions and other improvements now or hereafter erected, constructed or situated upon said premises (the "**Improvements**"), and all fixtures and equipment and other personal property of Mortgagor now or hereafter affixed to, or used in connection with, the operation or maintenance of said premises and any and all replacements thereof and additions thereto, all of which shall be deemed to be and remain and form a part of said premises and are covered by the lien of this Mortgage (said premises, buildings, structures, other Improvements, fixtures and equipment and other personal property being collectively referred to as the "**Premises**"),

TOGETHER with all of Mortgagor's right, title and interest in and to all strips and gores of land adjoining or abutting the Premises,

TOGETHER with all right, title and interest of Mortgagor in and to all streets, alleys, highways, waterways and public places open or proposed in front of, running through or adjoining the Premises, and all easements and rights of way, public and private, now or hereafter used in connection with the Premises,

TOGETHER with all tenements, hereditaments and appurtenances and all the estate and rights of Mortgagor in and to the Premises,

TOGETHER with all of Mortgagor's right, title and interest in and to all licenses, permits, approvals, certificates, rights and agreements of every type and nature with or from all boards, agencies and departments, governmental or otherwise, relating directly or indirectly to the ownership, use, operation, occupancy and maintenance of the Premises and/or Improvements, whether heretofore or hereafter issued or executed, including without limitation all permits and capacity reserved, acquired or to be acquired in connection with water and sewer connections and allocations for the construction and occupancy of the Improvements and any and all deposits for the issuance of such permits (collectively, the "**Licenses**") (said boards, agencies and departments (governmental or otherwise) are hereinafter collectively referred to as the "**Licensing Authorities**"),

11631766   B: 9820 P: 360   MTG
09/27/2018 01:39 PM          Page 3 of 37
FIRST AMERICAN TITLE INSURANCE COMPANY

© M&T Bank, 2014

TOGETHER with, to the extent assignable, all contracts (including without limitation construction and architect contracts), bonds, plans, specifications, subcontracts, agreements, service agreements, maintenance contracts, water and/or sewer capacity agreements, management and operating agreements, utility agreements, warranties, guaranties and purchase orders (collectively, the "**Contracts**") which have heretofore been or will hereinafter be executed by or on behalf of Mortgagor, or which have been or will hereafter be assigned to Mortgagor, in connection with the construction, use, operation, maintenance, occupancy and servicing of the Premises and the Improvements (the parties with whom or to whom such Contracts have been or are given are hereinafter collectively referred to as the "**Contractors**"),

TOGETHER to the extent of Mortgagor's interest therein, with all contracts for the purchase of all furniture, fixtures and equipment used or required for the operation of the Improvements together with all deposits and payments made on account or pursuant to the terms of such contracts (collectively, the "**FF&E Contracts**" and, together with the Licenses and the Contracts, the "**Development Collateral**") which have been or will hereinafter be executed by or on behalf of Mortgagor, or which have been or will hereafter be assigned to Mortgagor (the parties with whom such FF&E Contracts have been entered into are hereinafter collectively referred to as "**Vendors**"),

TOGETHER with all of Mortgagor's right, title and interest in and to all awards heretofore or hereafter made by any federal, state, county, municipal or other governmental authority, or by whomsoever made in any condemnation or eminent domain proceedings whatsoever, to the present or subsequent owners of the Premises or any portion thereof, for the acquisition for public purposes of the Premises or any portion thereof or any interest therein or any use thereof, or for consequential damages on account thereof, including any award for any change of grade of streets affecting the Premises or any portion thereof and any award for any damage to the Premises or any portion thereof or any interest therein or any use thereof,

TOGETHER with all of Mortgagor's right, title and interest in and to all replacements thereof and substitutions therefor as well as the proceeds thereof, including, without limitation, proceeds of insurance and condemnation awards.

THIS MORTGAGE SECURES FUTURE ADVANCES.  Without limiting any other provisions of this Mortgage, Mortgagee may make future advances, and this Mortgage shall secure repayment of such advances and the interest thereon, for the payment, in accordance with the Loan Documents, of taxes, assessments, maintenance charges, insurance premiums, or actual, reasonable costs similar or dissimilar incurred for the protection of the Premises or for the lien of this Mortgage, the actual, reasonable third-party expenses incurred by Mortgagee by reason of a default by Mortgagor, or advances made under a construction loan (if applicable) to enable the completion of the Improvements for which the construction loan was originally made.  Any and all future advances under this Mortgage and the Loan Documents shall have the same priority as if the future advance was made on the date that this Mortgage was recorded.  This Mortgage shall secure the principal, interest and all other obligations provided to be paid in the Loan Documents, whenever incurred, at the times provided in the Loan Documents.  Notice is hereby given that the indebtedness secured may <u>increase</u> as a result of any defaults hereunder by Mortgagor due to, for example, and without limitation, unpaid interest, unpaid taxes or insurance premiums which the

Mortgagee elects to advance, reasonable outside attorneys' fees and the actual, reasonable costs incurred in enforcing the Loan Documents or other such expenses incurred by the Mortgagee in protecting the Premises, the security of this mortgage or the Mortgagee's rights and interests.

This Mortgage is a "construction mortgage" within the meaning of Section 9334 of the Uniform Commercial Code (i.e. 13 Pa. C.S.A. §9334) and/or is given to secure advances made in order to pay toward, or to provide funds to the Mortgagor or the obligor to pay toward, all or part of the cost of completing any erection, construction, alteration or repair of any part of the Premises, and shall have the priority provided by 49 Pa.C.S.A. §1508, as amended from time to time. The Construction Loan Agreement of even date herewith between Mortgagor and Mortgagee (the "**Loan Agreement**") and the Letter of Credit Documents are each hereby made a part of this Mortgage as if set forth herein in full and all advances of the principal hereof shall be made by the Mortgagee to the Mortgagor pursuant to the terms, conditions, and provisions of the Loan Agreement or the Letters of Credit Document, as applicable. An Event of Default by the Mortgagor under the Loan Agreement or the Letter of Credit Documents shall likewise be an Event of Default by the Mortgagor hereunder and under the Note. The Loan Agreement, the Letter of Credit Documents, this Mortgage and the Note are intended to supplement each other and, to the extent of any conflict among them, the provisions of the Loan Agreement or the Letter of Credit Documents, as applicable shall prevail unless the giving of such priority to the provisions of the Loan Agreement would result in any lien against the Premises becoming superior in priority to the lien of this Mortgage as to all or any part of the indebtedness secured hereby theretofore or thereafter advanced by the Mortgagee. All initially capitalized terms used herein and not otherwise defined herein shall have the meanings given to such terms in the Loan Agreement.

PROVIDED ALWAYS that, if Mortgagor shall pay to Mortgagee all sums due or to become due under the Notes, this Mortgage, the Loan Agreement, the Letter of Credit Documents or any of the other Loan Documents and shall fully perform, comply with, and abide by each and every stipulation, agreement, condition, and covenant of this Mortgage, the Note, the Loan Agreement, the Letter of Credit Documents and shall pay, in accordance with the Loan Documents, all taxes, charges and assessments that may accrue on or be levied or assessed against the Premises, and all actual, reasonable third-party costs and expenses that Mortgagee may actually incur in collecting the indebtedness secured hereby, protecting the security hereof, and/or enforcing the covenants and promises of Mortgagor by foreclosure of this Mortgage or otherwise, including without limitation, reasonable outside attorneys' fees; that then and from thence forth, this Mortgage and the estate hereby granted shall cease and be null and void.

MORTGAGOR COVENANTS WITH MORTGAGEE SO LONG AS THIS MORTGAGE IS IN EFFECT AS FOLLOWS:

1. **PAY INDEBTEDNESS.** The Indebtedness shall be paid as provided in the Note and the other Loan Documents. Additionally, Mortgagor acknowledges and agrees that any amounts now or hereafter due and owing from Mortgagor to Mortgagee arising from or in connection with any interest rate swap agreement, now existing or hereafter entered into between Mortgagor and Mortgagee, and any costs incurred by Mortgagee in connection therewith, including, without limitation, any interest, actual, reasonable third-party expenses, fees, penalties

© M&T Bank, 2014

or other charges associated with any obligations undertaken by Mortgagee to hedge or offset Mortgagee's obligations pursuant to such swap agreement, or the termination of any such obligations, shall be (i) deemed an additional principal obligations, additional interest and/or a related expense (to be determined in the sole but reasonable discretion of Mortgagee) due in connection with the principal amount of the Indebtedness secured by this Mortgage, (ii) included (in the manner described above) as part of the Indebtedness secured by this Mortgage, and secured by this Mortgage to the full extent thereof, and (iii) included in any judgment in any proceeding instituted by Mortgagee or its agents against Mortgagor for foreclosure of this Mortgage or otherwise.

2.    **INSURANCE.**

(a)    Mortgagor, at its sole cost and expense, shall keep the Premises insured against all catastrophes and casualties included in an "all risks of physical loss" property insurance policy, including business income insurance, for the benefit of Mortgagee. Such insurance shall be provided in such amounts, for such periods, in such form, with such special endorsements, on such terms and by such companies and against such risks as shall be reasonably satisfactory to Mortgagee. Notwithstanding the foregoing, (i) if the Mortgagee reasonably determines at any time that any part of the Improvements is located in an area identified, on a Flood Hazard Boundary Map or Flood Insurance Rate Map issued by the Federal Emergency Management Agency, as having special flood hazards, the Mortgagor will obtain and maintain a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration, with a generally acceptable insurance carrier, in an amount reasonably satisfactory to the Mortgagee, but in no case less than the lesser of (y) the then outstanding principal balance of the Loan, or (z) the maximum amount of insurance which is available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as amended, and (ii) during the period of any construction or renovation or alteration of the Improvements, a so-called "Builder's All Risk" insurance policy written on a standard non-reporting, completed value form for any Improvements under construction, including, without limitation, for demolition and increased cost of construction or renovation, providing for full extended coverage against loss by fire, and containing an installation floater providing for coverage against vandalism, malicious mischief, and loss by theft (the amount of any deductible provision must be reasonably satisfactory to the Mortgagee), including a floater endorsement for work stored off-site or in transit, an Occupancy endorsement and Workers' Compensation Insurance covering all persons engaged in the construction, renovation or alteration in an amount at least equal to the minimum required by statutory limits of the state in which the Property is located, and protecting against damage to or destruction of the building under construction, machinery, tools and equipment at the construction site and materials and supplies to be used in construction that are at or near the site. Such "Builder's All Risk" policy shall name the Mortgagor as the insured and, as additional insured, the general contractor, and all subcontractors as their interests may appear, and shall provide that the same may not be canceled until the expiration of not less than thirty (30) days after written notice to the Mortgagee. The policy shall also name the Mortgagee under a standard noncontributory mortgagee clause. Said policy shall be in an amount to be reasonably determined by the Mortgagee, which amount shall in no event be less than the amount of the Loan or exceed in the aggregate one hundred percent (100%) of the completed insurable value of

the Improvements and shall be sufficient to meet all applicable coinsurance requirements.

(b)     Without limiting the generality of the foregoing, each property insurance policy pursuant to which such insurance is provided shall contain a mortgagee clause, in form and substance reasonably satisfactory to Mortgagee, naming Mortgagee as mortgagee, (i) such insurance shall not be affected by any act or neglect of Mortgagor or Mortgagee, any occupancy, operation or use of the Premises or any portion thereof for purposes more hazardous than permitted by the terms of such policy, any foreclosure or other proceeding or notice of sale relating to the Premises or any portion thereof or any change in the title to or ownership of the Premises or any portion thereof and (ii) such policy and such mortgagee clause may not be canceled or amended except upon thirty (30) days' prior written notice to Mortgagee. Mortgagor hereby assigns and shall deliver each policy pursuant to which any such insurance is provided to Mortgagee, and Mortgagor shall further deliver renewals of the each insurance policy with evidence of payment to Mortgagee no fewer than thirty (30) days' prior to the expiration of each then-current policy. The acceptance by Mortgagee of such policies from Mortgagor shall not be deemed or construed as an approval by Mortgagee of the form, sufficiency or amount of such insurance. Mortgagee does not in any way represent that such insurance, whether in scope or coverage or limits of coverage, is adequate or sufficient to protect the business or interest of Mortgagor. In the event of the foreclosure of this Mortgage, or a transfer of title to the Premises in extinguishment of the Indebtedness, all right, title and interest of Mortgagor in and to any such policies then in force shall pass to the purchaser or grantee of the Premises. Provided an Event of Default does not then exist, Mortgagee agrees that the proceeds of the insurance shall be used for the repair or replacement of the portions of the Premises, without affecting the lien of this Mortgage for the full amount of the Indebtedness before the making of such payment, as follows:

(i)     Such insurance proceeds shall be used for the repair or replacement of the Premises only upon satisfaction of the following:

(A)     Mortgagor shall deposit with Mortgagee in an interest bearing account sufficient funds to cover the costs of re equipping, restoring, reconstructing and renovating the Improvements which costs are in excess of the available insurance proceeds.

(B)     Mortgagor shall promptly furnish to Mortgagee plans and specifications for the repair, restoration and re equipping of the Improvements by such architect as shall be selected and engaged by Mortgagor, which architect and the plans and specifications shall be subject to the prior approval of Mortgagee, such approval not to be unreasonably withheld.

(C)     In connection with any loss in excess of $3,000,000, Mortgagor shall submit satisfactory evidence, by appraisal from an appraiser satisfactory to Mortgagee, that the appraised value of the Premises, as repaired is at least $116,000,000 on an "as stabilized" basis.

(D)     Intentionally deleted.

(E)     Mortgagor will submit satisfactory evidence that the



restoration, reconstruction and re-equipping will be completed prior to the earlier of: (i) ninety (90) days prior to the then "Final Maturity Date" (as defined in the Note), and (ii) two hundred ten (210) days after the insurance proceeds for such fire or other occurrence causing the loss are settled and available to be used for restoration, or such other longer time period necessary due to the extent of said loss as Mortgagee may approve in writing in its sole discretion, and subject to reasonable extension by reason of "force majeure" (the **Completion Date**").

Subject to the foregoing, the insurance proceeds, net of the cost of adjusting, collecting, and such reasonable administrative charge as Mortgagee may impose for distributing same, shall be advanced pursuant to and subject to the provisions and conditions of this Mortgage as work progresses and upon the architect's certification. Provided there is not then continuing an Event of Default, insurance proceeds for any loss less than less than Two Million Dollars ($2,000,000.00) shall be paid to Mortgagor for use in restoration. Otherwise, the insurance proceeds to be released, as aforesaid, shall be disbursed on request, but no more frequently than monthly, in accordance with a draw schedule approved by Mortgagee and in a manner approved by Mortgagee. The item or items to which each distribution may be applied are subject to the prior approval of Mortgagee, as are the frequency of, dates and amounts of each such distribution. Each distribution shall, at Mortgagee's option, be subject to retainage as provided for in the Loan Agreement, which shall be disbursed within thirty (30) days after completion of all work in a lien free manner.

(ii)      In the event all of the conditions of Subsections 2(b)(i)(A) through 2(b)(i)(E) are not fully complied with within one hundred twenty (120) days after the fire or other occurrence causing the loss, or in the event all restoration, reconstruction and re-equipping is not completed by the Completion Date set forth in Subsection 2(b)(i)(E), all insurance proceeds arising due to damage or destruction to the portions of the Premises shall be applied by Mortgagee in its sole discretion to the payment of accrued and unpaid interest, if any, on account of the unpaid principal sum, or to other sums due hereunder or under the other Loan Documents, all of the foregoing in such order as Mortgagee may elect.

Notwithstanding the foregoing, Mortgagee shall make property insurance and condemnation proceeds available to Mortgagor for (1) razing as required under Section 6.A(1) of that certain Declaration of Easements, Conditions and Restrictions by and among Main Street at Exton (WM), L.P. and Mortgagor, inter alia, dated August 2001 and recorded with the Chester County Recorder of Deeds in Book 5052, page 263 (the "Declaration") and (2) restoration of the Common Areas (as defined in the Declaration) as required under Section 6.A(2) of the Declaration, in each case to the extent required in order to comply with the Declaration.

Upon completion of such restoration, reconstruction and re-equipping pursuant to Subsections 2(b)(i) and/or 2(b)(ii) (as applicable), or upon and during the continuance of an Event of Default hereunder, any portion of the insurance proceeds remaining unexpended shall be applied by Mortgagee in its sole discretion to the payment of accrued and unpaid interest, if any, on account of the unpaid principal sum, or to other sums due hereunder or under the Loan Documents, all of the foregoing in such order as Mortgagee may elect. No damage or destruction of the Premises nor any application of insurance proceeds to the payment of the indebtedness evidenced by the Note shall postpone or reduce the amount of any installment of principal or interest due under the

Note which shall continue to be made in accordance with the terms of the Note.

3.   **ALTERATIONS, DEMOLITION OR REMOVAL**.  Except as otherwise provided in and contemplated by, the Loan Agreement, no building, structure, other improvement, fixture or equipment or other personal property constituting any portion of the Premises shall be removed, demolished or substantially altered without the prior written consent of Mortgagee, which consent shall not be unreasonably withheld, conditioned or delayed.

4.   **WASTE AND CHANGE IN USE.**  No Mortgagor shall commit any waste on the Premises or make any change in the use of the Premises which may in any way materially increase any ordinary fire, environmental or other risk arising out of construction or operation.

5.   **MAINTENANCE AND REPAIRS.**  Mortgagor shall keep and maintain (or shall cause to be kept and maintained) all buildings, structures, other Improvements, fixtures and equipment and other personal property constituting any portion of the Premises and the sidewalks and curbs abutting the Premises in good order and rentable and tenantable condition and state of repair.  In the event that the Premises or any portion thereof shall be materially damaged or destroyed by fire or any other casualty, or in the event of the condemnation or taking of any portion of the Premises as a result of any exercise of the power of eminent domain, Mortgagor shall promptly restore, replace, rebuild or alter the same as nearly as possible to the condition immediately prior to such fire, other casualty, condemnation or taking without regard to the adequacy of any proceeds of any insurance or award received.  Mortgagor shall, promptly upon obtaining knowledge thereof, give written notice to Mortgagee of any such damage or destruction or of the commencement of any condemnation or eminent domain proceeding affecting the Premises or any portion thereof.

6.   **INTENTIONALLY OMITTED.**

7.   **TAXES AND ASSESSMENTS**.  Unless paid from an escrow established pursuant to Section 8 of this Mortgage, Mortgagor shall pay (or cause to be paid) all taxes, general and special assessments and other governmental impositions with respect to the Premises prior to delinquency.  Upon written request by Mortgagee, Mortgagor shall promptly deliver to Mortgagee, when available, receipted bills showing payment of all such taxes, assessments and impositions prior to delinquency.  Mortgagor covenants that no owner of the Premises (including Mortgagor) shall be entitled to any credit against any amounts due under the Note or this Mortgage by reason of the payment of any taxes due thereon.

8.   **ESCROW FOR TAXES, ASSESSMENTS AND INSURANCE.**  During the existence of an Event of Default, upon written request by Mortgagee, Mortgagor shall pay (a) monthly to Mortgagee on or before the first day of each and every calendar month, until the Indebtedness is fully paid, a sum equal to one-twelfth (1/12th) of the yearly taxes, general and special assessments, other governmental impositions and other liens and charges with respect to the Premises to be imposed for the ensuing year, as reasonably estimated by Mortgagee in good faith, and annual premiums for insurance on the Premises and (b) an initial payment such that, when such monthly payments are added thereto, the total of such payments will be sufficient to pay such taxes, assessments, impositions and other liens and charges and such insurance

premiums at least thirty (30) days before the date when they become due.  Absent manifest error, Mortgagee's calculation as to the amount to be paid into Escrow shall be deemed conclusive. Mortgagee shall hold such payments in trust in an account maintained with Mortgagee without obligation to pay interest thereon, except such interest as may be mandatory by any applicable statute, regulation or other law, to pay, to the extent funds are available, such taxes, assessments, impositions and other liens and charges and such insurance premiums within a reasonable time after they become due.  Mortgagee may apply the balance of any such payments held to the Indebtedness then due and payable.  If the total of such payments made by any Mortgagor shall exceed the amount of such payments made by Mortgagee, such excess shall be held or credited by Mortgagee for the benefit of Mortgagor.  If the total of such payments made by any Mortgagor shall be less than the amount of such taxes, assessments, impositions and other liens and charges and such insurance premiums, then Mortgagor shall pay to Mortgagee any amount necessary to make up the deficiency on or before the date when any such amount shall be due.

9.      **LEASES**.  Reference is made to the separate Assignment of Rents and Leases from Mortgagor to Mortgagee of even date herewith with regard to certain restrictions and obligations of Mortgagor as to Leases.

10.     **INTENTIONALLY OMITTED**.

11.     **ASSIGNMENT OF DEVELOPMENT COLLATERAL**.

(a)     Mortgagor hereby assigns, transfers and sets over unto Mortgagee all of Mortgagor's right, title and interest in and to the Development Collateral and all rights and benefits therefrom including: (i) all cash and non-cash proceeds, and proceeds of proceeds of any of them; and (ii) any and all rights of Mortgagor to reject any Development Collateral under the United States Bankruptcy Code as security for the full, timely and faithful repayment by Mortgagor of the Loan and performance by Mortgagor of all of its obligations under the Loan Documents to the fullest extent permitted by law and by the terms of the Development Collateral. Mortgagor covenants and agrees to execute such further and additional instruments and assignments as may be requested by Mortgagee to vest in Mortgagee all rights of Mortgagor under any of the Development Collateral; provided, however, that in no event shall Mortgagor be obligated to execute any instruments or assignments that would increase Mortgagor's obligations or liabilities or decrease Mortgagor's rights and benefits under the Loan Documents.  Mortgagor shall, within ten (10) business days of any written request by Mortgagee, furnish Mortgagee with a complete list of all Development Collateral, and deliver to Mortgagee executed or certified copies of all FF&E Contracts, Contracts and Licenses and other written agreements, correspondence and memoranda between Mortgagor (and its predecessors in title) and Contractors, Vendors, Governmental Authorities and/or Licensing Authorities setting forth the contractual and other arrangements between them.  To the extent that Mortgagor does not have executed or certified copies of the foregoing in its possession, Mortgagor shall deliver copies of those of the foregoing which are in its possession, with a certification that to Mortgagor's actual knowledge, they are true and correct copies in all material respects.  Such requests may be made at any reasonable time and for purposes hereof, monthly requests, or more frequent requests if made during the existence of an Event of Default, shall be deemed to be made at a reasonable time.  Mortgagor shall also give to Mortgagee a true and correct copy of any notice that would

have a material adverse effect on Mortgagor's ability to perform its obligations under the Loan Documents that is received by Mortgagor in connection with any of the Development Collateral promptly following Mortgagor's receipt of such notice.

(b)      Mortgagor represents and warrants that, as of the date hereof, (i) it has made no prior assignment, pledge or hypothecation of any of the Development Collateral; (ii) all amounts due from Mortgagor to date under the Development Collateral will be paid in accordance with the terms thereof; (iii) to Mortgagor's actual knowledge, all Development Collateral is in full force and effect on the date hereof, has not been materially amended or modified in any way, and the performance of the other parties thereto is subject to no defenses, setoffs or counterclaims whatsoever; (iv) to Mortgagor's actual knowledge, there exists no event, condition or occurrence which constitutes, or which with notice and/or the passage of time would constitute, a breach of or default under any term or condition of any of the Development Collateral; and (v) it has not done and shall not perform any acts which might destroy or impair the security to Mortgagee of this assignment, or which might materially prevent Mortgagee from exercising its rights under this assignment or limit Mortgagee in such exercise.

(c)      So long as no Event of Default exists, Mortgagor may retain, use and enjoy the benefits of the Development Collateral.  The affidavit or written statement of an officer, agent or attorney of Mortgagee stating that an Event of Default exists shall constitute conclusive evidence thereof, and any governmental authorities exercising jurisdiction over the Premises and Improvements (collectively, the "**Governmental Authorities**") and all Licensing Authorities, Contractors, Vendors and other persons are authorized and directed to rely thereon. Mortgagee shall not be obligated to perform or discharge, nor shall it by acceptance of this assignment be deemed in any manner to have assumed any of the Development Collateral or to be under any obligation to perform or discharge any of the obligations applicable to any of the Development Collateral, nor shall Mortgagee be liable to any Governmental Authorities, Contractors or Vendors by reason of any default by any party under any of the Development Collateral.  During the existence of an Event of Default, Mortgagee may elect to exercise any and all of Mortgagor's rights and remedies under the Development Collateral, without any interference or objection from Mortgagor, and Mortgagor shall cooperate in causing the Contractors, Licensing Authorities and Vendors to comply with all the terms and conditions of their respective undertakings.  During the existence of an Event of Default, if and to the extent permitted by law, Mortgagee may, with or without entry upon the Premises and Improvements, and without prejudice to any other available rights or remedies under the Loan Documents, at its option, take over and enjoy the benefits of the Development Collateral, exercise Mortgagor's rights under the Development Collateral, and perform all acts in the same manner and to the same extent as Mortgagor might do, which acts may be performed either in the name of Mortgagor or Mortgagee.  In connection with any and all of the foregoing powers, and without limiting the same, during the existence of an Event of Default Mortgagee may affect new FF&E Contracts, Contracts and Licenses, cancel or surrender existing FF&E Contracts, Contracts and Licenses, alter and amend the terms of and renew existing FF&E Contracts, Contracts and Licenses, and make concessions to Governmental Authorities, Vendors and Contractors. Mortgagor hereby releases any and all claims which it has or might have against Mortgagee arising out of such performance by Mortgagee, except with respect to claims arising out of (and then solely to the extent of) Mortgagee's gross negligence or willful misconduct.  During the

existence of an Event of Default, Mortgagee may enter into new Contracts for the performance of all services provided for therein or perform such services itself; exclude Mortgagor and its agents and employees from the Premises and Improvements; take possession of all furniture, fixtures and equipment delivered or to be delivered pursuant to the FF&E Contracts; and require Mortgagor to deliver all books, documents, records, licenses, permits and contracts required by Mortgagee in order to permit it to assume management of the Premises and Improvements. All of the foregoing powers herein granted to Mortgagee shall be liberally construed. Mortgagee need not expend its own funds in the exercise of such powers, but if it does, all such amounts incurred (including reasonable outside attorneys' fees and legal expenses) shall be considered as advances for and on behalf of Mortgagor, secured by this Mortgage and also evidenced and secured by the Note and other Loan Documents. Any amounts so advanced shall be immediately due and payable within five (5) business days of written demand from Mortgagee to Mortgagor and shall bear interest if not paid within such five (5) business day period at the Default Rate (as such term is defined in the Note) until paid. Mortgagor further shall and hereby does agree to indemnify, defend and hold Mortgagee harmless from and against any and all claims, demands, liabilities, judgments, costs, expenses, losses or damages arising out of, or resulting from, any performance or discharge or failure or refusal to perform or discharge any of the terms, covenants or agreements contained in the Licenses, Contracts or FF&E Contracts. Should Mortgagee incur any liability, judgment, loss, reasonable cost or expense or damage in connection with any of the Licenses, Contracts or FF&E Contracts or under or by reason of this assignment, or in the defense of any such claims or demands, the amount thereof, including, without limitation, the actual, reasonable costs, expenses and reasonable attorney's fees, shall be secured hereby and by the lien of this Mortgage. Notwithstanding any of the foregoing in this Section to the contrary, in no event shall Mortgagor be liable to Mortgagee for, or be obligated to indemnify Mortgagee from, any consequential, special, punitive or treble damages.

12.   **SECURITY AGREEMENT.** This Mortgage constitutes a security agreement under the Pennsylvania Uniform Commercial Code in effect in the Commonwealth of Pennsylvania, as amended from time to time (the "**UCC**") and Mortgagor hereby grants to Mortgagee a continuing security interest in and to all of Mortgagor's right, title and interest in and to all personal property of Mortgagor used in connection with the Premises, including, without limitation, fixtures, goods that are or are to become fixtures, as-extracted items and timber to be cut, as such terms and categories may be defined or described in the UCC, as applicable, whether now existing or owned or hereafter arising or acquired, whether or not subject to the UCC, used in connection with any portion of or constituting any portion of the Premises and in the proceeds, rents, issues, profits and Accounts arising therefrom, to secure the Indebtedness. Mortgagee shall have the right to file in any public office, without the signature of Mortgagor, each financing statement relating to such personal property and proceeds therefrom. With respect to such personal property and proceeds, Mortgagee shall have each applicable right and remedy of a secured party under the UCC and each applicable right and remedy pursuant to any other law or pursuant to this Mortgage. IT IS INTENDED BY MORTGAGOR AND MORTGAGEE THAT THIS MORTGAGE BE EFFECTIVE AS A FINANCING STATEMENT FILED WITH THE REAL ESTATE RECORDS AS A FIXTURE FILING.

13.   **NO TRANSFER.** Mortgagor shall not, without Mortgagee's prior written consent, sell, convey, pledge or transfer the Premises or any portion thereof or any interest

therein or contract to do so.  No transfers, sales, conveyances or pledges of any partnership interest in either Mortgagor shall be permitted without Mortgagee's prior written consent; provided, however, transfers of direct or indirect equity interests in either Mortgagor or the general partner of either Mortgagor shall be permitted provided (a) all realty transfer taxes are paid in connection with any such transfer, (b) either Guarantor or, following the death of Steven B. Wolfson, the estate of Steven B. Wolfson, continues to control the management and day-to-day operations of Mortgagor, (c) either or both Guarantors or, subject to compliance with Section 8.1.11 of the Loan Agreement, their estates following the death of one or both Guarantors, in the aggregate, directly or indirectly through trusts for the benefit of immediate family members of such Guarantor, continues to own at least fifty-one percent (51%) of the issued and outstanding ownership interests in each Mortgagor, and (d) Mortgagor provides written notice of any such Transfer within thirty (30) days after such Transfer takes place along with a revised organizational structure chart of the affected Borrower or Borrowers (each, a "**Permitted Transfer**").  Notwithstanding anything to the contrary contained herein, any Permitted Transfer which would result in any Person other than Steven B. Wolfson or Milton Schneider owning, directly or indirectly, 10% or more of the direct or indirect ownership interests in Mortgagor shall require Mortgagor's prior notification to Lender at least thirty (30) days prior to such Permitted Transfer (except if such Transfer is the result of the death of Steven B. Wolfson and/or Milton Schneider), delivery of such documentation as is reasonably required by Mortgagee to complete any regulatory, "know your customer", OFAC, PATRIOT Act, etc. due diligence and shall be subject to Mortgagee's confirmation that such Person will not violate any regulatory requirements applicable to Mortgagee with respect to prohibited borrowers or otherwise cause a violation of Mortgagee's general credit policy and other internal requirements as they relate to persons or entities who are prohibited as borrowers of Mortgagee.

14.    **NO SECONDARY FINANCING OR OTHER LIENS.**  Mortgagor shall not, without Mortgagee's prior written consent, mortgage, pledge, assign, grant a security interest in or cause any other lien or encumbrance to be made or permit any other lien or encumbrance to exist upon the Premises or any portion thereof except for (a) taxes and assessments not yet delinquent and (b) any mortgage, pledge, security interest, assignment or other lien or encumbrance to Mortgagee or any affiliate of Mortgagee (an "**Affiliate**").  Any violation of the foregoing limitation, except as otherwise provided in this Section, at the option of Mortgagee, shall be deemed an Event of Default hereunder.  If any mechanic's or construction lien or notice of unpaid balance and right to file lien or other claim of mechanic's or construction lien shall be filed against the Premises or any portion thereof or any interest therein by reason of work, labor, services, or materials supplied or claimed to have been supplied, and if such mechanic's or construction lien or claim of mechanic's or construction lien or notice is not fully and finally released against the Premises, by bond or otherwise, within thirty (30) days after such lien, notice or claim of lien shall have been filed, then such shall be deemed an Event of Default and Mortgagee, at its option, may (a) pay and discharge the lien or other item so filed, in which case any sum which Mortgagee shall have so advanced in connection therewith shall be due immediately from Mortgagor to Mortgagee, shall be secured hereby, and shall bear interest at the Default Rate from the date of payment by Mortgagee until the date of repayment, and Mortgagee shall be subrogated to any rights, equities and liens so discharged; and/or (b) treat such occurrence as an Event of Default hereunder.

15.   **COMPLIANCE WITH LAWS.** Mortgagor, represents and warrants to Mortgagee, and continues to represent and warrant as long as this Mortgage is in effect, as follows: (a) the buildings, structures and other Improvements on the Premises and which are to be constructed by Mortgagor shall be in full compliance with all applicable statutes, regulations and other laws (including all applicable zoning, building, fire and health codes and ordinances and the Americans With Disabilities Act of 1990, as amended) and all applicable deed restrictions, if any, and is not and shall not be used for any illegal purpose; (b) such compliance is based solely upon Mortgagor's ownership of the Premises and not upon title to or interest in any other property. Mortgagor shall comply with or cause compliance with all statutes, regulations and other laws (including all applicable zoning, building, fire and health codes and ordinances and the Americans With Disabilities Act of 1990, as amended), all other applicable requirements of all governmental authorities whatsoever having jurisdiction over or with respect to the Premises or any portion thereof or the use or occupation thereof and with all applicable deed restrictions, if any; provided, however, that Mortgagor may postpone such compliance if and so long as the validity or legality of any such requirement or restriction shall be contested by such Mortgagor, with diligence and in good faith, by appropriate legal proceedings and Mortgagee is satisfied that such non-compliance will not materially impair or materially adversely affect the value of its security.

16.   **WARRANTY OF TITLE; TITLE INSURANCE.** Mortgagor represents and warrants to Mortgagee, and continues to represent and warrant as long as this Mortgage is in effect, good and marketable title in fee simple absolute to the Premises, Upon request by Mortgagee, Mortgagor shall furnish to Mortgagee at Mortgagor's own cost and expense a title insurance policy in the then amount of the Indebtedness, (a) naming Mortgagee as mortgagee, (b) covering the lien on the Premises granted pursuant to this Mortgage, (c) containing no exception not approved by Mortgagee, (d) issued by a title insurance company qualified to do business in the Commonwealth of Pennsylvania and satisfactory to Mortgagee and (e) otherwise in form and substance reasonably satisfactory to Mortgagee.

17.   **CERTAIN RIGHTS AND OBLIGATIONS**.

(a)   Mortgagee may take such action as Mortgagee deems appropriate to protect the Premises, its value, or the status or priority of the lien of this Mortgage, including, but not limited to: upon reasonable notice to Mortgagor absent there then occurring an Event of Default, entry upon the Premises, upon reasonable prior written notice and subject to the rights of tenants and occupants, to conduct appraisals or other valuations of the Premises or to protect the Premises from deterioration or damage, or to cause the Premises to be put in compliance with any governmental, insurance rating or contract requirements; payment of amounts due and payable on liens having priority over this Mortgage; payment of any tax or charge then delinquent for purposes of assuring the priority or enforceability of this Mortgage; obtaining and/or taking action so as to maintain uninterrupted insurance on the Premises (including flood insurance); or commencement or defense of any legal action or proceeding to assess or protect the validity or priority of the lien of this Mortgage. On demand, Mortgagor shall reimburse Mortgagee for all actual, reasonable third-party expenses in taking any such action, with interest, and the amount thereof shall be secured by this Mortgage and shall, to the extent permitted by law, be in addition to the maximum amount of the Indebtedness evidenced by the Note.

(b)     Mortgagor authorizes Mortgagee, without notice, demand or any reservation of rights and without affecting this Mortgage, from time to time: (i) to accept from any person or entity and hold additional collateral for the payment of the Indebtedness or any part thereof, and to exchange, enforce or refrain from enforcing, or release such collateral or any part thereof; (ii) to accept and hold any endorsement or guaranty of payment of the Indebtedness or any part thereof, and to release or substitute any such obligation of any such Guarantor or any person or entity who has given any collateral as security for the payment of the Indebtedness or any part thereof, or any other person or entity in any way obligated to pay the Indebtedness or any part thereof, and to enforce or refrain from enforcing, or compromise or modify, the terms of any obligation of any such Guarantor, person or entity; (iii) during the existence of an Event of Default, to direct the order or manner of the disposition of any and all collateral and the enforcement of any and all endorsements and guaranties relating to the Indebtedness or any part thereof as Mortgagee, in its sole discretion, may determine; and (iv) during the existence of an Event of Default to determine the manner, amount and time of application of payments and credits, if any, to be made on all or any part of any component or components of the Indebtedness (whether principal, interest, actual, reasonable third-party costs and expenses, or otherwise) including if the amount of the Indebtedness secured by this Mortgage is less than the total amount of the obligations under the Note or the Guaranty, to make any such application to such obligations, if any, in excess of the amount of the Indebtedness secured by this Mortgage.

(c)     Notwithstanding the existence of an Event of Default, this Mortgage shall remain valid, binding and enforceable: (i) without deduction by reason of any setoff, defense or counterclaim of Mortgagor or any Guarantor, (ii) without requiring protest or notice of nonpayment or notice of default to Mortgagor, any Guarantor or to any other person; (iii) without demand for payment or proof of such demand; (iv) without requiring Mortgagee to resort first to Mortgagor or to any other guaranty or any collateral which Mortgagee may hold; (v) without requiring notice of acceptance hereof or assent hereto by Mortgagee; and (vi) without requiring notice that any indebtedness has been incurred or of the reliance by Mortgagee upon this Mortgage; all of which Mortgagor hereby waives.

(d)     The enforceability of this Mortgage shall not be affected by: (i) any failure to perfect or continue the perfection of any security interest in or other lien on any other collateral securing payment of the Indebtedness; (ii) the invalidity, unenforceability, or loss or change in priority of any such security interest or other lien; (iii) any failure to protect, preserve or insure any such collateral; (iv) any defense arising by reason of the cessation from any cause whatsoever of liability of any Guarantor; (v) any compromise of any obligation of Mortgagor or any Guarantor; (vi) the invalidity or unenforceability of any of the Indebtedness; or (vii) any renewal, extension, acceleration, or other change in the time for payment of, or the terms of the interest on the Indebtedness or any part thereof; all of which Mortgagor hereby waives.

(e)     If Mortgagee shall receive from or on behalf of Mortgagor any sum less than the full amount then due and payable, Mortgagee may, but shall not be obligated to, accept the same and, if it elects to accept any such payment, it may without waiving any Event of Default: (i) apply such payment on account of the Indebtedness or any amount due and payable hereunder, or (ii) hold same or any part thereof, without liability for interest, in a special account and from time to time apply same or any part thereof as specified in subsection (i) of this

subsection.

18.    **APPLICATION OF AND INTEREST ON CONDEMNATION AWARD.**
Subject to the terms of Sections 6.A(1) and (2) of the Declaration and Sections 2(b)(ii) and 5 of this Mortgage, Mortgagor consents that Mortgagee may retain and apply the proceeds of any award by a condemning authority in satisfaction or reduction of the Indebtedness, whether or not then due and payable, or it may pay the same, wholly or in part, to Mortgagor for the restoration or alteration of the Premises or for any other purpose reasonably satisfactory to Mortgagee, without affecting the lien of this Mortgage for the full amount of the Indebtedness before the making of such payment. In the event of the condemnation or taking by eminent domain of the Premises or any portion thereof, Mortgagee shall not be limited to the interest paid on the award by the condemning authority, but shall be entitled to receive out of the award interest on the Indebtedness in accordance with its terms.

19.    **APPOINTMENT OF RECEIVER.** In addition to any other remedy, upon and during the continuance of any Event of Default, Mortgagee shall be entitled, without notice or demand and without regard to the adequacy of any security for the Indebtedness or the solvency or insolvency of any person liable for the payment thereof, to the appointment of a receiver of the rents, issues and profits of the Premises. The receiver shall have all rights and powers permitted under the laws of the state where the Premises are located and such other powers as the court making such appointment shall confer. The actual, reasonable third-party expenses, including, without limitation, actual receiver's fees, reasonable outside attorneys' fees, court costs, and agent's compensation, actually incurred pursuant to the powers herein contained shall be secured by the lien of this Mortgage. The right of a receiver to enter and take possession of and to manage and operate the Premises, and to collect the rents, issues and profits thereof shall be cumulative to any other rights or remedy hereunder afforded by law, and may be exercised concurrently therewith or independently thereof. Notwithstanding the appointment of any receiver or other custodian, Mortgagee shall be entitled as pledgee to the possession and control of any cash, deposits, or instruments at the time held by, or payable or deliverable under the terms of this Mortgage to Mortgagee.

20.    **SALE IN ONE OR MORE PARCELS.** In case of a foreclosure sale, the Premises may be sold in one or more parcels, any provision of any statute, regulation or other law to the contrary notwithstanding.

21.    **ESTOPPEL STATEMENT.** Upon written request by Mortgagee, Mortgagor shall furnish to Mortgagee within fifteen (15) business days a written statement to Mortgagor's actual knowledge duly acknowledged of the amount of the Indebtedness and whether any offsets or defenses exist against the Indebtedness.

22.    **RIGHT TO INSPECT AND EXAMINE.** Upon reasonable prior written request by Mortgagee, Mortgagor shall permit Mortgagee and each officer, employee, accountant, attorney and other agent of Mortgagee to enter and inspect the Premises, subject to the rights of tenants and occupants, and to examine, audit, copy and extract each record of any Mortgagor relating to the Premises or any portion thereof.

11631766  B: 9820 P: 373  MTG
09/27/2018 01:39 PM        Page 16 of 37
FIRST AMERICAN TITLE INSURANCE COMPANY

014

23.     **FINANCIAL STATEMENTS AND TAX RETURNS.**  Mortgagor shall provide or cause to be provided to Mortgagee all such financial statements and other materials required pursuant to the Note as and when required thereby.

24.     **AUTHORIZATION AND AGENCY**.  Mortgagee is irrevocably and unconditionally authorized to take, and Mortgagor irrevocably and unconditionally appoints Mortgagee as the agent of such Mortgagor, with full power of substitution and of revocation, to take, in the name of such Mortgagor or otherwise at the sole option of Mortgagee, during the existence an Event of Default each action relating to the Premises or any portion thereof that, subject to this Mortgage, such Mortgagor could take in the same manner, to the same extent and with the same effect as if such Mortgagor were to take such action; provided, however, that Mortgagee shall not have the right, pursuant to such authorization or as such agent, to sell or otherwise dispose of the Premises or any portion thereof.  Such power of attorney is coupled with an interest in favor of Mortgagee, and shall not be terminated or otherwise affected by the death, disability or incompetence of any Mortgagor.

25.     **FURTHER ASSURANCES.**  Upon reasonable prior written request by Mortgagee, Mortgagor shall execute and deliver each writing, and take each other action, that Mortgagee shall reasonably deem necessary at the sole option of Mortgagee (a) to perfect or accomplish any lien or security interest granted, or assignment made, pursuant to this Mortgage; (b) otherwise to accomplish any purpose of this Mortgage; (c) in connection with any transaction contemplated by this Mortgage; or (d) in connection with the Premises or any portion thereof. Notwithstanding the foregoing, in no event shall Mortgagor be obligated to executed any writing or take any action that would increase Mortgagor's liabilities or obligations or decrease Mortgagor's rights or benefits under the Loan Documents.

26.     **INTENTIONALLY OMITTED.**

27.     **EVENTS OF DEFAULT; REMEDIES**.

(a)     The existence of an "Event of Default" under and as defined in the Loan Agreement or the Letter of Credit Documents shall be an "Event of Default" under this Mortgage.

(b)     During the existence of any Event of Default, Mortgagee may forthwith and without notice or demand exercise all rights and remedies provided in this Mortgage and/or which may be available to Mortgagee by law or in equity and all such rights and remedies shall be cumulative and concurrent and may be pursued singularly, successively or together, at Mortgagee's sole option, and may be exercised as often as occasion therefor shall occur.  During the existence of an Event of Default as aforesaid, Mortgagee may, inter alia, notwithstanding anything to the contrary contained herein:

(i)     Declare the entire principal amount secured hereby immediately due and payable;

(ii)     File forthwith a complaint in mortgage foreclosure or any other



foreclosure proceeding upon this Mortgage and proceed thereon to judgment and execution for the recovery of possession of the Premises, buildings, and Improvements (to the extent of Mortgagor's interest therein) and the contents thereof and all other security for payments to Mortgagee hereunder; and ;

(iii)    Hold, manage, operate and lease the same to Mortgagor or any other person, firm or corporation on such terms and for such periods of time as Mortgagee may deem proper, and the provisions of any lease made by Mortgagee pursuant hereto shall be valid and binding upon Mortgagor notwithstanding the fact that Mortgagee's right of possession may terminate or this Mortgage may be satisfied of record prior to the expiration of the term of such lease;

(iv)    Have all remedies under Part 6 of Article 9 of the Pennsylvania Uniform Commercial Code, and, in connection therewith, Mortgagor agrees that five (5) business days' notice of sale is commercially reasonable notice;

(v)    Subject to the terms of any lease of 5,000 square feet or more of space (as applicable and provided such lease is in effect), make such alterations, additions, improvements, renovations, repairs, and replacements thereto as Mortgagee may deem necessary, including remodeling to make the same more readily rentable, useable, and/or available in whole or in part for commercial, residential, and/or industrial purposes;

(vi)    Subject to the terms of any lease of 5,000 square feet or more of space (as applicable and provided such lease is in effect), demolish all or any part of the buildings and Improvements now or hereafter erected or situate upon the Premises which, in the sole judgment of Mortgagee, may be in unsafe conditions and dangerous to life or property; and/or

(vii)    Collect the rents, issues, and profits (hereinafter collectively referred to as "rents") arising from the Premises and the buildings and Improvements thereon, past due and thereafter becoming due, and apply the same, in such order of priority as Mortgagee may determine, to the payment of all charges and commissions incidental to the collection thereof and the management and maintenance of the Premises, the buildings and Improvements thereon, and the contents thereof and to the payment of all sums required to be paid by the Mortgagor hereunder, as more fully described in the Section hereof referencing the Mortgagor's assignment of leases and rents.

(viii)    File forthwith a complaint in mortgage foreclosure or any other foreclosure proceeding upon this Mortgage and proceed thereon to judgment and execution for the recovery of the whole of the principal debt, or any unpaid balance thereof and all interest due thereon and other sums due hereunder, together with reasonable attorneys' fees for collection, besides costs of suit, and all actual, reasonable third-party expenses of paying taxes, water rents, assessments, and charges, and effecting insurance, repairs, and compliance with the terms of the Mortgage, with interest thereon, without further stay, any law, usage or custom to the contrary notwithstanding.

(ix)     Bring an appropriate action at any time and from time to time to recover any sums due and payable by Mortgagor under the terms of this Mortgage, without regard to whether or not the principal indebtedness or any other sums secured by this Mortgage shall be due, and without prejudice to the right of Mortgagee thereafter to bring an action of mortgage foreclosure, or any other action, for any Event of Default committed or suffered by Mortgagor existing at the time earlier action was commenced.

(x)     Institute and maintain at any time and from time to time any suits and proceedings as Mortgagee may deem advisable:

(A)     to prevent any impairment of the security of the Premises by any acts which may be unlawful or any violation of this Mortgage;

(B)     to preserve or protect its interest in the Premises, and

(C)     to restrain the enforcement of or compliance with any legislation or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid, if the enforcement of or compliance with such enactment, rule or order might impair the security hereunder or be prejudicial to Mortgagee's interest.

(xi)     At its option, advance and pay any sum of money that, in the reasonable judgment of Mortgagee, may be necessary to perfect the title of the Premises in Mortgagor; or to preserve the security intended to be given by this Mortgage and by the assignment of leases given by Mortgagor to Mortgagee; or to satisfy any tax, imposition or charge levied upon the debt for which this Mortgage is given as security.

(xii)     Subject to the rights of the tenant under any lease of 5,000 square feet or more of space (as applicable and provided such lease is in effect), institute and to prosecute to final determination or settlement an appeal of any real estate tax assessment or other lien or assessment on the Premises, or take any other appropriate proceedings in the name of Mortgagee or Mortgagor in connection therewith.  Mortgagee is hereby appointed as agent for Mortgagor, for such purposes, which appointment is irrevocable (said appointment being coupled with an interest).  If such an appeal or other proceeding is taken, the actual, reasonable third-party expenses thereof, including reasonable outside counsel fees, shall be payable by Mortgagor to Mortgagee upon demand and such sums shall be secured by this Mortgage.  Mortgagee shall have the right to take such action regardless of whether Mortgagor has instituted its own action(s).  In the event both Mortgagor and Mortgagee have instituted actions, the Mortgagee shall have the sole right to determine which action shall proceed; and if Mortgagee elects to proceed with its action, Mortgagor shall withdraw and terminate any procedures Mortgagor has commenced.  Mortgagee shall have no liability related to any such actions, including liability for any increase of taxes that may result therefrom, and Mortgagor waives any claims, actions or other rights that it may have against Mortgagee in such connection.

(c)     All delinquent payments hereunder and all monies advanced by Mortgagee as a result of the occurrence of an Event of Default hereunder or for any other purpose authorized in this Mortgage, the Note, the Loan Agreement, the Letter of Credit Documents, or in any of the other Loan Documents shall be repaid to Mortgagee with interest at the Default Rate (as defined in the

Note or the Letters of Credit, as applicable) from the date advanced by Mortgagee until such time as said sums are paid, including, without limitation, the period following entry of any judgment, shall without demand be repaid by Mortgagor to Mortgagee, and, if not repaid immediately, shall bear interest at the rate aforesaid, and the sum due shall be secured by the lien hereof.

**(d)      FOR THE PURPOSE OF PROCURING POSSESSION OF THE SUBJECT PREMISES AFTER THE OCCURRENCE AND DURING THE CONTINUANCE OF AN EVENT OF DEFAULT HEREUNDER, UNDER THE NOTE, THE LOAN AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, EACH MORTGAGOR HEREBY AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD IN THE COMMONWEALTH OF PENNSYLVANIA, AS ATTORNEY FOR SUCH MORTGAGOR AND ALL PERSONS CLAIMING UNDER OR THROUGH MORTGAGOR, TO APPEAR FOR AND CONFESS JUDGMENT AGAINST EACH MORTGAGOR AND ALL OF THEM JOINTLY AND SEPARATELY AND AGAINST ALL PERSONS CLAIMING UNDER OR THROUGH THE SAME, WITHOUT ANY STAY OF EXECUTION, FOR WHICH THIS MORTGAGE, OR A COPY THEREOF VERIFIED BY AFFIDAVIT, SHALL BE SUFFICIENT WARRANT; AND THEREUPON, A WRIT OF POSSESSION MAY BE ISSUED FORTHWITH, WITHOUT ANY PRIOR WRIT OR PROCEEDING WHATSOEVER, IF, FOR ANY REASON, AFTER SUCH ACTION HAS BEEN COMMENCED THE SAME SHALL BE DISCONTINUED OR POSSESSION OF THE SUBJECT PREMISES SHALL REMAIN IN OR BE RESTORED TO MORTGAGOR. MORTGAGEE SHALL HAVE THE RIGHT FOR THE SAME EVENT OF DEFAULT OR ANY SUBSEQUENT EVENT OF DEFAULT TO BRING ONE OR MORE FURTHER ACTIONS AS ABOVE PROVIDED AND RECOVER POSSESSION OF THE PREMISES. MORTGAGEE MAY BRING SUCH ACTION IN EJECTMENT BEFORE OR AFTER THE INSTITUTION OF FORECLOSURE PROCEEDINGS UPON THIS MORTGAGE, OR BEFORE OR AFTER JUDGMENT THEREON, ON SAID NOTE, OR SAID LOAN AGREEMENT OR ON ANY OTHER LOAN DOCUMENT OR BEFORE OR AFTER A SALE OF THE PREMISES BY THE SHERIFF, MARSHAL, CONSTABLE OR OTHER PROPER LEGAL OFFICER.**

**MAIN STREET PHASE II, L.P., a Pennsylvania limited partnership**

**By:      Main Street Phase II GP, LLC, its sole general partner**

**By: _____**
**Name: Steven B. Wolfson**
**Title: Sole Member and Manager**

**MAIN STREET PHASE III, L.P., a Pennsylvania limited partnership**

**By:      Main Street Phase III GP, LLC, its sole**

(d)      FOR THE PURPOSE OF PROCURING POSSESSION OF THE SUBJECT PREMISES AFTER THE OCCURRENCE AND DURING THE CONTINUANCE OF AN EVENT OF DEFAULT HEREUNDER, UNDER THE NOTE, THE LOAN AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, EACH MORTGAGOR HEREBY AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD IN THE COMMONWEALTH OF PENNSYLVANIA, AS ATTORNEY FOR SUCH MORTGAGOR AND ALL PERSONS CLAIMING UNDER OR THROUGH MORTGAGOR, TO APPEAR FOR AND CONFESS JUDGMENT AGAINST EACH MORTGAGOR AND ALL OF THEM JOINTLY AND SEPARATELY AND AGAINST ALL PERSONS CLAIMING UNDER OR THROUGH THE SAME, WITHOUT ANY STAY OF EXECUTION, FOR WHICH THIS MORTGAGE, OR A COPY THEREOF VERIFIED BY AFFIDAVIT, SHALL BE SUFFICIENT WARRANT; AND THEREUPON, A WRIT OF POSSESSION MAY BE ISSUED FORTHWITH, WITHOUT ANY PRIOR WRIT OR PROCEEDING WHATSOEVER, IF, FOR ANY REASON, AFTER SUCH ACTION HAS BEEN COMMENCED THE SAME SHALL BE DISCONTINUED OR POSSESSION OF THE SUBJECT PREMISES SHALL REMAIN IN OR BE RESTORED TO MORTGAGOR.  MORTGAGEE SHALL HAVE THE RIGHT FOR THE SAME EVENT OF DEFAULT OR ANY SUBSEQUENT EVENT OF DEFAULT TO BRING ONE OR MORE FURTHER ACTIONS AS ABOVE PROVIDED AND RECOVER POSSESSION OF THE PREMISES.  MORTGAGEE MAY BRING SUCH ACTION IN EJECTMENT BEFORE OR AFTER THE INSTITUTION OF FORECLOSURE PROCEEDINGS UPON THIS MORTGAGE, OR BEFORE OR AFTER JUDGMENT THEREON, ON SAID NOTE, OR SAID LOAN AGREEMENT OR ON ANY OTHER LOAN DOCUMENT OR BEFORE OR AFTER A SALE OF THE PREMISES BY THE SHERIFF, MARSHAL, CONSTABLE OR OTHER PROPER LEGAL OFFICER.

MAIN STREET PHASE II, L.P., a Pennsylvania limited partnership

By:      Main Street Phase II GP, LLC, its sole general partner

By: _____
Name: Steven B. Wolfson
Title: Sole Member and Manager

MAIN STREET PHASE III, L.P., a Pennsylvania limited partnership

By:      Main Street Phase III GP, LLC, its sole general partner

By: _____
Name: Steven B. Wolfson
Title: Sole Member and Manager

**11631766  B: 9820 P: 378  MTG**
09/27/201801:39 PM      Page 21 of 37
FIRST AMERICAN TITLE INSURANCE COMPANY

'&T Bank, 2014

**general partner**

**By:** _____
~~**Name: Steven B. Wolfson**~~
**Title: Sole Member and Manager**

(e)      Mortgagee, without regard to the value or occupancy of the security or the solvency of Mortgagor, shall, in accordance with the Loan Documents, be entitled as a matter of right, if it so elects, to the appointment of a receiver to enter upon and take possession of the Premises and to collect all rents, revenues, issues, income, products, and profits thereof and apply the same as the court may direct.  The receiver shall have all rights and powers permitted under the laws of the state where the Premises are located and such other powers as the court making such appointment shall confer.  The actual, reasonable third-party expenses, including, without limitation, receiver's fees, reasonable outside attorneys' fees, court costs, and agent's compensation, incurred by Mortgagee pursuant to the powers herein contained shall be secured by the lien of this Mortgage.  The right of a receiver to enter and take possession of and to manage and operate the Premises, and to collect the rents, issues and profits thereof shall be cumulative to any other rights or remedy hereunder or afforded by law, and may be exercised concurrently therewith or independently thereof.  Notwithstanding the appointment of any receiver or other custodian, Mortgagee shall be entitled as pledgee to the possession and control of any cash, deposits, or instruments at the time held by, or payable or deliverable under the terms of this Mortgage to Mortgagee.

(f)      In the event Mortgagee shall refer the Note, the Loan Agreement, the Letter of Credit Documents, this Mortgage, or any of the other Loan Documents to counsel because of or in connection with any default thereunder or hereunder or because any action or proceeding is instituted or threatened by or against Mortgagee or others, affecting the Premises or the title thereto or Mortgagee's interest hereunder in the Note, in the Loan Agreement, the Letter of Credit Documents, or in any of the other Loan Documents whether or not Mortgagee is or becomes a party thereto or for any other reason whatsoever, Mortgagor shall reimburse Mortgagee for all reasonable outside attorneys' fees and costs actually incurred by Mortgagee in connection therewith, whether or not suit is in fact commenced and whether or not an Event of Default is declared hereunder, under the Note, the Loan Agreement, the Letter of Credit Documents or any of the other Loan Documents.  Such reimbursement shall be due and payable immediately upon demand and the amount thereof shall be secured by the lien hereof and shall bear interest at the Default Rate until paid.

(g)      Any real estate sold pursuant to any writ of execution issued on a judgment obtained by virtue of the Note, the Loan Agreement, the Letter of Credit Documents, or this Mortgage, or pursuant to any other judicial proceedings under this Mortgage, the Note, the Loan Agreement, the Letter of Credit Documents, or any of the other Loan Documents, may be sold in one parcel as an entirety, or in such parcels, and in such manner or order as Mortgagee, in its sole discretion, may elect.  Upon any such foreclosure sale, Mortgagee may bid for and purchase the Premises and, upon compliance with the terms of sale, may hold, retain, possess and dispose of such Premises in its own absolute right without further accountability.  Mortgagee is hereby irrevocably authorized, at its option, to conduct any such sale subject to the rights of any

tenants of the Premises, and the failure to make any such tenants parties defendant to any such foreclosure proceedings and to their rights will not be, nor be asserted by Mortgagor to be, a defense to any proceedings instituted by Mortgagee to collect the sums secured hereby.  All remedies provided Mortgagee under this Mortgage or otherwise shall survive the consummation of any foreclosure sale.

    (h) Any failure by Mortgagee to insist upon strict performance by Mortgagor of the Note, this Mortgage, the Loan Agreement, the Letter of Credit Documents, or any of the other Loan Documents shall not be deemed to be a waiver thereof, and Mortgagee shall have the right thereafter to insist upon strict performance by Mortgagor.  Any waiver by Mortgagee of any breach by Mortgagor of any term, covenant, agreement, or condition contained herein shall not be valid unless in writing signed by an officer of Mortgagee, and such waiver shall not affect the right of Mortgagee thereafter to exercise all rights or remedies set forth herein or available at law or in equity on account of a subsequent Event of Default hereunder.

    (i) The grant of an extension or extensions of time by the Mortgagee with respect to the performance of any provision of this Mortgage, the Note, the Loan Agreement, the Letter of Credit Documents, or any of the other Loan Documents on the part of the Mortgagor to be performed, or taking of any additional security, or the release of any security, or the waiver of the Mortgagee or failure by the Mortgagee to enforce any provision of this Mortgage, the Note, the Loan Agreement, the Letter of Credit Documents, or any of the other Loan Documents or to declare a default with respect thereto, shall not operate as a waiver of any subsequent default or defaults or affect the right of the Mortgagee thereafter to exercise all rights or remedies stipulated herein and therein on account of such default or any subsequent default or defaults.

   28. **MORTGAGOR'S WAIVERS.**  Mortgagor hereby irrevocably waives and forever releases:

    (a) All procedural errors, defects, and imperfections in any proceeding instituted by Mortgagee under the Note, this Mortgage, the Loan Agreement, the Letter of Credit Documents, or any of the other Loan Documents;

    (b) All benefit that might accrue to Mortgagor by virtue of any present or future law exempting the Premises, or any part of the proceeds arising from any sale thereof, from attachment, levy, or sale on execution, or providing for any stay of execution, exemption from civil process, or extension of time for payment; and

    (c) Unless specifically required in the Loan Documents or by applicable law, all notices of Mortgagor's default or of Mortgagee's election to exercise, or Mortgagee's actual exercise of any option under the Note, this Mortgage, the Loan Agreement, the Letter of Credit Documents, or any other documents, instruments, agreements, guarantees, or other writings executed or delivered in connection herewith or in connection with the obligations secured hereby.

    (d) Any and all notice of the creation, or accrual of any of the said Indebtedness, or of any renewals or extensions thereof from time to time, or of the reliance by

Mortgagee upon this Mortgage.  The Indebtedness shall be deemed to have been created, contracted or incurred in reliance upon this Mortgage and all dealings between Mortgagor and Mortgagee to have been consummated in reliance upon this Mortgage.

29.    **WAIVER OF DOCTRINE OF MERGER; SURVIVAL OF OBLIGATIONS**. Mortgagor agrees that its obligations that arose prior to the entry of a judgment in foreclosure or a judgment under the Note and the rights and remedies of Mortgagee under this Mortgage and under the other Loan Documents with respect thereto shall continue after and survive the entry of a judgment in foreclosure or a judgment under the Note (whether by confession of judgment or otherwise), it being the intention of Mortgagor and Mortgagee that all such rights and remedies, including but not limited to, Mortgagor's obligation to reimburse Mortgagee for taxes, insurance premiums, other charges, expenses to preserve the Premises, including attorney's fees and disbursements and other out-of-pocket costs and expenses incurred by Mortgagee in enforcing Mortgagee's rights and remedies under this Mortgage and the other Loan Documents, including those under Section 27(d) above, that arose prior to the entry of a judgment in foreclosure or a judgment under the Note, shall not merge into or be extinguished by, and shall survive entry of, a foreclosure judgment and entry of a judgment under the Note until paid in full.

30.    **EXPENSES.**  Mortgagor shall pay to Mortgagee within five (5) business days of written demand all actual, reasonable third-party costs and expenses (including reasonable outside attorneys' fees and disbursements) incurred by Mortgagee in connection with the Indebtedness or the Mortgage including actual costs of collection, of preserving or exercising any right or remedy of Mortgagee under this Mortgage or any related Loan Document, of workout or bankruptcy proceedings by or against Mortgagor, of defending against any claim asserted as a direct or indirect result of the Indebtedness or of performing any obligation of any Mortgagor pursuant to this Mortgage or otherwise (including payment of any amount any Mortgagor is obligated to pay pursuant to this Mortgage and performance of any obligation of Mortgagor pursuant to this Mortgage).  Mortgagor agrees to defend and indemnify Mortgagee from any and all third party claims arising from Mortgagor's duties as owner and/or occupant of the Premises, and further agrees to pay, upon demand, any actual, reasonable third-party expense that Mortgagee may incur (including reasonable outside attorneys' fees and disbursements) due to Mortgagor's failure to provide appropriate defense and indemnification to Mortgagee in a timely manner.  Mortgagee reserves the right to have Mortgagor pay, upon demand, administrative fee(s) in regard to any administrative action Mortgagee is required or requested to take, including the preparation of discharges, releases or assignments to third parties.  Such costs and expenses shall accrue interest at the Default Rate from the date of demand until payment is actually received by Mortgagee.  Each such cost and expense and any interest thereon shall constitute part of the Indebtedness and be secured by this Mortgage and may be added to the judgment in any suit brought by Mortgagee or its agents against any Mortgagor on this Mortgage. Notwithstanding the foregoing, in no event shall Mortgagor be liable to Mortgagee for, or be obligated to indemnify Mortgagee from, damages arising solely due to the gross negligence or willful misconduct of Mortgagee.

31.    **NOTICES.**

(a)       Any demand or notice hereunder or under any applicable law pertaining



hereto shall be in writing and duly given if delivered to Mortgagor (at its address on Mortgagee's record) or to Mortgagee (at the address on page one and separately to Mr. K.C. Barrett, M&T Bank, 1650 Market Street, Suite 3150, Philadelphia, PA 19103). Such notice or demand shall be deemed sufficiently given for all purposes when delivered (i) by personal service and shall be deemed effective when delivered, or (ii) by certified or registered mail or courier and shall be deemed effective three (3) business days after deposit in an official depository maintained by the United States Post Office for the collection of mail or one (1) business day after delivery to a nationally recognized overnight courier service (*e.g.*, Federal Express). Notice by e-mail is not valid notice under this or any other agreement between Mortgagor and Mortgagee.

        (b)     Mortgagor agrees that any notice given by Mortgagor to Mortgagee purportedly pursuant to 42 Pa.C.S. §8143 shall be given by registered or certified mail, return receipt requested, to the address of Mortgagee specified on page 1 hereof and only to that address, and such notice shall be deemed to have been received no earlier than the date actually and physically received at the address on page 1 hereof.

        (c)     Mortgagor hereby authorizes Mortgagee, without liability and at Mortgagee's sole discretion, to give notice pursuant to 42 Pa. C.S.A. §8143(b), in form and substance satisfactory to Mortgagee, of the lien and security interest created by this Mortgage to a holder of a previously recorded mortgage which is a lien on the Premises in order, among other things, to subordinate further advances by such mortgage holder to the lien and security interest created by this Mortgage.

      32.    **LITIGATION.** Mortgagor shall promptly upon obtaining knowledge thereof notify Mortgagee in writing of any litigation, proceeding, or counterclaim against, or of any investigation of, Mortgagor (or the threat thereof) if: (i) the outcome of such litigation, proceeding, counterclaim, or investigation may materially and adversely affect the finances or operations of Mortgagor or title to, or the value of, any assets secured by the Mortgage or (ii) such litigation, proceeding, counterclaim, or investigation questions the validity of the Loan Documents or any action taken, or to be taken, pursuant to the Loan Documents. Mortgagor shall furnish to Mortgagee such information regarding any such litigation, proceeding, counterclaim, or investigation as Mortgagee shall reasonably request.

      33.    **NOTICE OF NON-COMPLIANCE.** Mortgagor shall notify Mortgagee in writing of any knowing failure by Mortgagor to comply with any provision of the Note, the Mortgage, the Guaranty or if any representation, warranty or covenant contained in any such document is known by Mortgagor to be no longer true in any material respects. Mortgagor shall also promptly notify Mortgagee in writing if there is any material adverse change in any of the information or financial statements supplied to Mortgagee to induce Mortgagee to extend credit to Mortgagor or if such information or financial statement is required under this Mortgage or any other document executed in connection therewith.

      34.    **COVENANTS SHALL RUN WITH THE LAND.** The covenants contained in this Mortgage shall run with the land and bind Mortgagor, each heir, legal representative, successor and assign of Mortgagor and each subsequent owner, encumbrancer, tenant and

subtenant of the Premises or any portion thereof, and shall inure to the benefit of, and be enforceable by, Mortgagee and each successor and assign of Mortgagee.

35.     **NONWAIVER BY MORTGAGEE.**  All rights and remedies of Mortgagee under this Mortgage and its other agreements with Mortgagor are cumulative, and no right or remedy shall be exclusive of any other right or remedy.  No single, partial or delayed exercise by Mortgagee or its agents of any right or remedy shall preclude full and timely exercise by Mortgagee or its agents at any time of any right or remedy of Mortgagee without notice or demand, at Mortgagee's sole option.  No course of dealing or other conduct, no oral agreement or representation made by Mortgagee or its agents or usage of trade shall operate as a waiver of any right or remedy of Mortgagee.  No waiver of any right or remedy of Mortgagee hereunder shall be effective unless made specifically in writing by Mortgagee.  No notice or demand on Mortgagor or Guarantor in any case shall entitle Mortgagor or Guarantor to any other or further notice in similar or other circumstances.

36.     **RIGHT OF SETOFF.**  If an Event of Default occurs and continues uncured, Mortgagee and Affiliates shall also have the right to setoff against the indebtedness any property held in a deposit or other account or otherwise owing by Mortgagee to Mortgagor whether or not the Indebtedness or the obligation to pay such moneys owed by Mortgagee is then due, and Mortgagee shall be deemed to have exercised such right of setoff immediately at the time of such election.

37.     **TERM; SURVIVAL**.

        (a)     The term of this Mortgage and Mortgagor's obligations hereunder shall continue until the Indebtedness has been fully paid to Mortgagee's satisfaction.  Mortgagor's obligation to pay any costs and expenses hereunder shall survive the term of this Mortgage and entry of any judgment of foreclosure.  If after receipt of any payment of all or any part of the Indebtedness, Mortgagee is for any reason compelled to surrender such payment to any person or entity because such payment is determined to be void or voidable as a preference, impermissible set-off, or a diversion of trust funds, or for any other reason, then the Indebtedness shall not be deemed to be fully paid, and this Mortgage shall continue in full force notwithstanding any contrary action which may have been taken by Mortgagee in reliance upon such payment, and any such contrary action so taken shall be without prejudice to Mortgagee's rights under this Mortgage and shall be deemed to have been conditioned upon such payment having become final and irrevocable.

        (b)     Notwithstanding any provision contained in this Mortgage, the Note, the Loan Agreement, the Letter of Credit Documents, any Guaranty or any other Loan Document, the total liability for payment of interest, or payment in the nature of interest, shall not exceed the limits now imposed by applicable usury laws, including the applicable choice of law rules, and in the event of the acceleration of the obligations hereby secured, the total charges for interest and in the nature of interest shall not exceed the maximum amount allowed by law, and any excess portion of such charges that may have been prepaid shall be refunded to the maker thereof.  Such refund may be made by application of the amount involved against the sums then due hereunder, but such crediting shall not cure or waive the Event of Default occasioning acceleration.

Mortgagor agrees that in determining whether or not any interest payable under this Mortgage exceeds the highest rate permitted by law, any non-principal payment, including without limitation late charges, shall be deemed to the extent permitted by law to be an expense, fee, premium or penalty, rather than interest.

38.    **ACTIONS OF MORTGAGEE.**  Mortgagee may, at any time and from time to time, without notice to, and without the consent of, any other person or entity (except for Mortgagor in the case of a modification of the terms of the Note, the Loan Agreement, the Letter of Credit Documents, the Guaranty or this Mortgage): (a) extend the time of payment of the indebtedness secured hereby, (b) release any person liable for payment of any indebtedness secured hereby or for performance of any obligation, (c) release all or any part of the security held for the indebtedness secured hereby or (d) exercise or refrain from exercising or waive any right Mortgagee may have.  Mortgagee shall have such rights and may exercise them without affecting the lien or priority of this Mortgage upon the Premises or any part thereof, and without affecting the liability of any Guaranty, notwithstanding the fact that Guaranties, junior mortgages, judgments or other claims or encumbrances may be impaired, prejudiced or otherwise adversely affected thereby.

39.    **MISCELLANEOUS.**  This Mortgage is absolute and unconditional.  This Mortgage and all documents, including the Note, any Guaranty and any other document required to be executed by Mortgagor or Guarantor in connection with the transaction contemplated hereby constitute the entire agreement and understanding between the parties hereto with respect to such transaction and supersedes all prior negotiations, courses of dealing, understandings, and agreements between such parties with respect to such transactions.  This Mortgage is a binding obligation enforceable against Mortgagor and its heirs and legal representatives and its successors and assigns and shall inure to the benefit of Mortgagee and its successors and assigns.  Any reference herein to "Mortgagee" shall be deemed to include and apply to every subsequent holder of this Mortgage and any reference herein to "Mortgagor" or "Guarantor" shall include: (i) any successor individual or individuals, association, partnership, limited liability company or corporation to which all or substantially all of the business or assets of Mortgagor or Guarantor, as the case may be, shall have been transferred; (ii) in the case of a partnership Mortgagor or Guarantor (as the case may be) any new partnership which shall have been created by reason of the admission of any new partner or partners therein, or by reason of the dissolution of the existing partnership by voluntary agreement or the death, resignation or other withdrawal of any partner; and (iii) in the case of a corporate or limited liability company, Mortgagor or Guarantor (as the case may be) any other entity into or with which Mortgagor or Guarantor (as the case may be) shall have been merged, consolidated, reorganized, or absorbed.  It is the intent of Mortgagor and Mortgagee that the provisions of this Mortgage shall be construed as affording to Mortgagee rights additional to, and not exclusive of, the rights conferred under the provisions contained in such statutory form.  Unless the context otherwise clearly requires, references to plural includes the singular and references to the singular include the plural; the word "or" has the inclusive meaning represented by the phrase "and/or"; the word "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; and captions or section headings are solely for convenience and not part of the substance of this Mortgage.  Each provision of this Mortgage shall be interpreted as consistent with existing law and shall be deemed amended to the extent necessary to comply with any conflicting law.  If any provision

nevertheless is held invalid, the other provisions shall remain in effect.  Mortgagor agrees that in any legal proceeding, a photocopy of this Mortgage kept in Mortgagee's course of business may be admitted into evidence as an original.

40.  **JOINT AND SEVERAL.**  If there is more than one Mortgagor, each of them shall be jointly and severally liable for all amounts and obligations which become due or should be performed under this Mortgage and the term "Mortgagor" shall include each as well as all of them.

41.  **GOVERNING LAW; JURISDICTION.**  This Mortgage has been delivered to and accepted by Mortgagee and will be deemed to be made in the Commonwealth of Pennsylvania.  This Mortgage will be interpreted in accordance with the laws of the Commonwealth of Pennsylvania excluding its conflict of laws rules.  **MORTGAGOR HEREBY IRREVOCABLY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT IN THE COMMONWEALTH OF PENNSYLVANIA IN A COUNTY OR JUDICIAL DISTRICT WHERE THE PREMISES IS LOCATED AND CONSENTS THAT MORTGAGEE MAY EFFECT ANY SERVICE OF PROCESS IN THE MANNER AND AT MORTGAGOR'S ADDRESS SET FORTH ABOVE FOR PROVIDING NOTICE OR DEMAND; PROVIDED THAT NOTHING CONTAINED IN THIS MORTGAGE WILL PREVENT MORTGAGEE FROM ENFORCING ANY AWARD OR JUDGMENT OR EXERCISING ANY RIGHTS AGAINST MORTGAGOR INDIVIDUALLY, AGAINST ANY SECURITY OR AGAINST ANY PROPERTY OF MORTGAGOR WITHIN ANY OTHER COUNTY, STATE OR OTHER FOREIGN OR DOMESTIC JURISDICTION.**  Mortgagor acknowledges and agrees that the venue provided above is the most convenient forum for both Mortgagee and Mortgagor.  Mortgagor waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Mortgage.  Mortgagor consents to service of process by certified mail, return receipt requested, to its address set forth herein or such other address as Mortgagor may direct by notice to Mortgagee.  Nothing herein contained shall in any way prevent or preclude Mortgagee from bringing any one or more actions against Mortgagor in any jurisdiction in the United States or elsewhere.

42.  **WAIVER OF JURY TRIAL.  MORTGAGOR AND MORTGAGEE HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY EACH WAIVE ANY RIGHT TO TRIAL BY JURY THEY MAY HAVE IN ANY ACTION OR PROCEEDING, IN LAW OR IN EQUITY, IN CONNECTION WITH THIS MORTGAGE OR THE TRANSACTIONS RELATED THERETO.  MORTGAGOR REPRESENTS AND WARRANTS THAT NO REPRESENTATIVE OR AGENT OF MORTGAGEE HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT MORTGAGEE WILL NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THIS RIGHT TO JURY TRIAL WAIVER.  MORTGAGOR ACKNOWLEDGES THAT MORTGAGEE HAS BEEN INDUCED TO ACCEPT THIS MORTGAGE BY, AMONG OTHER THINGS, THE PROVISIONS OF THIS SECTION.**

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**



© M&T Bank, 2014

IN WITNESS WHEREOF, this Mortgage has been duly executed by Mortgagor the day and year first above written.

MAIN STREET PHASE II, L.P., a Pennsylvania
limited partnership *FKA MAIN STREET CINEMA LP*

By:    Main Street Phase II GP, LLC, its sole
        general partner

        By: _____
        Name: Steven B. Wolfson
        Title: Sole Member and Manager

MAIN STREET PHASE III, L.P., a Pennsylvania
limited partnership *FKA MAIN STREET ASHBRIDLE LP*

By:    Main Street Phase III GP, LLC, its sole
        general partner

        By: _____
        Name: Steven B. Wolfson
        Title: Sole Member and Manager

[Signature Page to Open-End Mortgage]

11631766   B: 9820 P: 386   MTG
09/27/201801:39 PM        Page 29 of 37
FIRST AMERICAN TITLE INSURANCE COMPANY

## ACKNOWLEDGMENTS

COMMONWEALTH OF PENNSYLVANIA:

COUNTY OF _MONTGOMERY_ : : ss

On this, the _18th_ day of _SEPT_, 2018, before me, a Notary Public in and for the State of New Jersey, the undersigned officer, personally appeared Steven B. Wolfson who acknowledged himself to be the Sole Member and Manager of Main Street Phase II GP, LLC, the sole general partner of MAIN STREET PHASE II, L.P. a Pennsylvania limited partnership and he, being authorized to do so, executed the foregoing Instrument on behalf of the said limited partnership, for the purposes therein contained by signing his name as the Sole Member and Manager of the general partner of the limited partnership. *FKA MAIN STREET CINEMA LP*

IN WITNESS WHEREOF, I hereunto set my hand and Notarial seal.

My Commission Expires: 3/30/21

_____
NOTARY PUBLIC

> COMMONWEALTH OF PENNSYLVANIA
> NOTARIAL SEAL
> Susan E. Allen, Notary Public
> Plymouth Twp., Montgomery County
> My Commission Expires March 30, 2021
> MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

COMMONWEALTH OF PENNSYLVANIA:

COUNTY OF _MONTGOMERY_ : : ss

On this, the _18th_ day of _SEPT_, 2018, before me, a Notary Public in and for the State of New Jersey, the undersigned officer, personally appeared Steven B. Wolfson who acknowledged himself to be the Sole Member and Manager of Main Street Phase III GP, LLC, the sole general partner of MAIN STREET PHASE III, L.P. a Pennsylvania limited partnership and he, being authorized to do so, executed the foregoing Instrument on behalf of the said limited partnership, for the purposes therein contained by signing his name as the Sole Member and Manager of the general partner of the limited partnership. *FKA MAIN STREET ASHBRIDGE LP*

IN WITNESS WHEREOF, I hereunto set my hand and Notarial seal.

My Commission Expires: 3/30/21

_____
NOTARY PUBLIC

> COMMONWEALTH OF PENNSYLVANIA
> NOTARIAL SEAL
> Susan E. Allen, Notary Public
> Plymouth Twp., Montgomery County
> My Commission Expires March 30, 2021
> MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

[Signature Page to Open-End Mortgage]

I hereby certify that the precise address of the Mortgagee is:

M&T Bank, as Mortgagee
One M & T Plaza
Buffalo, New York 14203
Attn:  General Counsel's Office

_Meredith A. Snell_
Attorney for Mortgagee

Unofficial Copy

11631766  B: 9820 P: 388  MTG
09/27/201801:39 PM      Page 31 of 37
FIRST AMERICAN TITLE INSURANCE COMPANY

[Signature Page to Mortgage]      © M&T Bank, 2014

## SCHEDULE A

## THE PREMISES

Parcel A

ALL THAT CERTAIN lot or piece of ground, with the buildings and improvements thereon erected, situate in West Whiteland Township, Chester County, Commonwealth of Pennsylvania, more fully described as follows:

Beginning at a point along the dividing line between Parcel 41-5-133, lands now or formerly Hagee and Parcel 41-5-131, lands now or formerly Tabas, at its intersection with the proposed subdivision line between proposed Lot 1 and proposed Lot 2, through Parcel 41-5-133, said point being the following four (4) courses and distances from a point along the title line in the bed of Lincoln Highway (a.k.a. Route 30, a.k.a. S.R. 3070, variable width right-of-way), said point also being the dividing line between Parcel 41-5-133 and Parcel 41-5-132, lands now or formerly Valley Investments Group:

The following two (2) courses and distances along the dividing line between Parcel 41-5-133 and Parcel 41-5-132, lands now or formerly Valley Investments Group:

A. South 06 degrees 16 minutes 10 seconds East, a distance of 451.69 feet to a point, thence;

B. South 81 degrees 16 minutes 35 seconds West, a distance of 191.73 feet to a point, thence;

C. Along the dividing line between Parcel 41-5-133 and Parcel 41-5-132.1, lands now or formerly White Glove of Exton, North 88 degrees 29 minutes 50 seconds East, a distance of 206.57 feet to a point, thence;

D. Along the dividing line between Parcel 41-5-133 and Parcel 41-5-131, lands now or formerly Tabas, South 19 degrees 45 minutes 11 seconds East, a distance of 253.19 feet to the true point and place of beginning, and from said point and place of beginning running, thence;

The following two (2) courses and distances along the proposed subdivision line between proposed Lot 1 and proposed Lot 2, through Parcel 41-5-133:

1. North 86 degrees 53 minutes 26 seconds East, a distance of 220.91 feet to an angle point, thence;

2. South 89 degrees 32 minutes 18 seconds East, a distance of 310.63 feet to a point, thence;

3. Along the dividing line between proposed Lot 2 part of Parcel 41-5-133 and Parcel 41-5-134, lands now or formerly Frank's Nursery & Crafts, Inc., South 17 degrees 32 minutes 30 seconds East, a distance of 97.94 feet to a point, thence;

4. Along the dividing line between proposed Lot 2 part of Parcel 41-5-133 and Parcel 41-5-136, lands now or formerly Wal-Mart Stores, Inc., South 72 degrees 27 minutes 30 seconds West, a distance of 499.74 feet to a point, thence;

5. Along the common dividing line between Proposed Lot 2, Part of Parcel 41-5-133 and Parcel 41-5-129.01F, lands now or formerly DCCAI and Parcel 41-5-131, lands now or formerly Tabas, North 19 degrees 45 minutes 11 seconds West, a distance of 249.19 feet to the point and place of beginning.

Containing 89,298 square feet or 2.050 acres

11631766   B: 9820 P: 389   MTG
09/27/201801.39 PM      Page 32 of 37
FIRST AMERICAN TITLE INSURANCE COMPANY

© M&T Bank, 2014

This description was written with reference to a map entitled "Offsite Basin Plans, Wolfson-Verrichia Group, Inc., Main Street at Exton, Route 100 & Route 30 bypass, West Whiteland Township, Chester Co., PA, Subdivision Plan", prepared by Bohler Engineering, Inc., dated 6/14/01, last revised 8/21/01, Revision No. 2, Project No. P96124, CAD I.D. No. P96124SUB-OSB12, Sheet 1 of 1 and recorded 12/20/2001 in Chester County Plan No. 16051.

This description was also written with reference to a map entitled "Final Land Development Plans, Wolfson-Verrichia Group, Inc., Main street at Exton, Route 100 & Route 30 bypass, West Whiteland Township, Chester Co., PA, Subdivision Plan", prepared by Bohler Engineering, Inc., dated 3/1/99, last revised 8/21/01, Revision No. 12, Project No. P96124, CAD I.D. No. P96124SA-OSB-12, Sheet 3 of 125.

BEING known as the "detention basin" lot

BEING commonly known as 109 Commerce Drive

BEING Tax Parcel 41-5-133.1

Parcel B

ALL THAT CERTAIN lot or piece of ground, with the buildings and improvements thereon erected, situate in West Whiteland Township, Chester County, Commonwealth of Pennsylvania, more fully described as follows:

Beginning at a point along the Easterly right-of-way line of Indian Run Street (variable width right-of-way), said point also being the dividing line between Lot 7, Tax Map Parcel 41-5-138.6, lands now or formerly, Main Street at Exton L.P., and Lot 5, Tax Map Parcel 41-5-13.8.4,. lands now or formerly, Main Street at Exton LP., and from said point of beginning running, thence;

1. Along the Easterly right-of-way line of said Indian Run Street, North 13 degrees 57 minutes 22 seconds West, a distance of 419.00 feet to a point, thence;

The following six (6) courses and distances along the dividing line between Lot 7 and Lot 9, Tax Map Parcel 41-5-138.00; lands now or formerly, Main Street Exton L.P.:

2. North 76 degrees 02 minutes 38 seconds East, a distance of 132.17 feet to a point, thence;

3. South 13 degrees 57 minutes 22 seconds East, a distance of 68.00 feet to a point, thence;

4. North 76 degrees 02 minutes 38 seconds East; a distance of 161.00 feet to a point, thence;

5. South 13 degrees 57 minutes 22 seconds East, a distance of 126.00 feet to a point; thence;

6. South 70 degrees 33 minutes 27 seconds East, a distance of 71.87 feet to a point, thence;

7. North 89 degrees 31 minutes 40 seconds East, a distance of 15.34 feet to a point, thence;

8. Along the dividing line between Lot 7 and Lot 8, Tax Map Parcel 41-5-138.07, lands now or formerly, Main Street at Exton, L.P., South 13 degrees 57 minutes 22 seconds East, a distance of 100.86 feet to a point; thence;

9. Along the dividing line between Lot 7 and Lot 14, Tax Map Parcel 41-5-138.07, lands now or formerly, Main Street at Exton, L.P., South 76 degrees 02 minutes 38 seconds West a distance of 14.91 feet to a point, thence;

11631766   B: 9820 P: 390   MTG
09/27/201801:39 PM        Page 33 of 37
FIRST AMERICAN TITLE INSURANCE COMPANY

© M&T Bank, 2014

10. Along the same, South 13 degrees 57 minutes 22 seconds East a distance of 81.00 feet to a point, thence;

11. Along the dividing line between Lot 7 and Lot 5, South 76 degrees 02 minutes 38 seconds West, a distance of 353.17 feet to a point on the Easterly right-of-way line of said Indian Run Street and the point and place of beginning.

Containing 125,734 square feet or 2.886 acres

This description was written based upon a map entitled "Boundary Exhibit, Wolfson-Verrichia Group, Inc., Commerce Drive & Main Street, Tax Map Parcel #41-5-138.7, Lot 8, West Whiteland Township, Chester County, Pennsylvania", prepared by Control Point Associates, Inc., dated 7/3/2007, File No. CP97090.02, Lot 8, Sheet 1 of 1.

BEING known as Lot 7

BEING commonly known as 259 Indian Run

BEING Tax Parcel 41-5-138.6

Parcel C

ALL THAT CERTAIN lot or piece of ground, with the buildings and improvements thereon erected, situate in West Whiteland Township, Chester County, Commonwealth of Pennsylvania, more fully described as follows:

Beginning at a point on the Easterly right-of-way line of Indian Run Street at its intersection with the dividing line between Lot 9, Tax Map Parcel #41-5-138.8, lands now or formerly Main Street Exton, L.P., & Lot 7, Tax Map Parcel #41-5-138.6, lands now or formerly Main Street Ashbridge, and from said point of beginning running, thence;

Along the said Easterly right-of-way line of Indian Run Street, North 13 degrees 57 minutes 22 seconds West, a distance of 126.24 feet to a point, thence;

Continuing along the same, North 17 degrees 32 minutes 31 seconds West, a distance of 34.10 feet to a point, thence;

Along the dividing line between Lot 9 & Lot 13, North 72 degrees 31 minutes 16 seconds East, a distance of 719.35 feet to a point, thence;

Along the dividing line between Lot 9 & an area designated as open space "A.", South 13 degrees 57 minutes 22 seconds East, a distance of 343.88 feet to a point, thence;

The following three (3) courses and distances along the dividing line between Lot 9 & Lot 8:

South 76 degrees 02 minutes 38 seconds West, a distance of 293.73 feet to a point, thence;

South 13 degrees 57 minutes 22 seconds East, a distance of 25.71 feet to a point, thence;

Along the arc of a non-tangent curve to the left an arc length of 96.57 feet, said curve has a radius of 75.02 feet and a chord of South 22 degrees 55 minutes 59 seconds West, a distance of 90.04 feet to a point, thence;

The following six (6) courses and distances along the dividing line between Lot 9 and Lot 7:

© M&T Bank, 2014

North 89 degrees 31 minutes 40 seconds West, a distance of 15.34 feet to a point, thence;

North 70 degrees 33 minutes 27 seconds West, a distance of 71.87 feet to a point, thence;

North 13 degrees 57 minutes 22 seconds West, a distance of 126.00 feet to a point, thence;

South 76 degrees 02 minutes 38 seconds West, a distance of 161.00 feet to a point, thence;

North 13 degrees 57 minutes 22 seconds West, a distance of 68.00 feet to a point, thence;

South 76 degrees 02 minutes 38 seconds West, a distance of 132.17 feet to the point and place of beginning.

This description was written based upon a map entitled "Boundary Exhibit, Wolfson-Verrichia Group. Inc., Commerce Drive & Main Street, Tax Map Parcel #41-5-138.7, Lot 8, West Whiteland Township, Chester County, Commonwealth of Pennsylvania", prepared by Control Point Associates, Inc., dated 7/3/2007, File No. CP97090.02Lot8, Sheet 1 of 1.

BEING known as Lot 9

BEING commonly known as 210 Main Street

BEING Tax Parcel 41-5-138.8

Parcel D

ALL THAT CERTAIN lot or piece of ground, with the buildings and improvements thereon erected, situate in West Whiteland Township, Chester County, Commonwealth of Pennsylvania, more fully described as follows:

Beginning at a point along the Northwesterly right-of-way line of Commerce Drive (variable width right-of-way), said point also being the dividing line between Lot 10 and Lot 11, the following two (2) courses from a point formed by the intersection of the Westerly right-of-way line of Pennsylvania State Highway Route 100 (a.k.a. Pottstown Pike, a.k.a. LR 147, variable width right-of-way), at its intersection with the Northwesterly right-of-way line of said Commerce Drive:

a. Along the arc of a curve to the right, having a radius of 100.00 feet, a central angle of 87 degrees 17 minutes 25 seconds, an arc length of 152.35 feet, a chord bearing South 28 degrees 48 minutes 47 seconds West and a chord distance of 138.04 feet to a point of tangency, thence;

b. Along the Northwesterly right-of-way line of said Commerce Drive, South 72 degrees 27 minutes 30 seconds West, a distance of 682.00 feet to the true point and place of beginning, and from said point of beginning running; thence;

The following eleven (11) courses and distances along the Northwesterly right-of-way line of said Commerce Drive:

1. South 72 degrees 27 minutes 30 seconds West, a distance of 9.52 feet to a point, thence;

2. North 17 degrees 32 minutes 30 seconds West, a distance of 14.00 feet to a point, thence;

3. South 72 degrees 27 minutes 30 seconds West, a distance of 240.58 feet to a point, thence;

Unofficial Copy

4. North 17 degrees 32 minutes 30 seconds West, a distance of 5.50 feet to a point, thence

5. South 72 degrees 27 minutes 30 seconds West, a distance of 227.83 feet to a point, thence;

6. South 17 degrees 32 minutes 30 seconds East, a distance of 20.00 feet to a point, thence;

7. South 72 degrees 27 minutes 30 seconds West, a distance of 231.79 feet to an angle point, thence;

8. South 70 degrees 27 minutes 30 seconds West, a distance of 343.84 feet to an angle point, thence;

9. South 72 degrees 27 minutes 30 seconds West, a distance of 120.62 feet to a point of curvature, thence;

10. Along the arc of a curve to the right, having a radius of 346.00 feet, a central angle of 33 degrees 53 minutes 55 seconds, an arc length of 204.71 feet, a chord bearing South 89 degrees 24 minutes 27 seconds West and a chord distance of 201.74 feet to a point of tangency, thence;

11. North 73 degrees 38 minutes 36 seconds West, a distance of 378.77 feet to a point on the Easterly right-of-way line of said Commerce Drive, thence;

12. Along the Easterly right-of-way line of said Commerce Drive, along the arc of a non-tangent curve to the left, having a radius of 52.00 feet, a central angle of 09 degrees 28 minutes 52 seconds, an arc length of 8.60 feet, a chord bearing North 15 degrees 21 minutes 38 seconds West and a chord distance of 8.59 feet to a point of non-tangency, thence;

The following two (2) courses and distances along the dividing line between Lot 10 and Lot 121.1F, lands now or formerly Rental Parsons 1:

13. North 69 degrees 53 minutes 44 seconds East, a distance of 204.77 feet to a point, thence;

14. North 19 degrees 30 minutes 54 seconds West, a distance of 28.21 feet to a point, thence;

15. Along the common dividing line between Lot 10 and Lot 133, lands now or formerly Hagee and Lot 134, lands now or formerly Frank's Nursery & Crafts, Inc., North 72 degrees 27 minutes 30 seconds East, a distance of 878.30 feet to a point, thence;

The following two (2) courses and distances along the dividing line between Lot 10 and Lot 134, lands now or formerly Frank's Nursery & Crafts, Inc,:

16. North 17 degrees 32 minutes 30 seconds West, a distance of 112.00 feet to a point, thence;

17. North 72 degrees 27 minutes 30 seconds East, a distance of 599.11 feet to a point, thence;

18. Along the dividing line between Lot 10 and Lot 11, South 17 degrees 32 minutes 30 seconds East, a distance of 415.50 feet to a point on the Northwesterly right-of-way line of said Commerce Drive and the point and place of beginning.

Containing 517,727 square feet or 11.885 acres

This Description is written with reference to a Map entitled "Final Land Development Plans, Wolfson-Verrichia Group, Inc., Main Street at Exton, Route 100 & Route 30 Bypass, West Whiteland Township, Chester Co., PA, subdivision Plan", prepared by Bohler Engineering, Inc., dated 3/1/99 last revised 5/31/01, Project No. P96124, Sheet 3A of 123.

11631766  B: 9820 P: 393  MTG
09/27/201801:39 PM      Page 36 of 37
FIRST AMERICAN TITLE INSURANCE COMPANY            M&T Bank, 2014

TOGETHER WITH the benefit of the easements appurtenant to the Land as in that certain Declaration of Easements, Conditions and Restrictions as set forth in Record Book 5052 Page 259, re-recorded in Record Book 5107 Page 409, First Amendment in Record Book 6139 Page 2118.

BEING known as Lot 10

BEING commonly known as 103 Commerce Drive

BEING Tax Parcel 41-5-138.9

BEING (As to Parcel A) the same premises which Sarr Real Estate, LP, a Delaware limited partnership, by Deed dated 01/10/2011 and recorded 01/28/2011 in Chester County at Record Book 8108 Page 1473, granted and conveyed unto Main Street Cinema L.P., a Pennsylvania limited partnership, in fee.

BEING (As to Parcel B) the same premises which Main Street Ashbridge, L.P., a Pennsylvania limited partnership, by Deed of Confirmation dated 07/26/2007 and recorded 07/27/2007 in Chester County at Record Book 7223 Page 1177, granted and conveyed unto Main Street Ashbridge, L.P., a Pennsylvania limited partnership, in fee.

BEING (As to Parcel C) the same premises which Main Street Ashbridge, L.P., a Pennsylvania limited partnership, by Deed of Confirmation dated 07/26/2007 and recorded 07/27/2007 in Chester County at Record Book 7223 Page 1184, granted and conveyed unto Main Street Ashbridge, L.P., a Pennsylvania limited partnership, in fee.

BEING (As to Parcel D) the same premises which Wal-Mart Stores, Inc., a Delaware corporation, by Deed dated 08/14/2001 and recorded 08/30/2001 in Chester County at Record Book 5052 Page 163, granted and conveyed unto Main Street Cinema L.P., a Pennsylvania limited partnership, in fee.

AND THE SAID Main Street Cinema, L.P., by Certificate of Amendment to its Certificate of Incorporation filed with the Secretary of the State of the State of Pennsylvania on January 22, 2015 changed its name to and is now known as Main Street Phase II, L.P., a Pennsylvania limited partnership.

AND THE SAID Main Street Ashbridge, L.P., by Certificate of Amendment to its Certificate of Incorporation filed with the Secretary of the State of the State of Pennsylvania on January 22, 2015 changed its name to and is now known as Main Street Phase III, L.P., a Pennsylvania limited partnership.



11631766  B: 9820 P: 394  MTG
09/27/201801:39 PM      Page 37 of 37
FIRST AMERICAN TITLE INSURANCE COMPANY

[Exhibit A to Mortgage]

© M&T Bank, 2014

# EXHIBIT 2



**Sandhya M. Feltes**
Direct Dial: (610) 941-2561
Direct Fax: (610) 684-2011
Email: sfeltes@kaplaw.com
www.kaplaw.com

July 18, 2022

<u>**VIA EMAIL**</u>

Noah H. Charlson, Esq.
Charlson Braber McCabe & Denmark, P.C.
1628 JFK Blvd., Suite 1803
Philadelphia, PA 19103

>      RE:   **Fidelity and Deposit Company of Maryland v. Main Street Phase II, L.P.,**
>            **et al.**
>            **USDC ED PA No. 21-3576**

Counsel:

Main Street Phase II, L.P. ("Main Street") is in receipt of Fidelity and Deposit Company of Maryland's ("F&D") Subpoena To Produce Documents, Information or Objects directed to M&T Bank ("F&D's Subpoena").  Main Street objects to the Subpoena and demands that F&D withdraw the Subpoena no later than close of business on <u>July 19, 2022</u>.

F&D's Subpoena demands the production of information regarding the construction financing obtained by Main Street for the Project, including, but not limited to, documents and communications relating to the Mortgage, Note, construction loan, loan agreements and letters of credit.  F&D's Subpoena also demands the production of documents and communications relating to Main Street's loan payments, amounts currently owed on the loan(s), and/or defaults under the loan documents.

F&D's Subpoena violates Fed.R.Civ.P. 26 and 45. The Subpoena improperly seeks confidential information, seeks irrelevant information not related to the parties' claims or defenses, is vastly over broad and was issued for the purpose of harassing Main Street.   Main Street's objections to F&D's Subpoena include, but are not limited to, the following:

F&D's Subpoena demands the production of information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in violation of Fed.R.Civ.P. 26(b)(1).  The disputes between Main Street, F&D and JMB arise from the Construction Contract, the Performance Bond and the Liquidated Damages Agreement.  Main Street contends that JMB and F&D breached the Construction Contract, Performance Bond and

**Kaplin Stewart**
Union Meeting Corporate Center
910 Harvest Drive, P.O. Box 3037
Blue Bell, PA  19422-0765
610-260-6000 tel

*Offices in*
Pennsylvania
New Jersey

7801491v1

Noah H. Charlson, Esquire
July 18, 2022

Liquidated Damages Agreement by, *inter alia*, failing to complete the Ashbridge Project in accordance with the Contract Documents and by failing to pay Main Street the full amount of liquidated damages due and owing to Main Street.  F&D contends that Main Street breached the Liquidated Damages Agreement by failing to deposit certain funds into an escrow account.

M&T Bank's records regarding the construction loan obtained by Main Street to finance the Project have no bearing on the parties' breach of contract claims against each other.  There is no claim or defense which implicates the construction financing.  And, there is no contention that the construction financing in any way caused or affected JMB's/F&D's failure to properly or timely construct the Ashbridge Project or Main Street's alleged obligation to deposit funds into an escrow account.

F&D's Subpoena demands the disclosure of Main Street's confidential commercial and confidential financial information, which information is protected from disclosure under Fed.R.Civ.P. 45(d)(3)(A)(iii) and 45(d)(3)(B)(i).  *See also*, *Countryman v. Cmty. Link Fed. Credit Union*, 2012 WL 1143572, at *3 (N.D. Ind. Apr. 3, 2012) ( '[b]usinesses have a legitimate interest in the privacy of their financial information that can confer standing to challenge a subpoena to a third party to produce that information.'); *Green v. Cosby*, 216 F. Supp. 3d 560, 564 (E.D. Pa. 2016) (explaining that personal rights or interests exist in bank accounts).  The information demanded by F&D contains commercially confidential information about Main Street and its finances, and the finances of Main Street's partners.  Disclosure of this protected confidential commercial and financial information could harm Main Street and its partners.

F&D's Subpoena is overbroad and exceeds the scope of discovery allowed by Fed.R.Civ.P. 26.  For example, the Subpoena demands the production of communications and documents, not only from and to Main Street, but also from and to Main Street's "members, partners, directors, officers, employees, agents, affiliates, representatives, consultants and attorneys".  F&D's Subpoena is also overbroad because it requires the production of communications and documents, not only from and to M&T Bank, but also from and to M&T Bank's "members, partners, directors, officers, employees, agents, affiliates, representatives, consultants, and attorneys".

Based on the above, and for other reasons which will be detailed to the Court, if necessary, it is clear that F&D's Subpoena constitutes a fishing expedition, intended to harass Main Street and to interfere with and/or harm Main Street's business relationship with M&T Bank.

Main Street will file a Motion to Quash F&D's Subpoena to M&T Bank if F&D does not withdraw the Subpoena by close of business on July 19, 2022.  Main Street is available to meet and confer regarding this discovery dispute on July 18th  or July 19th.

Noah H. Charlson, Esquire
July 18, 2022

Sincerely,

Sandhya M. Feltes

cc:    Christopher J. Brasco, Esquire, via Email
       Adam Tuckman, Esquire, via Email
       Steven Coren, Esquire, via Email
       Marc B. Kaplin, Esquire via Email

7801491v1

# EXHIBIT 3



**Sandhya M. Feltes**
Direct Dial: (610) 941-2561
Direct Fax: (610) 684-2011
Email: sfeltes@kaplaw.com
www.kaplaw.com

July 25, 2022

<u>**VIA EMAIL**</u>

Noah H. Charlson, Esq.
Charlson Braber McCabe & Denmark, P.C.
1628 JFK Blvd., Suite 1803
Philadelphia, PA 19103

> RE:   **Fidelity and Deposit Company of Maryland v. Main Street Phase II, L.P**
> **USDC ED PA No. 21-3576**

Counsel:

 This follows up on my July 15, 2022 and July 18, 2022 letters and our July 19, 2022 meet and confer regarding subpoenas issued by F&D in the above matter.

**F&D's Subpoena to M&T Bank**. As stated in the July 18th  letter and during our meet and confer, it is Main Street's position that the documents subpoenaed from M&T Bank are not discoverable under Fed.R.C.P. 26.  The documents are not relevant to any claims or defenses asserted and will not lead to the discovery of admissible evidence, the Subpoena is overbroad, and the documents requested implicate Main Street's privacy rights and various privileges.  We reiterate the previously stated objections and Main Street's demand that F&D's subpoena be withdrawn.

**F&D's Subpoenas to Northstar Owner's Representation, Bozzuto Management, Bernardon, Bohler Engineering, Advantage Engineers, McMahon Associates and Advanced Engineers**.  Main Street made clear in its July 15, 2022 letters and during the July 19th meet and confer that these third-parties are in possession of documents which are protected from disclosure by various privileges arising, in part, from their roles as Main Street's consulting experts.  Main Street objects to F&D's July 19, 2022 Subpoenas to Advanced Engineers on the same basis.

**Kaplin Stewart**
Union Meeting Corporate Center
910 Harvest Drive, P.O. Box 3037
Blue Bell, PA  19422-0765
610-260-6000 tel

*Offices in*
Pennsylvania
New Jersey

7801491v1

Noah H. Charlson, Esquire
July 25, 2022


In order to avoid motion practice, Main Street scheduled a meet and confer to discuss the F&D's Third-Party Subpoenas.  Main Street also proposed that the third-parties produce documents responsive to F&D's Subpoenas to Main Street to allow Main Street to review and redact the documents for privilege.

You requested until close of business on Friday, July 19, 2022 to provide F&D's response to Main Street's objections and proposal.  We have not received F&D's response.  Accordingly, Main Street will seek relief from the Court.


Sincerely,

Sandhya M. Feltes


cc:     Christopher J. Brasco, Esquire, via Email
        Adam Tuckman, Esquire, via Email
        Steven Coren, Esquire, via Email
        Marc B. Kaplin, Esquire via Email

## <u>CERTIFICATE OF SERVICE</u>

The undersigned does hereby certify that on July 25, 2022, the undersigned caused a true

and correct copy of the foregoing Motion to Quash Plaintiff's Subpoena to M&T Bank to be served

via ECF Electronic Notification upon the following:

Noah H. Charlson, Esq.
Charlson Braber McCabe & Denmark, P.C.
1628 JFK Blvd., suite 1803
Philadelphia, PA 19103

Christopher J. Brasco, Esquire
Noah R. Meissner, Esquire
Adam M. Tuckman, Esquire
Watt Tieder Hoffar & Fitzgerald, LLP
1765 Greensboro Station Place, Suite 100
McLean, VA 22102

**KAPLIN STEWART MELOFF REITER & STEIN, P.C.**

/s/  Sandhya M. Feltes
Sandhya M. Feltes, Esq.
Union Meeting Corporate Center
910 Harvest Drive. P.O. Box 3037
Blue Bell, PA 19422
(610) 941-2561
(610) 684-2011 (fax)
sfeltes@kaplaw.com
Attorneys for Defendants
Main Street Phase II, L.P. and Main Street Phase III, L.P.